No. 2014-1349

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————

E-LYNXX CORPORATION,

*Plaintiff - Appellant,*

v.

INNERWORKINGS, INC. AND CIRQIT.COM, INC.,

*Defendants - Appellees*

———————————

Appeal from the United States District Court for the Middle District of
Pennsylvania in Civil Action No. 1:10-cv-2535, Chief Judge Christopher C. Conner

———————————————————————————————

### BRIEF FOR PLAINTIFF-APPELLANT E-LYNXX CORPORATION
———————————————————————————————

MARK D. STRACHAN
DARREN P. NICHOLSON
SAYLES | WERBNER PC
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

JONATHAN T. SUDER
BRETT M. PINKUS
FRIEDMAN, SUDER & COOKE PC
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400

Dated: June 9, 2014

# CERTIFICATE OF INTEREST

Counsel for e-LYNXX Corporation, certifies the following:

1.    The full name of every party or amicus represented by me is: e-LYNXX Corporation.

2.    The name of the real party in interest I represent is: e-LYNXX Corporation.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**SAYLES | WERBNER PC:** Mark D. Strachan and Darren P. Nicholson

**FRIEDMAN, SUDER & COOKE. PC:** Jonathan T. Suder and Brett M. Pinkus


Dated: June 9, 2014

/s/ Mark Strachan

*Counsel of Record*
Mark D. Strachan
SAYLES | WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES .....................................................................iv

STATEMENT OF RELATED CASES ...................................................1

INTRODUCTION ...................................................................................2

JURISDICTIONAL STATEMENT ........................................................4

STATEMENT OF THE ISSUES..............................................................5

STATEMENT OF THE CASE..................................................................6

STATEMENT OF FACTS ........................................................................7

    A.   The Parties ..................................................................................7

    B.   The Asserted Patents ..................................................................8

    C.   Relevant Prosecution History ..................................................15

    D.   Accused Systems ......................................................................17

    E.   District Court Proceedings Relevant to This Appeal ...............18

SUMMARY OF THE ARGUMENT .....................................................22

ARGUMENT ........................................................................................24

I.     STANDARD OF REVIEW .........................................................24

II.    THE DISTRICT COURT'S SUMMARY JUDGMENT IN FAVOR OF INNERWORKINGS SHOULD BE REVERSED BECAUSE THE COURT MISCONSTRUED AND MISAPPLIED THE TERMS "BUYER" AND "POOL OF VENDORS ASSOCIATED WITH SAID BUYER."..................................................................................26

    A.   The District Court's Construction of "Buyer" is Unnecessary and Contrary to Its Plain and Ordinary Meaning. ...........................................27

B. The District Court's Construction of "Buyer" is Contrary to the Claims and Specification of the Asserted Patents. ...................................28

C. The District Court's Application of the Term "Buyer" to InnerWorkings' PPM4 System Demonstrates Why Its Construction of the Term "Buyer" is Wrong. ...................................................32

D. The District Court's Application of the Phrase "a Pool of Vendors Associated with Said Buyer" Is Also Erroneous. .......................................36

    1. Because There are Two or More Vendors Associated with InnerWorkings in the PPM4 System, the District Court Erred by Finding No "Pool of Vendors Associated with Said Buyer" in that System. ...................................................................36

    2. The District Court Erred by Concluding During Summary Judgment That a "Subset" of Vendors Must Be Created "Before" a Comparison Is Run by the Accused System. .................37

III. THE DISTRICT COURT'S SUMMARY JUDGMENT IN FAVOR OF CIRQIT SHOULD BE REVERSED BECAUSE THE COURT MISCONTRUED AND MISAPPLIED THE TERM "VENDOR CAPABILITY DATA." ...................................................................41

A. The District Court Found a Disclaimer of "Goods Sold" from "Vendor Capability Data" Where None Exists .......................................43

B. The District Court Overstated the Scope of the Prosecution Disclaimer of "Goods Sold" to Exclude Certain Capabilities of Vendors to Produce Unfinished Goods from the Scope of "Vender Capability Data" ...................................................................46

C. The District Court's Judgment of Non-infringement for Cirqit Should Be Vacated Because It Wrongly Infers that "Supplier Types" and "Supported Products" in the Order-It System Are "Goods Sold" Disclaimed from "Vendor Capability Data" .....................53

CONCLUSION .......................................................................60

CERTIFICATE OF COMPLIANCE .......................................................................61

CERTIFICATE OF FILING AND SERVICE .......................................................................62

iii

# TABLE OF AUTHORITIES

## CASES

*Abraxis Bioscience, Inc. v. Mayne Pharm. (USA) Inc.*,
    467 F.3d 1370 (Fed. Cir. 2006) .....................................................26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................25

*Bai v. L & L Wings*,
    160 F.3d 1350 (Fed. Cir. 1998) .....................................................25

*CyberCorp v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) .....................................25

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999) .......................................................28

*Fitness Quest, Inc. v. Monti*,
    330 Fed. Appx. 904 (Fed. Cir. 2009) ............................................59

*Gemmy Indus. Corp. v. Chrisha Creations Ltd.*,
    452 F.3d 1353 (Fed. Cir. 2006) ...............................................25, 59

*IMS Tech, Inc. v. Haas Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000), cert. denied,
    530 U.S. 1299 (2000) ....................................................................44

*Laryngeal Mask Co. Ltd. v. Ambu*,
    618 F.3d 1367 (Fed. Cir. 2010) .....................................................26

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    744 F.3d 1272 (Fed. Cir. Feb. 21, 2014) (en banc) ......................25

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
    215 F.3d 1281 (Fed. Cir. 2000) .....................................................46

*O2 Micro Int'l Ltd v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) .....................................................27

iv

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ..............................................44, 46

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
    469 F.3d 978 (Fed. Cir. 2006) ....................................................24

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) ..................................................26

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .............................28, 29, 30, 31, 32

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    82 F.3d 1298 (Fed. Cir. 1999) ....................................................25

*SanDisk Corp. v. Memorex Prods.*,
    415 F.3d 1278 (Fed. Cir. 2005) ............................................41, 52

*SuperGuide Corp. v. DirectTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ....................................................46

*United States v. United States Gypsum Co.*,
    333 U.S. 364 (1948)....................................................................26

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ............................................27, 28

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................28

## STATUTES AND RULES

FED. R. CIV. P. 56(c)......................................................................25

28 U.S.C. § 1295(a)(1).....................................................................4

28 U.S.C. § 1338(a) .........................................................................4

## OTHER AUTHORITY

*Merriam-Webster's Collegiate Dictionary*,
      Merriam-Webster, Inc. (11th ed. 2011) ....................................................28, 48

## STATEMENT OF RELATED CASES

Counsel for Appellant e-LYNXX Corporation ("e-LYNXX") is not aware of any other case pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in this case.

## INTRODUCTION

e-LYNXX is a print procurement management company and the owner of U.S. Patent Nos. 7,451,106 (the "'106 Patent") and 7,788,143 (the "'143 Patent), (collectively the "Asserted Patents"). The '106 and '143 Patents teach a novel procurement system and method that facilitates matching of a buyers' unique job requirements with a vendors' unique capabilities to secure competitive bids for custom goods and services, such as custom print. Unlike off-the-shelf items sold from inventory, custom goods and services are highly tailored. As a result, competitive bidding of custom goods was traditionally slow and cumbersome with buyers forced to sacrifice price, time, quality, or a combination of all three. The '106 and '143 Patents solved this vexing problem, often called the "iron triangle."

e-LYNXX alleges that two of its competitors, InnerWorkings, Inc. ("InnerWorkings") and Cirqit.com, Inc. ("Cirqit") use print procurement systems that directly infringe upon these patents. Specifically, InnerWorkings uses its system called PPM4, and Cirqit created and sold a system called Order-It. Both systems permit users to competitively bid customized print by matching specific job requirements with unique vendor capabilities in the same manner as disclosed in e-LYNXX's patents.

In construing the claim terms of the Asserted Patents, the District Court (i) defined the term "buyer" to mean the "the ultimate purchaser of customized goods

or services," [A000117-119, 162]; (ii) defined the phrase "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer," [A000141, 162]; and (iii) defined the term "vendor capability data" to mean "two or more capabilities of a vendor to manufacture or produce a customized good or service and excluding the vendor's name, contact information, payment preferences, type of business and goods sold." [A000125-26]. Based on these constructions, the District Court granted summary judgment in favor of InnerWorkings because the PPM4 system did not permit "buyers" direct access and did not create "a vendor pool associated with said buyer." The District Court granted summary judgment in favor of Cirqit because the Order-It system did not store "vendor capability data" as construed.

e-LYNXX appeals the entries of judgment in favor of InnerWorkings and Cirqit based on the District Court's erroneous claim construction, which improperly imported limitations into the claims. In addition, even if those claims were properly construed, e-LYNXX appeals the erroneous application of those constructions to InnerWorkings' and Cirqit's respective systems.

e-LYNXX requests that this Court reverse the District Court's erroneous claim construction, reverse the District Court's entry of judgment in favor of InnerWorkings and Cirqit, and remand this case for trial.

# JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a). This Court has jurisdiction based on 28 U.S.C. § 1295(a)(1). The District Court entered summary judgments on July 25, 2013, holding that the claims asserted in the '106 and '143 Patents were not infringed by either Defendant-Appellees InnerWorkings or Cirqit. A motion for reconsideration was timely filed and denied by the District Court on February 6, 2014. e-LYNXX timely filed a notice of appeal on March 5, 2014. On March 20, 2014, all remaining claims were dismissed by the District Court making the District Court's previously entered judgments final. e-LYNXX timely filed an amended notice of appeal on March 25, 2014.

## STATEMENT OF THE ISSUES

(1)      Whether the District Court erred in its construction and application of the term "buyer" in the '106 Patent resulting in an erroneous summary judgment of non-infringement in favor of InnerWorkings.

(2)      Whether the District Court erred in its construction and application of the phrase "a pool of vendors associated with said buyer" in the '143 Patent resulting in an erroneous summary judgment of non-infringement in favor of InnerWorkings.

(3)      Whether the District Court erred in its construction and application of the term "vendor capability data" in the '106 and '143 Patents resulting in an erroneous summary judgment of non-infringement in favor of Cirqit.

## STATEMENT OF THE CASE

e-LYNXX is a print procurement software and management company based in Chambersburg, Pennsylvania, which owns and practices the '106 and '143 Patents, "System and Method for Competitive Pricing and Procurement of Customized Goods and Services." e-LYNXX filed suit against two competitors, InnerWorkings and Cirqit, in the United States District Court for the Middle District of Pennsylvania, alleging infringement of the '106 and '143 Patents. [A004509] e-LYNXX asserts that InnerWorkings' PPM4 system and Cirqit's Order-It system directly infringe both patents. *Id.*

During claim construction the District Court construed the term "buyer" as used in both patents to mean "the ultimate purchaser of customized goods or services." [A000117-119, 162] The District Court construed the phrase "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." [A000141, 162] Finally, the District Court construed the term "vendor capability data" to mean "two or more capabilities of a vendor to manufacture or produce a customized good or service and excluding the vendor's name, contact information, payment preferences, type of business and goods sold." [A000125-26]

The District Court granted summary judgment in favor of InnerWorkings on two separate grounds. First, the District Court found there was no direct

infringement by InnerWorkings of the '106 Patent because "buyers," as the District Court had construed the term, did not have access to the PPM4 system. [A000183-188] Second, the District Court found that there was no direct infringement of the '143 Patent because InnerWorkings' system did not have "a pool of vendors associated with said buyer," based on the court's conclusion that its construction "require[d] that a subset of vendors be drawn from a database before running a job specification." [A000188-191 (emphasis added)]

The District Court also granted summary judgment in favor of Cirqit because the Order-It system did not store "vendor capability data," as the court had construed that phrase. [A000191-195]

e-LYNXX appeals the entry of the summary judgments for InnerWorkings and Cirqit in addition to the District Court's claim construction rulings on which those summary judgments were based.

## STATEMENT OF FACTS

### A.     The Parties

Plaintiff-Appellant e-LYNXX is a Pennsylvania corporation headquartered in Chambersburg, Pennsylvania. e-LYNXX is the assignee of the Asserted Patents from the named inventor William A. Gindlesperger. [A004509, 04512-4513] Mr. Gindlesperger is the Founder and Chairman of e-LYNXX. e-LYNXX practices the

Asserted Patents with its Print Management Center software, a proprietary competitive print-procurement and management software platform.

Defendant-Appellee InnerWorkings, Inc., is a Delaware corporation headquartered in Chicago, Illinois. [A004509] InnerWorkings procures, manages, and delivers print materials for their customers through a system known as the Print Procurement Manager 4 ("PPM4"). [A000171, 004514] InnerWorkings does not print materials itself. Rather, using the PPM4 system, InnerWorkings competitively procures print materials from vendors using the PPM4 system, and then resells this print its customers at a mark-up. [A000171, 201]

Defendant-Appellee Cirqit is a Delaware Corporation headquartered in Whippany, New Jersey. [A000171, 004511] Until October 2009, Cirqit offered a web-based competitive print procurement system known as Order-It. [A000172] The Order-It system facilitates a buyer's selection of a print vendor by comparing job specifications requested by the buyer with vendor capabilities. In October 2009, Cirqit sold its assets to LogicSource, Inc. in exchange for an ownership interest. [A000171] LogicSource, Inc. is not a party to this proceeding.

### B.     The Asserted Patents

e-LYNXX's infringement action is directed to procurement systems covered by the '106 and '143 Patents. [A000052-76, 77-108] The procurement systems and associated methods that have been patented under the Asserted Patents involve

competitive bidding on customized goods and services. [A000052, 77] Customized goods and services, such as print and other types of digitally mastered information product goods (e.g. CD's and DVD's) and services, differ from non-custom goods or services in that the former are generally not pre-stocked as commercial "off-the-shelf" items but, instead, must be specifically manufactured to meet the buyers particular requirements at the time they are being ordered or requisitioned. [A000067, 97] The use of a competitive bidding process typically seeks to ensure the best relative value for the buyer and the opportunity for work by qualified vendors. [A000067-68, 166-167]

The inventor of the Asserted Patents and Founder of e-LYNXX, William A. Gindlesperger, using his over 30-years of experience in both supply chain management and print procurement, identified three glaring problems with the previously available procurement systems: (1) the lack of automated communication and workflow management; (2) the absence of systems designed specifically for the procurement of *customized* goods or services; and (3) the inability of existing systems to create a competitive bidding environment that leverages the excess production capacity of qualified vendors. [A000067-68, 003144]

Mr. Gindlesperger invented and developed the computer-operated systems covered by the Asserted Patents to fill this need. Broadly speaking, the claimed

systems use designated selection criteria to match the attributes of vendors in a pre-approved vendor pool with a buyer's project specifications to identify the qualified vendors and then disseminate a solicitation to the qualified vendors for bidding on the project. [A000052, 67-68] The result of using the claimed invention is the elimination or reduction of time-consuming assessments of the quality or capability of each vendor every time an individual job is solicited by introducing automation at key points in the process. [A000067-68, 74-75] This functionality enables a buyer or its agent to manage a large vendor base without costly administrative burdens so they can focus on budget planning, job preparation, internal customer service needs, production quality, and contract compliance. [A000067-68, 74-75] Additionally, the invention creates a unique competitive bidding environment that generates the submission of numerous bids containing low competitive pricing designed to fill excess production capacity on virtually every job being solicited, a process referred to as "contribution pricing." [A000067-68, 74-75, 110-113, 166-167] While this technology has become more common place today, in 1998, this ability to leverage excess production capacity through a single system was new, novel, and non-obvious. [A000067-68, 74-75, 3144-3145]

e-LYNXX asserted seven claims – independent claim 13 and dependent claims 13, 14, 15, 16, and 18 of the '106 Patent and independent claims 1 and 2 of the '143 Patent. Claim 13 of the '106 patent states:

A system for facilitating a buyer's selection of a vendor via automated comparison of records and based upon bidding by vendors of customized goods or services via a computer operated system, comprising:

a means for receiving electronic communications from a plurality of vendors prior to receiving job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

a means for receiving an electronic communication from any buyer using the system providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

a means for receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid;

a means for automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or

11

service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer;

a means for automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

a means for transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

a means for receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price;

and a means for outputting to said buyer an electronic communication providing at least one of said bid response data.

[A000106-07] Claims 14, 15, 16, and 18 of the '106 patent are dependent claims that refer back to independent claim 13. [A000107]

Claim 1 of the '143 patent states:

A method for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services via a computer operated system, comprising the steps of:

prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, receiving and processing electronic communications from a plurality of vendors, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

receiving an electronic communication from or on behalf of any buyer using the system which provides information identifying a

plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receiving an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor;

and outputting to said buyer an electronic communication providing at least one of said bid response data.

[A000075-76] Claim 2 of the '143 patent states:

A computer operated system for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services, the system comprising:

an electronic memory comprising a plurality of vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service; and

a computer processor associated with said electronic memory, the computer processor configured to:

receive and process electronic communications from a plurality of vendors, prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing the plurality of vendor records which are stored in the electronic memory;

receive an electronic communication from or on behalf of any buyer using the system which provides information identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receive an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically compare via the computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identify via the computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmit the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receive bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor; and

output to said buyer an electronic communication providing at least one of said bid response data.

[A000076]

## C.   Relevant Prosecution History

In the course of prosecution of the '106 Patent, the inventor filed Amendment F in response to the examiner's rejection in light of U.S. Patent No. 5,794,207, which was issued to three inventors including Jay S. Walker, a founder of Priceline ("Walker '207 Patent"). [A003099-4009]

In the relevant section of Amendment F, e-LYNXX argued that the claimed invention of Mr. Gindlesperger requires that "the vendor records include vendor capability data identifying a ***plurality*** of capabilities for the vendor." [A004005 (emphasis added)] In the course of so doing, e-LYNXX stated the following in distinguishing the Walker '207 Patent:

> Next, the Examiner has asserted that Applicant's recited steps of receiving a plurality of vendor records and receiving a job data from a buyer are satisfied by the seller database and CPO database (citing Column 13, lines 11-29 and Column 8, lines 42-56). However, Applicant's limitation with respect to the receipt of vendor records requires that the specified vendor records identify a plurality of capabilities for each of the plurality of vendors. Significantly, Applicant notes, that ***neither this portion of the Walker reference nor***

*any other portion of this reference details receipt of vendor records each of which identify multiple capabilities for each vendor*.

The cited portion of the specification describes the seller database and the CPO database. In regard to the seller database, the specification notes that the database maintains data on sellers with fields such as name, contact information, payment preferences, type of business, and the goods sold. (Lines 11-15 of column 13). *None of the referenced fields indicate that data regarding a plurality of capabilities for each vendor should be maintained for subsequent comparison*. . . . This claim specifically requires that the vendor records include vendor capability data indentifying a plurality of capabilities for the vendor. *Nothing in the referenced portion of the cited document or any other portion could reasonably be considered to be data identifying a plurality of capabilities of each vendo*r.

[A004004-5 (emphasis added)] e-LYNXX demonstrated that the Walker '207 Patent does not disclose a plurality (i.e. two or more) of vendor capabilities in the database by listing examples of specific categories in the seller database. Further illustrating this point, e-LYNXX explained:

The only portion which could remotely be considered to be capability data at all is the portion in column 13 at lines 18-23 which states that "[u]pon registration, the seller may be required to demonstrate evidence of ability to deliver on bound CPOs." Significantly, this portion of the document does not indicate that a plurality of capabilities for each vendor should be maintained for subsequent comparison. This portion of the cited reference actually teaches away from the presently claimed invention as it indicates that confirmation concerning any capability is made at the time of registration. This is contrary to Applicants (sic) claimed comparison.

[A004005-4006]

### D.    Accused Systems

While InnerWorkings sells print to its customers, InnerWorkings does not actually print products. As a result, InnerWorkings must outsource the production of the print that it resells to its customers. [A000171, 000201, 007835] InnerWorkings purchases or procures its print products using its PPM4 system. [A000171] PPM4 is a computer-based print procurement system used by InnerWorkings' print managers. [A000171] InnerWorkings' customers do not directly access PPM4, which stores a database that includes the capabilities of print vendors who have been "pre-certified" and pre-approved by InnerWorkings. [A000190, 007173-7176, 7218-7226, 7285-7295, 7383-7385] Print managers procure specific print jobs by entering job specifications for print materials into the PPM4 system, which are automatically matched with the job capabilities of certified vendors in the PPM4 database. [A000188-191, 007173-7176, 7218-7226, 7285-7295, 7383-7385]

This matching returns a list of vendors capable of fulfilling the order. From this list, the print management selects a vendor for a job, and the print manager contracts with the selected vendor who then prints the ordered materials, which InnerWorkings resells to its customer in a separate transaction. [A000188-191, 007835-7836, 007947-7948] InnerWorkings pays the print vendor according the terms of the contract, which is exclusively between the print vendor and

InnerWorkings. *Id.* InnerWorkings does not disclose the identity of the resale customer to the print vendor or vice versa. At no point are InnerWorkings' resale customers a party to the InnerWorkings' contract or purchase order with the print vendor. *Id.*

Unlike InnerWorkings, Cirqit does not buy or sell print products. Cirqit's Order-It system is strictly a web-based system which allows print buyers to submit invitations to bid to print vendors. [A000172] The buyer customers enter the desired job specifications, which are then compared with vendor capabilities. [A000172] The buyer customers may then evaluate the results of the comparison and select vendors to receive invitations to bid. [A000172]

### E. District Court Proceedings Relevant to This Appeal

e-LYNXX filed this action on December 14, 2010. [A000165] The District Court issued its claim construction on September 27, 2012. [A000109] The first pertinent term disputed by the parties is "buyer," which appears several times in the claims. During claim construction, the parties presented the District Court with two opposing constructions:

**"BUYER"**
('106 PATENT: CLAIM 13; '143 PATENT: CLAIMS 1, 2)

| e-LYNXX's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| e-LYNXX does not believe that any construction of this term is necessary. But to the extent the Court decides to construe this term, "buyer" means:  "one who makes a purchase." | "ultimate purchaser of customized goods or services" (synonym: buyer using the system) |

[A000370-75] The District Court adopted the Defendants' position and construed

the term "buyer" to mean "the ultimate purchaser . . ." [A000117-19]

The second relevant term is "a pool of vendors associated with said buyer."

With respect to this term, the parties proposed as follows:

**"A POOL OF VENDORS ASSOCIATED WITH SAID BUYER"**
('106 PATENT: CLAIM 13; '143 PATENT: CLAIMS 1, 2)

| e-LYNXX's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| e-LYNXX does not believe that any construction of this term is necessary. But to the extent the Court decides to construe this term, "a pool of vendors associated with said buyer" means: "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." | Indefinite  (synonyms: "vendor pool;" "said buyer's vendor pool;" the "buyer's associated pool of vendors") |

[A000392-93]  On this term, the District Court rejected the Defendants'

indefiniteness argument and adopted e-LYNXX's alternative construction of "two

or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." [A000136-41]

The third relevant term for claim construction purposes is "vendor capability data." The parties proposed the following constructions:

**"VENDOR CAPABILITY DATA"**
('106 PATENT: CLAIM 13; '143 PATENT: CLAIMS 1, 2)

| e-LYNXX's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **"vendor capability data"**<br>"a set of information identifying a plurality of capabilities for a vendor to **provide** a customized good or service" | *Defendants propose that "vendor capability data" and "plurality of capabilities for said vendor to provide a customized good or service" are synonyms, and therefore both terms mean:*<br><br>"two or more capabilities of a vendor to **manufacture or produce** a customized good or service **and excluding the vendor's name, contact information, payment preferences, type of business and goods sold"** |
| **"plurality of capabilities for said vendor to provide a customized good or service"**<br>Plaintiff does not believe that any construction of this term is necessary. But to the extent the Court decides to construe this term, "plurality of capabilities for said vendor to provide a customized good or service" means: "two or more capabilities of a vendor to **provide** a customized good or service" | (synonyms: plural capabilities for vendors; plurality of capabilities for said vendor to provide a customized good or service; corresponding plural capabilities of vendors) |

[A000382-83, 386] Here the District Court ruled that e-LYNXX "expressly disclaimed" five types of data (the "vendor's name, contact information, payment preferences, type of business and goods sold") in an Amendment F, filed

September 19, 2006. [A000126] Accordingly, the Defendants' proposed construction of "vendor capability data" was adopted. [A000124-26]

Following claim construction and discovery, InnerWorkings filed a Motion for Summary Judgment of Non-Infringement based upon the District Courts' construction of the two terms "buyer" and "a pool of vendors associated with said buyer." [A000182-83]

Noting that Step Two of the '106 Patent requires "an electronic communication" from the "buyer" that furnishes information associating the "buyer" with a vendor pool, the District Court held that InnerWorkings' customers do not directly access the PPM4 system. [A000183-188] At the same time, without any discussion or explanation, the court merely assumed or inferred that InnerWorkings' customers were the "buyer" for purposes of Step Two since they were the "ultimate purchasers" in a resale transaction with InnerWorkings that occurred outside the PPM4 system. *Id.* From these factual findings (and inferences) the District Court concluded that InnerWorkings' PPM4 system does not infringe Claim 13 of the '106 Patent.

The court further held that InnerWorkings does not infringe Claims 1 or 2 of the '143 Patent because its customers are not associated with any vendors within the PPM4 system. [A000188-191] Step Two in each of Claims 1 and 2 require that there be "a pool of vendors associated with said buyer," but since no "subset of

vendors … [is] drawn" from the master pool of InnerWorkings suppliers for comparison with a customer's job specification, the court found that there are no vendor pools associated with particular customers, which again the court assumed were the "buyers" for infringement purposes. [A000190-91]

Following claim construction and discovery, Cirqit also filed a Motion for Summary Judgment of Non-Infringement based upon the District Courts' construction of the term "vendor capability data." [A000191-94] In ruling for Cirqit, the court held that Cirqit's Order-It system did not infringe the Asserted Patents because the only "vendor capability data" stored in the system were (i) a "type of business" and (ii) a "type of goods sold," which the court had ruled during claim construction were disclaimed as "vendor capability data" by e-LYNXX. [A000191-92]

The court entered judgment in favor of InnerWorkings [A000198] and Cirqit [A000199]. e-LYNXX filed a Motion to Alter or Amend the Judgments. [A007821-7845] The District Court denied e-LYNXX's Motion [A000200-215] and entered an order disposing of all remaining claims as moot. [A000216]

## SUMMARY OF THE ARGUMENT

The District Court committed several errors that warrant reversal and remand for trial. Specifically, the District Court erred in its Memorandum Denying Summary Judgment and Construing Disputed Claim Terms [A000109-163], which

served as the basis for the entry of summary judgments in favor of InnerWorkings [A000164-197, 198] and Cirqit [A000164-197, 199].

First, the District Court erred in granting summary judgment for InnerWorkings. The District Court construed the term "buyer" to mean the "the ultimate purchaser of customized goods or services" and found that InnerWorkings' PPM4 system did not provide "buyers" (i.e. "ultimate purchasers") with direct access and did not create a "pool of vendors associated with said buyer" (i.e. the "ultimate purchasers"). The District Court's construction of the term "buyer" was erroneous, first and foremost, because it was contrary to the plain and ordinary meaning of the word "buyer." Furthermore, the District Court's construction was based upon the need to distinguish "ultimate purchasers" and "intermediaries," although this distinction is nowhere to be found in the claims, the specification, or the prosecution history. In addition, the District Court ignored the uncontested fact that InnerWorkings uses the PPM4 system to buy print and, within that system, is the "ultimate purchaser" with a "pool of vendors" associated with it. Finally, the District Court erred by imposing a new limitation that the "pool of vendors" consist of a *subset* of vendors drawn from the vendor database when this limitation is clearly not required by the Asserted Patents.

Second, the District Court erred in granting summary judgment for Cirqit. The District Court erred in its construction of the term "vendor capability data" by

excluding the "vendor's name, contact information, payment preferences, type of business and good sold" from that term. This exclusion is not found in the claims or the specifications, and the District Court improperly ruled that the inventor disclaimed these data during patent prosecution. The District Court compounded its error with an incorrect conclusion of mixed fact and law that Cirqit's database vendor records are "goods sold" rather than "vendor capability data."

These errors in construction and application of claim terms resulted in the improper grant of summary judgment of non-infringement to InnerWorkings and Cirqit. This Court should reverse the District Court's grant of summary judgment and remand this case for trial.

## ARGUMENT

## I.    STANDARD OF REVIEW

A grant of summary judgment by a district court is reviewed *de novo*. *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 984 (Fed. Cir. 2006). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]he fundamental premise of a grant of summary judgment is that no reasonable jury could find other than in

favor of the movant, when all reasonable factual inferences are drawn in favor of the non-movant." *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359 (Fed. Cir. 2006). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson* at 247-48.

The review of summary judgment of non-infringement requires two steps. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999). First, claim construction, in which the determination of the meaning and scope of the patent claims is a question of law, is reviewed *de novo* without deference to the trial court. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272 (Fed. Cir. Feb. 21, 2014) (en banc); *CyberCorp v. FAS Techs., Inc.*, 138 F.3d 1448, 1451 (Fed. Cir. 1998) (en banc). Second, infringement, in which the comparison of properly construed claims to the device accused of infringing is a question of fact, is reviewed to determine whether there was no genuine issue of material fact. *Bai v. L & L Wings,* 160 F.3d 1350, 1353 (Fed. Cir. 1998).

A district court's judgment of non-infringement based on an erroneous claim construction should be vacated and remanded for further proceedings. *Laryngeal Mask Co. Ltd. v. Ambu*, 618 F.3d 1367, 1373 (Fed. Cir. 2010). However, a district court's determination of non-infringement based on a finding of fact is reviewed for clear error. *Abraxis Bioscience, Inc. v. Mayne Pharm. (USA) Inc.*, 467 F.3d

1370, 1375 (Fed. Cir. 2006). "A factual finding is clearly erroneous if, despite some supporting evidence, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## II. THE DISTRICT COURT'S SUMMARY JUDGMENT IN FAVOR OF INNERWORKINGS SHOULD BE REVERSED BECAUSE THE COURT MISCONSTRUED AND MISAPPLIED THE TERMS "BUYER" AND "POOL OF VENDORS ASSOCIATED WITH SAID BUYER."

In its Claim Construction Memorandum and Order, the District Court construed the term "buyer" to mean "the ultimate purchaser of customized goods or services." [A000117-119, 162] e-LYNXX challenges that construction in this appeal. The District Court further construed the phrase "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." [A000141, 162] e-LYNXX does not challenge that construction on appeal, except to the extent it incorporates the District Court's erroneous construction of the term "buyer."

Because the District Court's construction of "buyer" is contrary to the plain and ordinary meaning of the word as well as inconsistent with its use in the claims and the specification, the District Court's Claim Construction Order construing "buyer" should be reversed. Similarly, the District Court's Order Granting

Summary Judgment on behalf of InnerWorkings, which is predicated on this erroneous construction, should also be reversed.

### A. The District Court's Construction of "Buyer" is Unnecessary and Contrary to Its Plain and Ordinary Meaning.

Because the plain and ordinary meaning of the word "buyer" would be apparent and obvious to any juror and because the term "buyer" is so common-place as to defy the need for any construction, e-LYNXX argued during claim construction and maintains on appeal that there is no need for this term to be construed. [A003150] The central purpose of the *Markman* exercise and the ultimate goal of claim constructions are to aid the jury. *See O2 Micro Int'l Ltd v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1360-63 (Fed. Cir. 2008). They are not meant to be an "obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997). As explained below, because there is nothing in the record to indicate that any special meaning was ever intended or implied, the plain and ordinary meaning of the word "buyer" should control. *See, e.g., Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, at 1582 (Fed. Cir. 1996); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 979 (Fed. Cir. 1999); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005).

And were a definition actually needed, both Plaintiff and Defendants agreed during claim construction that the proper dictionary definition could be found in

*Merriam-Webster's Collegiate Dictionary*, Merriam-Webster, Inc. (11th ed. 2011).[1] [A000370-375] In that dictionary, a "buyer" is simply "one who buys; consumer." [A000370, 374] And "buy" means "to acquire possession, ownership, or rights to the use or service of by payment especially of money." [A000371, 374] Combining those two definitions verbatim, a "buyer" would be "one who acquires possession, ownership, or rights to the use or service of by payment especially of money." At claim construction e-LYNXX proposed the more succinct (albeit unnecessary) definition of "buyer" as "one who makes a purchase" but contested the need to define the word at all.[2] e-LYNXX reiterates this position on appeal.

### B. The District Court's Construction of "Buyer" is Contrary to the Claims and Specification of the Asserted Patents.

Without addressing e-LYNXX's primary argument that the meaning of the word "buyer" was obvious and required no construction, the District Court, citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005), noted that "the manner in which a term is referenced in the claim itself may provide 'substantial guidance' as to the term's definition." [A000117] The court observed that "[t]he term 'buyer' as used in the claims is often preceded by language distinguishing an

---

[1] Available at http://www.merriam-webster.com.

[2] Not surprisingly, the definition of "purchase" is "to buy," (http://www.merriamwebster.com/dictionary/purchase), which demonstrates further why defining a common word like "buyer" would not help the jury and was nothing more than an "exercise in redundancy" in the first instance. *U.S. Surgical Corp.,* 103 F.3d at 1568.

*intermediary* from *the ultimate purchaser*," two terms that were wholly created by the court and *not found* in the claims or the specification of the Asserted Patents. [*Compare* A000117 *with* A000052-108] Because the claims made reference to the "buyer," while other times made reference to actions taken "by or on behalf of the buyer"[3] or "from or on behalf of the buyer"[4] the District Court concluded:

> This distinguishing language strongly implies that the definition of "buyer" is narrower than simply "one who makes a purchase," otherwise there would be no need to differentiate between a buyer and an intermediary. *Cf. Phillips*, 415 F.3d at 1314 ("steel baffles" implies that baffles are not "inherently" steel). Moreover, to adopt e-LYNXX's proposed construction would swallow any distinction between a "buyer" and one who purchases "from or on behalf of" a buyer, because both entities would be "one who makes a purchase." [A000118]

The District Court buttressed its conclusion by noting that the "specification generally describes job data input into the system in the context of the buyer's preferences" and these "particular requirements" for job solicitations "originate not from third parties who enter them on behalf of buyers, but from the buyers

---

[3]     [A000117-118] citing to '106 patent, col. 21, ll. 21-22 ("job for which bids are sought *by or on behalf of the buyer*") (emphasis added); '143 patent, at col. 19, ll. 11-12 ("analysis of job data pertaining to a job for which bids are sought *by or on behalf of the buyer*") (emphasis added).

[4]     [A000117-118] citing to '106 patent at col. 21, ll. 23-24 ("a means for receiving an electronic communication defining a job data *from or on behalf of* at least one buyer") (emphasis added); '143 patent, col. 19, ll. 1-2 ("receiving an electronic communication *from or on behalf of any buyer*") (emphasis added); *id.* col. 20, ll. 9-10 ("receive an electronic communication *from or on behalf of any buyer*") (emphasis added).

themselves." [A000119] This, according to the court, was further evidence of a distinction between an "intermediary" and an "ultimate purchaser." The District Court's reasoning is flawed for several reasons.

First, the District Court simply disregards the actual meanings of the word "buy" (and its synonym "purchase"), which was defined by the parties to mean "to acquire ***possession***, ***ownership***, or ***rights to the use*** or services of by payment especially of money." [A000371, 374] With this understanding, the distinction between a "buyer" (i.e. one who takes possession) and an action taken "on behalf of the buyer" (i.e. on behalf of one who takes possession) is obvious because the former necessarily "acquires possession, ownership, or rights to the use" while the later does not. In other words, the phrase "on behalf of" expands the scope of the claims at issue to include agents who act on behalf of another but who are not otherwise "buyers" because they do not "take possession" of anything. It does not narrow or change the meaning of the word "buyer" at all.[5]

---

[5]     And to be clear, "buyers" and those who act "on behalf of buyers" are not necessarily mutually exclusive categories. An agent of another may be a "buyer" as that word is used in the claims if the agent "acquires possession, ownership, or the rights to use." The additional language of "on behalf of buyers" in the claims just makes clear that agents are not required to be buyers (i.e. they do not have to take possession) to be covered by the claim.

Second, the District Court clearly misreads and misapplies the example given by this Court in *Phillips,* 415 F.3d at 1314, to explain how context can shed light on the meaning of a disputed term. This Court noted in *Phillips*:

> To begin with, the context in which a term is used in the asserted claim can be highly instructive. To take a simple example, the claim in this case refers to "steel baffles," which strongly implies that the term "baffles" does not inherently mean objects made of steel.

*Id.* Attempting to analogize from this simple example, the District Court argued that use of the phrase "on behalf of the buyer" implied that the term "buyer" excluded anyone who acted "on behalf of" another. [A000118] But this applied the example from *Phillips* backwards. The phrase "steel baffles" implied that the term "baffles" included other materials *in addition to steel*. The terms were not mutually exclusive. A baffle could be made of steel or other materials besides steel. In other words, the use of the phrase "steel baffles" implied that the definition of "baffles" was more expansive, not less, and the definitions of the terms overlapped; all steel baffles are baffles, but not all baffles are made of steel. Applying the *Phillips* reasoning correctly, the use of the phrase "on behalf of the buyer" expands the scope of the claim to include agents *who were not buyers themselves but were acting on behalf of buyers*; it does not limit the meaning of the word "buyer" to somehow exclude actual buyers *who are also agents*.

Third, a closer examination of the uses of the phrase "on behalf of" only further confirms that the phrase has nothing to do with the meaning of the word

"buyer." The phrase "on behalf of" is used twice in Claim 13 of the '106 Patent, three times in Claim 1 of the '143 Patent, and three times in Claim 2 of the '143 Patent.[6] Not one of these uses refers to "buying" or "procuring" on behalf of "the buyer." On the contrary, they refer specifically to *seeking bids*[7] "on behalf" of the buyer or *sending electronic communications*[8] "on behalf of" the buyer, neither of which encompasses (or excludes) a scenario where an agent is also a buyer, such as a procurement agent – like InnerWorkings – who makes a purchase and then resells a custom good or service in a separate transaction. Rather, the "on behalf of the buyer" language of the Asserted Patents does not limit the term "buyer" but rather *expands* the claim to include agents who are not making the purchase but are acting on behalf of someone who is.

### C. The District Court's Application of the Term "Buyer" to InnerWorkings' PPM4 System Demonstrates Why Its Construction of the Term "Buyer" is Wrong.

In light of the above, there is no serious argument that InnerWorkings is not a "buyer" as that term is used the Asserted Patents because InnerWorkings literally buys print (i.e. it "acquires possession, ownership, or rights to the use" print [A000371, 374]) using the PPM4 system. It is undisputed that:

---

[6]   *See* '106 Patent, Claim 13, col. 21, ll. 21-22, 23-24; '143 Patent, Claim 1, col. 19, ll. 1-2,11-12,13-14; '143 Patent, Claim 2, col. 20, ll. 9-10, 19-20, 21-22.

[7]   *See* FN 3 *supra*.

[8]   *See* FN 4 *supra*.

(1) InnerWorkings procures, manages, and delivers print materials for their customers through a system known as the Print Procurement Manager 4 ("PPM4"). [A000171,201]

(2) InnerWorkings' "production managers work closely with [InnerWorkings] customers to determine their required product specifications." [A007882]

(3) InnerWorkings then uses the accused PPM4 system to procure and buy print from print vendors in the PPM4 system. [A007835]

(4) In a separate transaction that occurs outside the PPM4 system, InnerWorkings resells the print that it buys in the PPM4 system to its customers. [A007835]

(5) InnerWorkings' customers and InnerWorkings' print suppliers do not have a contractual relationship with each other; they only have a contractual relationship with InnerWorkings. [A007947]

(6) InnerWorkings is intentional and deliberate in keeping its transactions with its print suppliers in the PPM4 system separate from its resale transactions with its own customers outside the PPM4 system. InnerWorkings uses this critical distinction to support its revenue disclosures to the Securities and Exchange Commission (SEC). [A007836, A007947-7948] As InnerWorkings affirmed to the SEC:

We are directly responsible to the customer for providing the product or service desired by the customer including order fulfillment and incur the risks and rewards as principal in the transaction. Once a customer orders a product, **we determine at our discretion the best supplier to fulfill the customer order and contract with the supplier directly**. Suppliers do not attend our sales presentations to clients and potential clients, nor do suppliers participate in our general marketing activities. Accordingly, fulfillment obligations are our sole responsibility legally and from our customers' perspective. Our customers and suppliers do not have interaction with each other during the course of a transaction. Upon fulfillment by the supplier, **we are responsible for paying the supplier, which is independent of our receipt of payment from our customer**. In addition, our contract sales terms further support a gross revenue reporting treatment as they are solely between us and our customer, binding us as the primary obligor in the arrangement. Furthermore, our customer contracts do not specify a print manufacturer to be used. [A007947]

Accordingly, InnerWorkings is a "buyer" of print generally and "the buyer" of print within PPM4 system as that term is used in the Asserted Patents, and the District Court's entry of Summary Judgment, (should be reversed) because it is predicated on an erroneous construction.

Moreover, even if the District Court's construction of "buyer" to mean "ultimate purchaser" were correct (and it is not), based on the undisputed facts set forth above, InnerWorkings would similarly qualify as an "ultimate purchaser" and not an "intermediary" because of the separateness of the transactions at issue. Simply put, *within the accused PPM4 system*, InnerWorkings is the "ultimate

purchaser," not an intermediary. Infringement analysis requires application of the asserted claims to the accused system, in this case, InnerWorkings' PPM4 system, and not to transactions that occur *outside* the accused system or in subsequent transactions that occur down the stream of commerce. In this context and looking at the accused system, InnerWorkings must be the "ultimate purchaser" in the accused PPM4 system because there is no other purchaser in that system.

This conclusion only further demonstrates why the court's construction of "buyer" to mean "the ultimate purchaser of customized goods or services" was unfounded and erroneous. [A000117-119, 162] Key infringement terms like "ultimate" and "intermediary" were inserted into the analysis not by the claims or the specification or the prosecution history, but by the District Court, which did not further define or elaborate those new terms. It is irrational to define a term used within a system claim in such a way that a potential infringer must (1) read the District Court opinion to learn that words like "ultimate" and "intermediary" govern the analysis; (2) determine what the court meant by those words, which are not used in the patents; and (3) then examine his conduct *outside of the system* to determine whether or not his conduct *within the system* infringes. Yet that is precisely what the District Court's Claim Construction and Summary Judgment Opinions require. For these reasons the District Court's construction of "buyer" and the judgment based thereon should be reversed.

35

### D. The District Court's Application of the Phrase "a Pool of Vendors Associated with Said Buyer" Is Also Erroneous.

Assuming that the term "buyer" is given its plain and ordinary meaning, the District Court correctly construed the phrase "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." [A000141, 162] Nevertheless, e-LYNXX challenges the District Court's application of that construction in its Summary Judgment Order in favor of InnerWorkings because (1) the order is dependent upon the court's flawed construction and application of the term "buyer" set forth above and (2) the Order creates a new requirement that is not required by the claims or the specification, namely the limitation "that a subset of vendors be drawn from a database *before* running a job specification comparison." [A000191 (emphasis added)]

### 1. Because There are Two or More Vendors Associated with InnerWorkings in the PPM4 System, the District Court Erred by Finding No "Pool of Vendors Associated with Said Buyer" in that System.

As set forth above, when "buyer" is properly construed and applied, there is little doubt (and certainly genuine issues of material fact) that the PPM4 system has two or more vendors *associated with InnerWorkings* that can potentially receive a job solicitation *from InnerWorkings*. The proper inquiry with respect to this term, as construed, is whether there is an association between "two or more

36

vendors" and the "buyer." In this regard, it is undisputed that the PPM4 system includes "two or more vendors" "associated" with InnerWorkings because InnerWorkings is the only "buyer" in that system. Because the District Court misconstrued and misapplied the term "buyer," its Summary Judgment Opinion simply ignores the evidence that the PPM4 system has a pool of vendors associated with InnerWorkings. [A000190] (Commenting that e-LYNXX's evidence on this point was an attempt to "pivot[] the focus" of the analysis from InnerWorkings' customers, whom the court considered to be the "ultimate purchasers").

> **2.** **The District Court Erred by Concluding During Summary Judgment That a "Subset" of Vendors Must Be Created "Before" a Comparison Is Run by the Accused System.**

Separately from its misapplication of the term "buyer," the District Court created a new limitation that the "system . . . extract a subset of vendors from the database" "before running a job specification comparison" in its analysis of the "vendor pool" requirement of the claims. [A000190-191] With this new limitation in hand, the District Court concluded there could be no infringement by the PPM4 system because it compared job specification to "the entire network of vendors in its database" rather than a "subset" of the database. [A000191] Because this conclusion is wrong on both legal and factual grounds, it should be reversed.

First, as a matter of law, there is no requirement in the Asserted Patents "that a subset of vendors be 'associated'" with a buyer before running a comparison" or,

conversely, that by comparing "the entire network of vendors in its database" an accused system cannot infringe. [A000190-191, 211] Nothing in the claim language of the '106 or '143 Patent refers to a "subset" of vendors associated with a buyer *prior* to a job comparison being performed; the claims only reference "subsets" to describe the results *after* a comparison has been performed. Specifically, the '106 Patent requires that "each buyer using the system" have a "pool of vendors associated with said buyer," while the '143 Patent requires that "any buyer using the system" have a "pool of vendors associated with the buyer." There is no requirement that this "pool of vendors" be a "subset" of anything.

The court's confusion on this point can be found in its summary judgment ruling that "[t]he '143 patent's claims require that a subset of vendors be drawn from a database before running a job specification comparison." [A000190-191] While District Court asserts that this subset requirement for vendor pools was compelled by its claim construction ruling, the court never actually cites that ruling and for good reason. The court's claim construction order *never made such a finding*.

The District Court's construction of the term "a pool of vendors associated with said buyer" occurred in the portion of its decision that denied InnerWorkings' original summary judgment motion for indefiniteness. [A000126, 136-141] At the time, InnerWorkings argued that the term "vendor pools" was indefinite because

the specification supposedly referenced only one type of "vendor pool," while the claim language described two types: (1) the original vendor pool associated with a buyer; and (2) the subsequent "subset" pool of vendors created by the comparison process. The court ruled in favor of e-LYNXX because there were clear references in the specification that showed and distinguished these two types of vendor pools (pre-matching and post-matching). [A000136-141] The court therefore adopted e-LYNXX's construction of the term "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." [A000141, 162]

In fact, the indefiniteness ruling only uses the word "subset" to refer to the *second* type of vendor pool created *after* the automatic matching.[9] In ruling on summary judgment that there is a "requirement that a *subset* of vendors be 'associated' with a buyer *before* running a comparison," [A000190-191, 211] the court mischaracterized its own ruling to create a limitation on the claim language that is unsupported by either the specification or claim language and which the court never found during claim construction. In fact, while e-LYNXX rebutted InnerWorkings' indefiniteness argument with reference to an embodiment of the

---

[9]    *See, e.g.,* [A000137] ("When a buyer submits the specifications for a job, the system compares those specifications with the attributes contained within the buyer's pre-qualified vendor pools, generating a subset of vendors who will then receive invitations to bid.")

invention for "maintaining multiple vendor pools" when *there are multiple buyers using the same system,* [A000137-138] the preferred embodiment described in Figure 1A of the specification shows only a single buyer associated with an entire database of vendors. [A000079]



FIG. 1A

"A claim construction that excludes a preferred embodiment . . . 'is rarely, if ever, correct.'" *SanDisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005). Moreover, the claim language itself requires only a single buyer ("each buyer" or "any buyer"), not a system used by multiple buyers requiring separate multiple vendor pools.

Finally, even if the creation of a "subset" of vendors from a database "before" any comparison were required (and it is not), the District Court erred in holding that "there was no genuine factual dispute that the PPM4 system does not compare job specifications to anything less than the entire database of vendors." [A000211] As the District Court itself acknowledged, "the PPM4 system maintains records for vendors that have not been certified by InnerWorkings or are otherwise pending, inactive, or deleted" and "only certified vendors are selected from the aggregate database" to receive a "job solicitation" from InnerWorkings. [A000190] The undisputed evidence was that the PPM4 system selects vendors from *only* the pool of certified vendors. [A007173-7176, 7218-7226, 7285-7295, 7383-7385] Because these "certified vendors" are clearly a "subset" of the vendors in the PPM4 system and because this subset is created "before" any comparison occurs, the PPM4 system creates a "vendor pool" that constitutes a "subset" of a database before any comparison is performed, and this element is met. Accordingly, even if the District Court's "subset" requirement were upheld, there are genuine issues of material fact warranting reversal.

## III. THE DISTRICT COURT'S SUMMARY JUDGMENT IN FAVOR OF CIRQIT SHOULD BE REVERSED BECAUSE THE COURT MISCONTRUED AND MISAPPLIED THE TERM "VENDOR CAPABILITY DATA."

In its Claim Construction Memorandum and Order, the District Court construed the term "vendor capability data" to mean "two or more capabilities of a

vendor to manufacture or produce a customized good or service and ***excluding the vendor's name, contact information, payment preferences, type of business and goods sold.***" [A000125-26 (emphasis added)] The first portion of this construction – "two or more capabilities of a vendor to manufacture or produce a customized good or service" – accurately reflects the meaning of "vendor capability data" as disclosed within the specification of the Asserted Patents and is not contested by e-LYNXX. The highlighted portion of this construction does not find support in the claims or specification of the Asserted Patents. Rather, it is quoted directly from the text of the Walker '207 Patent, which was distinguished by e-LYNXX during the prosecution of the '106 Patent. [*See* A007927 at 13:10-13]

e-LYNXX disputes the District Court's rulings both that a prosecution disclaimer occurred and the scope of any such disclaimer in the court's summary judgment and claims construction opinions. This appeal therefore raises three questions: (1) a legal question regarding whether a prosecution disclaimer occurred; (2) if a disclaimer did occur, a legal question as to the scope of what is disclaimed by reference to "goods sold" in construing "vendor capability data;" and (3) a factual question regarding whether the actual data in the Cirqit Order-It system falls within the disclaimed "goods sold."

## A.    The District Court Found a Disclaimer of "Goods Sold" from "Vendor Capability Data" Where None Exists

In finding that a prosecution disclaimer of "vendor's name, contact information, payment preferences, type of business and goods sold" from the term "vendor capability data" occurred, the District Court cites to an argument made in Amendment F of the prosecution history. [A000125] With respect to "goods sold," however, e-LYNXX's argument does not "clearly and unmistakably disclaim the territory between the full ordinary meaning of the claim language and the asserted new meaning," which is required for a disclaimer to attach. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1327 (Fed. Cir. 2003). The District Court has taken e-LYNXX's statements on their face – without examining the intended purpose of e-LYNXX's argument – to establish a disclaimer where none exists. *IMS Tech, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433-34 (Fed. Cir. 2000), cert. denied, 530 U.S. 1299 (2000) (looking to the purpose of the patentee's statements to determine that the statements did not rise to the level of a disclaimer).

In the relevant section of Amendment F, e-LYNXX argued that the claimed invention requires that "the vendor records include vendor capability data identifying a ***plurality*** of capabilities for the vendor." [A004005 (emphasis added)] In the course of so doing e-LYNXX stated the following in distinguishing the Walker '207 Patent:

43

Next, the Examiner has asserted that Applicant's recited steps of receiving a plurality of vendor records and receiving a job data from a buyer are satisfied by the seller database and CPO database (citing Column 13, lines 11-29 and Column 8, lines 42-56). However, Applicant's limitation with respect to the receipt of vendor records requires that the specified vendor records identify a plurality of capabilities for each of the plurality of vendors. Significantly, Applicant notes, that ***neither this portion of the Walker reference nor any other portion of this reference details receipt of vendor records each of which identify multiple capabilities for each vendor***.

The cited portion of the specification describes the seller database and the CPO database. In regard to the seller database, the specification notes that the database maintains data on sellers with fields such as name, contact information, payment preferences, type of business, and the goods sold. (Lines 11-15 of column 13). ***None of the referenced fields indicate that data regarding a plurality of capabilities for each vendor should be maintained for subsequent comparison***. . . . This claim specifically requires that the vendor records include vendor capability data indentifying a plurality of capabilities for the vendor. ***Nothing in the referenced portion of the cited document or any other portion could reasonably be considered to be data identifying a plurality of capabilities of each vendo***r.

[A004004-5 (emphasis added)] e-LYNXX's purpose here was to show that the Walker '207 Patent does not disclose a plurality (i.e. two or more) of vendor capabilities in the database. The mention of specific categories in the seller database was to illustrate this point, not to disclaim these categories from being encompassed as a "vendor capability."

Further illustrating this point, e-LYNXX explained:

The only portion which could remotely be considered to be capability data at all is the portion in column 13 at lines 18-23 which states that "[u]pon registration, the seller may be required to demonstrate evidence of ability to deliver on bound CPOs." Significantly, this

portion of the document does not indicate that a plurality of capabilities for each vendor should be maintained for subsequent comparison. This portion of the cited reference actually teaches away from the presently claimed invention as it indicates that confirmation concerning any capability is made at the time of registration. This is contrary to Applicants (sic) claimed comparison.

[A004005-6] As such, the Walker '207 Patent at most discloses a database containing a single vendor capability – i.e. the use of "goods sold." This is exactly the point of e-LYNXX's argument – a prior art reference that discloses a database containing a single vendor capability does not teach a database that retains two or more vendor capabilities for use in a subsequent comparison. There is no interpretation of e-LYNXX's statements that can be considered to be an unambiguous disclaimer of "goods sold" as a type of vendor capability. To the contrary, e-LYNXX was stating that "goods sold" may, in fact, potentially be considered a vendor capability.

Accordingly, e-LYNXX's statement mentioning "goods sold" as a particular category in the seller database of the Walker '207 Patent fails to rise to the level of a clear disavowal made as to what constitutes a vendor capability. *SuperGuide Corp. v. DirectTV Enterprises, Inc.*, 358 F.3d 870, 874-75 (Fed. Cir. 2004) ("To be given effect, such a [prosecution history] disclaimer must be made with 'reasonable clarity and deliberateness.'") (quoting *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294 (Fed. Cir. 2000)).

45

**B.    The District Court Overstated the Scope of the Prosecution Disclaimer of "Goods Sold" to Exclude Certain Capabilities of Vendors to Produce Unfinished Goods from the Scope of "Vender Capability Data"**

"[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim *congruent* with the scope of the surrender." *Omega,* 334 F.3d at 1324 (emphasis added). The scope of the disavowal must be ascertained in light of the term being construed and the statements made in the prosecution history to determine what is actually being disclaimed. *See id.* at 1327.

As discussed in Sec. III.A *supra*, in distinguishing the Walker '207 Patent, the District Court found that e-LYNXX expressly disclaimed types of information including "vendor's name, contact information, payment preferences, type of business and goods sold" from the scope of "vendor capability data" based on certain statements made in the prosecution history. [A000125] In doing so, the court asserted that "[i]n attempting to distinguish the instant invention from the prior art, the applicant stated unequivocally that the aforementioned attributes did *not* constitute capabilities." [A000125] The District Court, however, did not examine the reason why these attributes would not constitute vendor capabilities, which was a necessary next step to properly decipher what exactly, in the District Court's view, was being excluded from the scope of the claim.

46

It is clear and unmistakable that the types of information including "the vendor's name, contact information, payment preferences, [and] type of business" do not constitute vendor capabilities. This type of information is simply biographical data of the vendor that might be contained in an address book or rolodex. The term "goods sold," on the other hand, is not self-defining, and the District Court failed to define it during claim construction. Indeed, the term "goods sold" standing alone has an inherent ambiguity because it does not say whether the seller first produced and then sold the goods, or simply obtained and then sold, or bought and then re-sold the goods. Accordingly, a proper construction of "vendor capability data" cannot just say that "goods sold" was disclaimed and stop there. The construction must instead explain what the disclaimer of "goods sold" means in relation to "vendor capability data," with particular emphasis on the word "*capability*."

As the backdrop for the disclaimer analysis, we start with the plain and ordinary meaning of the term "vendor capability data" from which the scope is being surrendered. A "capability" is ordinarily defined as "the facility or potential for an indicated use or deployment."[10] Simply put, a "vendor capability" is a vendor's capability to produce a good or perform a service. When placed in

---

[10]     *Merriam-Webster's Collegiate Dictionary*, Merriam-Webster, Inc. (11th ed. 2011)     (available     at     http://www.merriamwebster.com/dictionary/capability) [A001477].

context of the specification, e-LYNXX does not dispute the court's construction of "vendor capability" as being "two or more capabilities of a vendor to manufacture or produce a customized good or service."

The next step in the disclaimer analysis is to ascertain the precise scope of the disclaimer that was surrendered, which necessitates a closer examination of the prior art being distinguished. The Walker '207 Patent, which is assigned to Priceline.com Inc., discloses a system for enabling buyers to place a conditional purchase order (CPO) for a good to be sold by a seller, which in essence is a marketplace for selling *existing* goods from the seller's inventory to willing buyers. [A007924 at 8:28-56] The system is set up with a seller database that is specified as including "data on sellers with fields such as name contact information, public/private key information, payment preferences, type of business, and *goods sold*," and it is this statement that serves as the source of the disclaimer found by the District Court. [A007927 at 13:10-13 (emphasis added)]

To formulate the CPO, "the buyer selects the subject of the goods he wants to purchase by selecting from a list of possible subjects" specified in the seller database, which "might include airline tickets, hotel rooms, rental cars, insurance, mortgages, clothing, etc." [A007928 at 16:3-8] The buyer then enters a description of the goods it desires, such as in the case of an airline ticket, the origination city, destination city, dates of return and departure, or in the case of a hotel, the

48

destination city and dates for check-in and check-out. [A007928 at 16:12-19] The buyer can also impose additional conditions for the CPO, for example, that the flight be non-stop and arrive before midnight or the hotel room be non-smoking. [A007928 at 16:19-45]

To receive a CPO, a potential seller selects an appropriate subject area for which it has goods in inventory and browses the list of available CPOs. For example, a large Chicago hotel that had just experienced the cancellation of a block of rooms for a convention might search the hotel subject area in the hopes of finding a CPO requesting a room in Chicago on those dates. [A007929 at 18:56-19:3] The potential seller then selects the CPO that will bind both parties to the transaction. [A007930 at 19:14-21]

Before the seller can be bound to the CPO, the Priceline system authenticates the seller's identity and verifies the seller's probable capacity to deliver the requested type of goods. [A007930 at 19:14-21] In particular, it is specified that:

> Information in seller database 260 then provides an indication of the seller's ability to deliver the goods. Before a seller can bind CPO 100 for an airline ticket, for example, central controller 200 must authenticate that the seller is an airline. If necessary, central controller 200 may verify that the seller can provide the specific good requested. Rather than just verifying that the seller is an airline, central controller 200 may verify that it serves the city pairs requested by the buyer.

[A007930 at 19:32-40; *see also* A007929 at 17:13-22] In this example, the system is not determining the airline's capability to create a new route for this specific buyer's request, but is providing proof of its capability to sell the buyer a ticket to travel on an existing route already being offered for sale.

Similarly, for a hotel, the system verifies the ability of the hotel to provide a hotel room on the dates requested by the buyer. In such a transaction, a CPO can only be offered if the "goods sold" is indeed ready to be sold; otherwise the buyer cannot know what exactly they are tendering the CPO for. These types of goods are precisely what the Asserted Patents refer to as "non-custom manufactured goods or services" which are "pre-stocked as 'off-the-shelf' items" and available to be purchased at fixed prices. [A000097 at 1:30-45] This reflects a capability to *sell existing goods in the vendor's inventory*. The Asserted Patents, on the other hand, focus on a vendor's capability to *produce customized goods or services* which "must be specifically manufactured or provided to meet the buyer's particular requirements;" in other words, a vendor's production capabilities. [A000097 at 1:35-36]

This distinction is further apparent from the other examples of "goods sold" described by the Walker '207 Patent in its other preferred embodiments, including rental cars, insurance, mortgages, rare coins, clothing, new cars, jewelry, and computer equipment. [A007928 at 16:3-7; A007930 at 20:9-10 and 20:33-35]

What is significant about all of these categories of *goods being sold* is that, in the Walker '207 Patent, they represent either a particular industry or specific type of good or service that is *ready to be sold out of inventory*. It does not reflect the manufacturing capability of a seller to produce customized goods that are not yet in existence in accordance with the buyer's specifications. It is this customization of goods, and the analysis of the vendor's capabilities to manufacture such customized goods, that is the central purpose of the invention described and claimed in the Asserted Patents, and which is the very distinction made by e-LYNXX over the Walker '207 Patent in the prosecution history.

A disclaimer that goes so far as to generally exclude product categories from "vendor capability data," as found here by the District Court, will have the nugatory effect of excluding all of the embodiments described by the Asserted Patents. *See SanDisk Corp.*, 415 F.3d at 1285 ("A claim construction that excludes a preferred embodiment . . . 'is rarely, if ever, correct'"). For instance, in the hierarchy of the job specification process described in the Asserted Patents, the buyer must first add an "item" to the job by selecting from among the options in a drop down list as shown in Figure 5. [*See, e.g.*, A000086 at Fig. 5; A000102 at 12:1-12] This "item" is a product category that is compared to the data stored in the system reflecting types of items that the vendors are capable of producing. The comparison process is described as follows:

. . . the system receives the invitation-for-bid data BIFBD, and extracts the buyer's attributes BATTR from the information entered by the screens of FIGS. 3-14, and then compares those attributes to each of the plurality of sets of print vendor's attributes VATTR, using as the selection criteria SC for generating the vendor pool VPOOL the standard selection criteria SC entered by the buyer 6 along with the buyer's job attributes BATTR (such as **_product category_** and quality level) and any additional optional selection criteria SC (such as geographical limits or whether the vendor must be a union shop, small-disadvantaged business, or a minority- or women-owned business), specified by the buyer 6.

[A000103 at 13:25-37 (emphasis added); *see also* A000100 at 8:41-57] Only if it is specified in the vendor capability data that a vendor has the manufacturing capability to produce the requested "item" (i.e. product category) would there be a need to further compare the vendor's ability to meet additional technical requirements, such as "Run on press capable of printing 4 colors in 1 pass" as depicted in Fig. 10 of the '106 Patent. [A000091]

Therefore, if a disclaimer exists with respect to "goods sold," which e-LYNXX contends it does not, such a disclaimer must be limited narrowly to categories of existing non-customized goods that a seller has the capability of selling out of inventory. It certainly does not, and cannot, go so far as to exclude goods that are not ready to be sold, as the District Court found here, by excluding the vendor's production capabilities to manufacture a customized type of good.

## C. The District Court's Judgment of Non-infringement for Cirqit Should Be Vacated Because It Wrongly Infers that "Supplier Types" and "Supported Products" in the Order-It System Are "Goods Sold" Disclaimed from "Vendor Capability Data"

Cirqit contends that all of the actual data in the Order-It system falls within the alleged disclaimer of "goods sold" and thus outside the District Court's construction of "vender capability data." For the reasons set forth below, this contention is a disputed issue of material fact that precludes summary judgment.

In its Claim Construction Memorandum and Order, the District Court failed to address the scope of the alleged disclaimer, asserting only that "[i]n attempting to distinguish the instant invention from the prior art, the applicant stated unequivocally that the aforementioned attributes did *not* constitute capabilities." [A000125] As noted in Sec. III.B *supra*, this assertion was a mischaracterization of e-LYNXX's position, which the District Court did not address again until the summary judgment stage, when it analyzed the infringement claim against Cirqit. On summary judgment, the District Court once again failed to construe what "goods sold" meant in the context of "vendor capability data" and instead assumed that the "Supported Products" stored in the Order-It system are the equivalent of *existing goods sold by a vendor* rather than *a manufacturing capability of a vendor to produce those types of customized goods*. The District Court based this assumption on what was effectively a factual finding that the Cirqit Order-It system "stores only information regarding the types of goods *that a vendor sells*,

53

such as product catalogs, envelopes, letters, cards, posters, and stationary (sic) and business cards." [A000194-95; A000213 (emphasis added)]

While such a finding was improper on summary judgment, the District Court further based its finding on a clearly erroneous, misleading statement made by Cirqit that "Supplier Types" was the "only information stored about the supplier relat[ing] to the goods it *sells*" [A005824 (emphasis added)], and that "Supported Products" were the equivalent of "goods sold" [A005826]. When examining the record on summary judgment, it is evident that this statement is mischaracterization of the nature of both "Supplier Types" and "Supported Products."

The "Supplier Types" and "Supported Products" for the Cirqit Order-It system are listed in the Enhancement Release Notes for Order-It v8.3 [A005539, A005554]. At the top of the list of "Supported Products" in the Release Notes is the following statement: "*This Supplier can <u>produce</u> all of the Items in the Job*." [A005554 (italics in original, underlining added)]:

> This Supplier can *produce* all of the Items in the Job.
>
> **Giant Press**
> 2 Willow Dr.
> Framingham, MA 30001
> US
>
> **Phone:** 888-555-1212
>
> **Region:** North East
> **Quality Rating:** Medium
>
> **Supported Products:**
>
> - 1 and 2 Color Manual Documentation
> - Product Catalog
> - Product Catalog
> - Envelope
> - Commercial Print - Bound
> - Commercial Print - Bound: Two Text Sections
> - Commercial Print Catalog
> - Die Cut Mailer
> - Letter
> - Cards
> - Pocket Folder
> - Point of Purchase
> - Poster
> - Stationery And Business Cards
> - Commercial Print - Flat or Fold
> - Financial Print - Flat or Fold
>
> **Business Classification:**
>
> - Union

While e-LYNXX specifically noted this assertion by Cirqit that "Supported Products" were only what the supplier can "produce" [A007841 – 42], the District Court ignored Cirqit's own characterization of "Supported Products" and instead adopted the mischaracterization that "Supported Products" were only what a supplier sells.

55

What the District Court should have found is that e-LYNXX and Cirqit both agree that "Supported Products" are not "goods sold" and hence that it was an undisputed fact that the data in the Order-It system is "vendor capability data." At the very least, a disputed material fact is created by Cirqit's statement in the Release Notes that "Supported Products" are only what the supplier can "produce." In ruling that no reasonable jury could find that the "Supported Products" in the Order-It system were supplier capabilities, the District Court improperly ignored Cirqit's own characterization and improperly drew inferences about the evidence against e-LYNXX when applying its construction to the Order-It system.

The District Court also impermissibly and incorrectly made a factual determination where it found that there was a qualitative difference between the "Supplier Types" and "Support Products" used in the Order-It system and vendor capability data such as "printing four colors in one pass" as used in the Asserted Patents. [A000194-95, 213] In so doing, the District Court ignored the indisputable fact that the product categories in the Asserted Patents are entirely analogous with the categories listed in Cirqit's "Supplier Types" and "Supported Products," as shown in the table below.

| e-LYNXX Product Categories/"Items" Asserted Patents - Fig. 5 [A000086] | Cirqit "Supplier Types" [A005539] | Cirqit "Support Products" [A005539] |
|---|---|---|
| • Forms: Flat Sheet<br>• Forms: Snap Sets<br>• Envelopes<br>• Labels<br>• Mailer<br>• Rolled Labels<br>• Continuous Rolls<br>• Commercial Printing | • 1 and 2 Color Digital<br>• 4 Color Digital<br>• Envelope<br>• Envelopes<br>• Catalog Envelopes<br>• Forms<br>• Forms Catalog<br>• Offset Conventional<br>• Offset Documentation<br>• Silkscreen Banners<br>• Custom Products and Services | • 1 and 2 Color Manual Documentation<br>• Commercial Print – Bound<br>• Commercial Print – Flat or Fold<br>• Envelope<br>• Forms<br>• Die Cut Mailer<br>• Letter<br>• Cards<br>• Pocket Folder<br>• Poster<br>• Stationery and Business Cards<br>• Financial Print – Flat or Fold<br>• Direct Mail Processing<br>• Imaging<br>• Banner<br>• Custom Products and Services |

The categories listed above as "Supplier Types" and "Supported Products" are neither a generalized "type of business" nor "goods sold" for which a product already exists, but rather vendor capabilities for producing a particular type of product or product feature based on their equipment. For example, "Envelopes," "Forms Catalog," "1 and 2 Color Digital," "Offset Conventional," or "Commercial

Print – Bound," are types of products or printing features falling under the category of Commercial Print that a vendor is capable of producing if they have the proper equipment. A vendor cannot sell something called "1 and 2 Color Digital" without more detailed customized information being specified, such as the paper type, paper size, paper thickness, type of binding, ink color, the text and graphics to be printed, etc.

The District Court, however, obscured this fact by conflating the hierarchy of the filtering process of the Asserted Patents created by the use of product categories as selection criteria. As addressed *supra* in Sec. III.B, when a buyer moves down this hierarchy to specify additional requirements, the selection criteria becomes more specific and the filtering gets more precise, but the selection criteria themselves are not qualitatively different. The District Court, in effect, selectively chose a vendor capability data from a lower level in the hierarchy ("printing four colors in one pass" from Figure 10 of '106 Patent) and then compared it with vendor selection data from a higher level in the hierarchy in the Cirqit Order-It system ("product catalogs, envelopes, letters, cards, posters, and stationary (sic) and business cards" from the "Supported Product" category), thereby making an apples-to-oranges comparison to justify its conclusion. [A000213]

In fact, a comparison of the Product Categories used in Fig. 5 of the Asserted Patents and the "Supported Products" in the Release Notes for the Order-

It system show that they are both vendor capability data of categories of goods that must first be produced, before they can be sold – and thus are quite different from the finished "goods sold" database fields used in the Walker '207 Patent, which include *"airline tickets, hotel rooms, rental cars, insurance, mortgages, clothing."* [A007928 at 16:3-7 (emphasis added)] The categories of "goods sold" from the Walker '207 Patent are suitable for a customer's CPO because you can search under "airline tickets" to find a particular airline ticket that is ready to be sold. In contrast, even a cursory review of the table above shows that this is not true for anything in Fig. 5 for the Asserted Patents or the "Supplier Types" and "Supported Products" for the Cirqit Order-It system.

Accordingly, even under the District Court's construction of "vendor capability data," there exists a genuine issue of material fact as to whether the "Supplier Types" and "Supported Products" for the Cirqit Order-It system are existing "goods sold" or production capabilities of a vendor to manufacture a customized product. The District Court has drawn improper inferences against e-LYNXX by overlooking contrary evidence in making its factual finding, and therefore summary judgment should be vacated. *See Gemmy*, 452 F.3d at 1359; *Fitness Quest, Inc. v. Monti*, 330 Fed. Appx. 904, 912 (Fed. Cir. 2009).

## CONCLUSION

For the reasons set forth above, the District Court's Claim Construction Memorandum and Order, Judgment in favor of InnerWorkings, and Judgment in favor of Cirqit should be reversed, and this case should be remanded to the District Court for trial.

e-LYNXX respectfully requests oral argument for this appeal at a time and place convenient for the Court.

Respectfully Submitted,

Dated: June 9, 2014      /s/ Mark Strachan

Mark D. Strachan
Darren P. Nicholson
SAYLES | WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

Jonathan T. Suder
Brett M. Pinkus
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400

**ATTORNEYS FOR
PLAINTIFF/APPELLANT
e-LYNXX CORPORATION**

# CERTIFICATE OF COMPLIANCE

I, Mark D. Strachan, counsel for Plaintiff-Appellant e-LYNXX Corporation, hereby certify that the Appeal Brief for Plaintiff-Appellant complies with the type volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). Specifically, the pertinent portion of the Appeal Brief contains 13,370 words (including both body and footnotes) as calculated by the word count of the word processing system (MICROSOFT WORD 2010) used to prepare the Appeal Brief.

Dated: June 9, 2014

/s/ Mark Strachan
*Counsel of Record*
Mark D. Strachan
SAYLES | WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

## CERTIFICATE OF FILING AND SERVICE

Pursuant to Federal Circuit Rule 25 and the Court's Administrative Order Regarding Electronic Case Filing ECF-6, counsel of record have been served electronically by the court's CM/ECF system and independent service, either by paper or otherwise, need not be made. In addition, courtesy copies of the forgoing document have been separately emailed to the following:

Jennifer E. Hoekel
ARMSTRONG TEASDALE, LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
JHoekel@ArmstrongTeasdale.com

Daryl L. Josepher
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
djoseffer@kslaw.com

Dated: June 9, 2014

/s/ Mark Strachan
*Counsel of Record*
Mark D. Strachan
SAYLES | WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

| Docket No | Date | Description | Appendix |
|---|---|---|---|
| **PATENTS** | | | |
| N/A | N/A | U.S. Patent No. 7,788,143 B2, Dated August 31, 2010 | A000052[1] |
| N/A | N/A | U.S. Patent No. 7,451,106 B1, Dated November 11, 2008 | A000077 |
| **ORDERS / JUDGMENT ON APPEAL** | | | |
| 205 | 09.27.12 | Memorandum Denying Summary Judgment and Construing Disputed Claim Terms | A000109 |
| 302 | 07.25.13 | Memorandum Granting Summary Judgment | A000164 |
| 303 | 07.25.13 | Final Judgment in favor of InnerWorkings, Inc. | A000198 |
| 304 | 07.25.13 | Final Judgment in favor of Cirqit.com, Inc. | A000199 |
| 319 | 02.06.14 | Memorandum Denying Motion to Alter or Amend the Judgment | A000200 |
| 320 | 02.06.14 | Order Denying Motion to Alter or Amend the Judgment | A000215 |
| 325 | 03.20.14 | Order Dismissing Defendants' Counterclaims as Moot | A000216 |

---

[1] Appendix pages A000001 to A000051 were reserved by the parties for the Docket Sheet from *e-LYNXX Corporation v. InnerWorkings, Inc., Case* No. 1:10-cv-02535-CCC, United States District Court for the Middle District of Pennsylvania, Harrisburg Division. The Docket Sheet was omitted from this Addendum.

US007788143B2

## (12) United States Patent
### Gindlesperger

(10) Patent No.: **US 7,788,143 B2**
(45) Date of Patent: **\*Aug. 31, 2010**

(54) **SYSTEM AND METHOD FOR COMPETITIVE PRICING AND PROCUREMENT OF CUSTOMIZED GOODS AND SERVICES**

(75) Inventor: **William A. Gindlesperger**, Chambersburg, PA (US)

(73) Assignee: **e-LYNXX Corporation**, Chambersburg, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 58 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/268,285**

(22) Filed: **Nov. 10, 2008**

(65) **Prior Publication Data**

US 2009/0125415 A1 May 14, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 09/450,023, filed on Nov. 29, 1999, now Pat. No. 7,451,106.

(60) Provisional application No. 60/110,248, filed on Nov. 30, 1998.

(51) **Int. Cl.**
*G06Q 30/00* (2006.01)

(52) **U.S. Cl.** .......................................... **705/26**; 705/37

(58) **Field of Classification Search** ................... 705/26, 705/37

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,839,829 A   6/1989 Freedman

4,992,940 A   2/1991 Dworkin

(Continued)

OTHER PUBLICATIONS

Peter Heerwagen, e-LYNXX Web site helps companies procure printing at reduced cost. Quad—State Business Journal. Winchester: Dec. 1999. vol. 11, Iss. 2; p. 10, downloaded from ProQuest Direct on the Internet on Mar. 1, 2010, 3 pages.*

(Continued)

*Primary Examiner*—James Zurita
(74) *Attorney, Agent, or Firm*—Novak Druce & Quigg LLP

(57) **ABSTRACT**

An apparatus and method for selecting a lowest bidding vendor from a plurality of vendors of a customized good or service, including receiving a set of vendor's attributes from each of the plurality of vendors representing their respective capabilities, and receiving an invitation-for-bid data from the buyer defining a custom job for which the buyer desires price quotes or bids. The vendor attributes and the invitation-for-bid, or both, are received through a web browser. The invitation-for-bid is compared to each of the vendor's attributes according to certain standard or optional selection criteria to generate a vendor selection pool of vendors qualified to bid on the job. Each vendor in the vendor selection pool receives a vendor's invitation-for-bid. A bid is received from at least one vendor in the vendor selection pool, the lowest price bid is identified, the buyer is informed of the identity of the selected vendor, and solicited for approval of the selected vendor. Upon receipt of approval from the buyer, an order is issued to the selected vendor. The non-selected vendors in the selection pool are informed of the bid prices and of the selection results.

**2 Claims, 13 Drawing Sheets**



## US 7,788,143 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,117,353 A | 5/1992 | Stipanovich et al. |
| 5,237,499 A | 8/1993 | Garback |
| 5,287,194 A | 2/1994 | Lobiondo |
| 5,592,375 A | 1/1997 | Salmon et al. |
| 5,627,973 A | 5/1997 | Armstrong et al. |
| 5,634,055 A | 5/1997 | Barnewall et al. |
| 5,640,569 A | 6/1997 | Miller et al. |
| 5,659,731 A | 8/1997 | Gustafson |
| 5,664,115 A | 9/1997 | Fraser |
| 5,758,327 A | 5/1998 | Gardner et al. |
| 5,758,328 A * | 5/1998 | Giovannoli .................. 705/26 |
| 5,765,138 A | 6/1998 | Aycock et al. |
| 5,790,642 A | 8/1998 | Taylor et al. |
| 5,794,207 A | 8/1998 | Walker et al. |
| 5,815,665 A | 9/1998 | Teper et al. |
| 5,826,244 A | 10/1998 | Huberman |
| 5,842,178 A | 11/1998 | Giovannoli |
| 5,862,223 A | 1/1999 | Walker et al. |
| 5,963,911 A | 10/1999 | Walker et al. |
| 5,970,475 A | 10/1999 | Barnes et al. |
| 5,995,947 A | 11/1999 | Fraser et al. |
| 6,014,644 A | 1/2000 | Ericson |
| 6,324,522 B2 | 11/2001 | Peterson et al. |

### OTHER PUBLICATIONS

Screen shots from www.archive.org of www.e-lynxx.com, www.bidsplus.com, and home page for www.bidsplus.com on Jan. 28, 1998, pdf document, 3 pages, 12268285__NPL__archiveOrg__WebSites.pdf.*

Vinocur, Michael D., Profitable horizons, American Printer. Chicago: Sep. 1996. vol. 217, Iss. 6; p. 26, downloaded from ProQuest Direct on the Internet on Jul. 6, 2010, 8 pages.*

Peter Heerwagen, e-LYNXX Goes After Big Prey, Quad—State Business Journal. Winchester: Nov. 2008. vol. 20, Iss. 1; p. 1, downloaded from ProQuestDirect on the Internet on Jul. 6, 2010, 4 pages.*

ABC/BidsPlus Service Agreement; Jan. 1, 1997.

ABC/BidsPlus Printing and Information Product Service Agreement; Mar. 24, 1997.

ABC/BidsPlus Printing and Information Product Service Agreement; Sep. 8, 1997.

ABC/BidsPlus 1st Marketing Package: Cover Letter; Mar. 24, 1997.

ABC/BidsPlus 1st Marketing Package:(Feb. 1, 1997 Supplemental Printing Specifications (ABC SPS1); Mar. 21, 1997.

ABC/BidsPlus 1st Marketing Package: Invitation for Bid; Mar. 26, 1997.

ABC/BidsPlus 1st Marketing Package: Bid Submission Form; Mar. 21, 1997.

ABC/BidsPlus 2nd Marketing Package: Black Folder Cover Stock and Introductory Letter; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Print and Information Product Procurement Management Services Agreement; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Print and Information Product Procurement Management Services Agreement; Operational Guidelines; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Supplemental Printing Specifications (SPS); Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Invitation for Bid; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Bid Submission Form; Sep. 1, 1997.

Sources sought and Long Range opportunities, Set-Aside Alert, Feb. 10, 1997, ISSN: 1069-5715, V5, N3.

"ImprovemeNet Improve.Netcom Now Matches Homeowner to Pre-Screened Architects and Designers: America's Home Improvement Network Answers Consumer Demand for More Help with Home Remodeling" Business Wire Dec. 4, 1997 entire article.

"ImproveNet: A Match Made on the Internet: ImproveNet.com Helps Contractors build their Nusinesses", business Wire, Oct. 15, 1997, entire article.

Chad et al., "Selecting and Commissioner Building Automation Systems", The Gale Group Nesletter, ISSN: 0162-9131, Oct. 1, 1998.

* cited by examiner

## Fig. 1A





**Fig. 1B**



**Fig. 1C**

**Fig. 1D**

A-000056



Fig. 2A

Case: 14-1349 Case: 15-1517 Document: 108-3 Page: 227 Filed: 07/01/2015 Page: 25 06/09/2014

**Fig. 2B**



## Fig. 3



## Fig. 4



**Fig. 5**



**Fig. 6**



## Fig. 7



## Fig. 8



**Fig. 9**



**Fig. 10**



## Fig. 11



## Fig. 12



**Fig. 13**



Case: 14-1349 Case: 14-1349 Case: 14-1349 CBA Document Document 21 Page: 85 29 Filed: Filed: 06/09/2014 06/09/2014

**Fig. 14**



## Fig. 15



US 7,788,143 B2

1

## SYSTEM AND METHOD FOR COMPETITIVE PRICING AND PROCUREMENT OF CUSTOMIZED GOODS AND SERVICES

The subject matter of application Ser. No. 09/450,023, is incorporated herein by reference. The present application is a Continuation of U.S. Ser. No. 09/450,023, filed Nov. 29, 1999, now U.S. Pat. No. 7,451,106, issued on Nov. 11, 2008, which claims priority to U.S. Provisional Application No. 60/110,248 filed Nov. 30, 1998. The present application claims priority to these previously filed applications.

### FIELD OF THE INVENTION

The present invention generally relates to an apparatus and method for creating a database representing pools of vendors of customized goods and services for one or more subscribing buyers, and for selecting the lowest bidder from the database's represented vendor pool on a per-job basis and, more particularly, for (i) creating and maintaining a database representing a vendor base or pool for each subscribing buyer of customized goods and services, the database further representing capabilities of said vendors, (ii) receiving solicitation data containing production specifications and related contracting terms and vendor qualification criteria from buyers, (iii) extracting vendor qualification criteria data from said solicitation data, (iv) transmitting invitations to bid on said solicitations to qualified ones of said vendors, based on said vendor qualification criteria data, and (v) selecting from among the responding vendors based on the response price and other factors.

### BACKGROUND OF THE INVENTION

Customized goods and services, such as print and other types of digitally mastered information product goods (e.g. CDs and DVDs) and services, differ from non-custom manufactured goods or services in that such goods and services are generally not pre-stocked as "off-the-shelf" items but, instead, must be specifically manufactured or provided to meet the buyer's particular requirements. Consequently, customized goods and services cannot simply be purchased "off-the-shelf" at fixed prices appearing on standard price lists. Instead, their prices are established when the exact goods or services are actually specified, either by single or multiple order(s), invitation-for-bid ("IFB"), request-for-quote ("RFQ"), or request-for-proposal ("RFP"); only then can the manufacturer or service provider assess the precise quality and manufacturing or service specifications required to perform the job.

The general procedure used in the prior art of procurement of customized goods and services is that the buyer provides the actual solicitation to one or more vendors with whom, in general, the buyer has had sufficient previous experience or recommendation to know what type of product or level of service can be provided. For purposes of this description the term "vendor", unless further qualified or clearly having a different meaning readily apparent from the context, means an entity in the market for providing customized goods and services and, unless specified, does not require that the entity being qualified meets any criteria or preference. Similarly, for purposes of this description, the terms "solicitation" or "solicitations" shall mean, individually or collectively, an order, IFB, RFQ, or RFP, while the terms "quote" or "bid" shall be used interchangeably and mean any type of pricing or other response from a vendor to an order, IFB, RFQ, or RFP.

2

After receiving the solicitation, the vendor reviews the buyer's product manufacturing and delivery specifications and requirements that are stated therein, including but not limited to physical specifications, characteristics of style, quantities, mode of shipment, delivery schedule, and quality level required to perform individual jobs or estimated job requirements over a given period of time. Then based on its previous experience in producing or providing the requested goods or services, the vendor provides an estimated price quote or bid to the buyer. Generally, the buyer will provide the solicitation to a single or very limited number of vendors, and either (1) award the contract to the single or lowest bidder; (2) award the contract to a vendor whose quality or working relationship is preferred if that preferred vendor's quote or bid is sufficiently low; or (3) "shop" the lowest quote or bid to other vendors to determine if they are willing to match or underbid the initial low quote or bid.

In following this general procedure in the prior art, however, buyers of customized goods or services confront the so-called "iron triangle" of quality, timeliness, and cost. Buyers want a product or service that is good, fast, and cheap, but what they discover is that traditional procurements methods will, at best, only achieve two of these three goals on any given job. Thus, a buyer might demand and receive top quality on a "rush" order, but only at a high cost. Conversely, negotiating a lower price may achieve cost savings, but also compromise quality and timeliness.

This problem is heightened by great elasticity in the so-called "market" price of many customized goods or services, which can vary widely from vendor to vendor and from week to week. This elasticity results from the fact that pricing of such customized goods or services greatly depends on (1) the level of service and quality desired; (2) the labor and equipment required to produce the job or provide the service; (3) the amount time involved in producing the job or providing the service; (4) whether the job or service can be engineered, designed, or furnished in a cost-effective way; and (5) whether the customer order can be included in the vendor's production schedule, while still complying with the required delivery date.

This last factor is particularly crucial when the vendors are "hard-iron" manufacturers or service providers with high overhead and labor costs, such as suppliers of print and information products. In the case of such vendors, idle equipment and labor can be devastating to their profit margins. At the same time, such vendors must be ready to service their regular customers on short notice, which means planning for downtime in the production schedule to ensure that their machinery is available for "rush" orders. Because of the limitations of traditional procurement methods, vendors are often left not only with unscheduled holes in their production schedules, but also unable to fill downtime purposefully set aside for last minute "rush" orders from regular customers. Managing customer job orders in a way that minimizes these "holes" in the production schedule is frequently what distinguishes the profitable vendor from the insolvent one.

As a result of this tension between the cost of idle equipment and labor and the need to preserve downtime for regular customers, vendors are constantly seeking short-turnaround jobs to fill their production "holes" when their regular orders do not materialize. To obtain these short-turnaround jobs, many vendors will resort to extremely low pricing, provided that they can do so without losing the goodwill of their regular customers. This pricing strategy is called "contribution pricing" because it involves bidding for work at below normal profit margins knowing that any income above out-of-pocket costs will still "contribute" 100% to the vendor's bottom line

US 7,788,143 B2

3

in comparison to the cost of letting its labor and machinery remain idle. In current printing markets, for example, "contribution" pricing on a regular basis is found in federal and state government procurements of customized print goods.

Contribution pricing occurs in the public sector because federal and state agencies are often required by law to make bid opportunities available to large numbers of vendors in order to obtain "full and open competition." Where government agencies are further required to award contracts to the lowest responsive and responsible bidder, procurements of customized goods typically result in poor quality control and relatively high administrative costs that must be subsidized by the taxpayer. In contrast, traditional procurement methods and prior art devices in the private sector have emphasized quality control by limiting the vendor pool for customized goods and services to a small number of reliable vendors with whom the buyer has previously done business.

There is a significant cost problem, however, associated with limiting the vendor pool to a small number of suppliers. Lacking the discipline of a more competitive market, vendors who know that they are bidding against limited competition will offer and charge higher prices. Prior art methods attempt to address this problem of non-competitive pricing in one of two ways: (1) longer term contracts with preferred vendors in established commercial relationships that lump procurements together over an extended contract period in the hope of enhancing the buyer's purchasing power and thereby obtaining controlled term pricing; and (2) "best buy" or "best value" procurement practices that award jobs based on factors other than price and which are largely creative user or quality control driven. Such alternative prior art methods are now being adopted increasingly in the public sector due precisely to quality issues arising from "full and open competition."

In both public and private sector customized product and service markets, however, traditional procurement methods and prior art devices have failed to solve the "iron triangle" because of their inability to take advantage of "contribution" pricing without incurring prohibitive administrative costs or sacrificing quality or timeliness. There are several key reasons for this failure.

First, in order to find the manufacturer or service provider who is willing to offer the lowest "contribution" pricing on any given job, the buyer must often request price quotations from a larger vendor pool than they are prepared or equipped to manage efficiently. A larger vendor pool would, in theory, be desirable because it usually means that a lower price quote or bid can be received. This is well-known in the general business world. In the actual business environment, however, identifying such a large vendor pool is generally not practical. The main reason is that gathering and maintaining information about a large number of current and potential vendors is time consuming and expensive. Few companies have the time, money, or inclination to maintain a large, up-to-date database on such potential vendors, particularly when soliciting dozens of quotes or bids can itself require staff and administrative time that costs more than the savings generated from receiving a greater number of competitive bids. This disparity is heightened by the fact that many customized goods or services involve relatively low dollar purchases or procurements, which is often the case, for example, with printing jobs.

Second, even if a buyer were willing to absorb the administrative costs associated with establishing, maintaining, and managing a large database of vendors to improve the competitiveness of their bidding, the buyer is often reluctant to do so because quality control becomes more difficult as the vendor pool increases. A crucial aspect of quality control is

4

obtaining information about the performance record of vendors from whom the buyer would like to solicit quotes or bids, particularly with respect to the quality and dependability of goods and services output by each vendor in the vendor pool. This is difficult not due only to the volume and nature of the information required, but also to the fact that the buyer must generally obtain such information from its own dealings with the vendor. In such circumstances, the reliability, price history, and quality of a vendor's work for other buyers may not be obtainable. As a result, buyers are reluctant to seek goods or services from new vendors because negative information on their reliability or quality may then have to be learned first hand.

This problem is made more acute by the fact that the procurement of customized goods and services frequently requires specialized knowledge and expertise in finding the right vendor for each job. Most businesses hire purchasing officials with general procurement knowledge who are then given responsibility for a wide range of purchases. As a result, the purchasing official is ill-equipped to manage large numbers of customized procurements efficiently and without loss of control over the production of individual jobs. Instead, the purchasing official is forced to rely on the vendor's expertise in designing or engineering a job, which often results in a more expensive (and more profitable for the vendor) design, engineering, or production process.

Third, even if the buyer is willing to make the financial investment necessary to hire procurement personnel with the administrative experience, staffing resources, and specialized product knowledge to manage a large pool of vendor and monitor each job closely for quality control and contract compliance, the buyer has no guarantee that vendors will offer contribution pricing. The reason is that even vendors who would gain, in an immediate sense, from contribution pricing to fill a production hole are frequently unwilling to offer that pricing to their regular customers. Such vendors are primarily concerned about losing their customers' goodwill when the vendor is unable or otherwise fails to offer contribution pricing on a repeat basis. After once receiving a quote or bid reflecting contribution pricing (e.g., due to idle machine time at the vendor's production plant when the contract must be performed), the regular customer would expect to pay the same low prices for all future jobs from that same vendor, even when the vendor lacks idle production capacity. The vendor is then faced with a Hobson's choice of either risking the loss of the customer account by refusing the less profitable job (thereby forfeiting the sales and marketing costs previously incurred to obtain the customer account) or suffering financial loss by displacing more profitable work to accept the regular customer's lower paying work.

As a consequence of the foregoing obstacles to overcoming the "iron triangle" of quality, timeliness, and cost, there has been a long felt need for a system and method of competitive pricing for custom goods and services that: (1) identifies and manages a vendor pool large enough to obtain the benefits of enhanced pricing competition, without imposing high administrative costs; (2) enables the buyer to procure from a greater number of vendors without causing a loss of quality control or contract compliance; and (3) encourages vendors to offer contribution-level pricing on a consistent basis, while identifying vendors willing to offer contribution pricing on any given job.

SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a system and method meeting the above-identified long-felt

5

needs. The present invention meets these and other objectives by providing a system and method for matching and selecting a vendor meeting both general and job-specific requirements specified by a buyer, from a plurality of vendors, comprising, in one example embodiment, an apparatus and method for quantifying a set of buyer's attributes associated with at least one kind of customized good or service and quantifying a set of vendor's attributes associated with the manufacturing, production, or provider capabilities corresponding to each of a plurality of vendors. The example embodiment further comprises means and method steps for comparing the set of quantified buyer's attributes to each quantified set of vendor's attributes corresponding to each of the plurality of vendors, the comparison being in accordance with a buyer defined selection criteria and generating, as a result of the comparison, a data set representing a vendor selection pool for the particular buyer. In addition, the example embodiment comprises means and method steps for receiving a data representing a buyer's invitation for bid to manufacture, produce, and/or provide at least one manufactured item or customized service and for submitting a corresponding data to each of the vendors represented by the data in the vendor selection pool. The described example embodiment further comprises means and method steps for receiving a bid data, having a field representing a bid price (which may be based on alternative specifications suggested by the responding vendor), from each vendor in the vendor selection pool that submits a bid data, for identifying the received bid data having the lowest bid price, and for transmitting a data to the buyer representing the identity of the identified vendor and notifying the buyer to transmit a data representing a approval or disapproval of the identified vendor. In addition, the described example embodiment includes means and method steps for receiving an approval data from the buyer and, in response to receipt, for generating and transmitting an order to the selected vendor for the purchase of at least one manufactured item or customized service at the bid price, and for transmitting or otherwise releasing a data to all vendors in the selection pool, informing each of the identity of the selected vendor and the rank order value of the bids submitted by all other selection pool vendors.

A further described embodiment of the invention implements the reception of buyer attribute data and vendor attribute data by a web site accessible through the Internet. According to this embodiment, a web site includes a graphical user interface through which potential vendors are asked to input information characterizing their products and services, their manufacturing capability, and other attribute data. Similarly, the web site has a graphical user interface accessible to buyers, for entering solicitation data and other information, including preferred vendors and standard or optional vendor selection criteria.

A further embodiment of the invention includes means and method steps for maintaining multiple vendor pools for each of a plurality of buyers, the multiple vendor pools for a particular buyer corresponding to multiple product or service types that the buyer procures.

A still further embodiment of the invention transmits and/or releases data representing the bid price of all received bids, to all vendors who submitted bids or received solicitations.

A still further embodiment of the invention automatically generates a set of project milestone data, in reverse scheduling format, for use in monitoring the winning vendor's progress on the buyer's requested manufactured item or customized service.

A still further embodiment of the invention has means and method steps for receiving an invoice data from the winning

6

vendor upon completion of the job, and generating a corresponding invoice for the buyer's approval. In this embodiment, upon invoice approval, the system can prepare the invoice data for direct transmission to the buyer's accounting system for (i) the proper allocation of costs associated with the job within the buyer entity and (ii) the transfer of funds for payment of the buyer-approved invoice from the buyer into a single escrow account for subsequent transfer of the payment funds to the vendor. This embodiment provides a single source accounting feature for buyers dealing with a plurality of vendors regardless of the type of fee charged for using the invention.

A still further embodiment of the invention has means and method steps for allocating a service, user, access, licensing, or similar fee for using the invention to each job transaction. For purposes of this description, such fee shall be referred to as a "job transaction fee." In this embodiment, the system receives an invoice data from the winning vendor upon completion of the job, and generates for the buyer's approval a corresponding invoice that, in addition to the invoice payment data from the winning vendor, includes the job transaction fee associated with the individual job. Upon invoice approval and the transfer of funds indicated on the buyer-approved invoice into an escrow account, the system can then allocate and distribute such funds by transmitting the job transaction fee included on the buyer-approved invoice to a system administration account and transmitting the remainder of such funds to the winning vendor.

BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of the present invention will be more fully described by the following detailed description of the preferred embodiment of the invention, which is to be considered together with the accompanying drawings wherein like numbers refer to like parts and further wherein:

FIGS. 1A and 1B show a typical communications system and arrangement of an example embodiment of the invention, and a flow chart of the system operation;

FIGS. 1C and 1D show flow charts of example embodiments of the invoicing and payments procedures associated with the system operation;

FIG. 2A shows an Internet-based arrangement of the system of FIGS. 1A and 1B;

FIG. 2B shows a more detailed example embodiment of an arrangement of the system's web servers and database servers shown generally on FIG. 2A at Block 621.

FIGS. 3-14 show screen displays used in connection with a specific embodiment of a print procurement application of the present invention; and

FIG. 15 shows a general embodiment of the communications system of FIG. 1A.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The method and apparatus of the present invention will be better understood by the description below of its operation in reference to the attached figures. It is to be understood, though, that the present invention is not limited to the example embodiments and arrangements described herein, but that it also comprises any modifications or equivalents within the scope of the claims.

FIGS. 1A and 1B set forth a first example embodiment of the present invention. Referring to FIG. 1A, a system database 2, which is resident on the data storage (not shown) associated with a conventional general purpose program-

US 7,788,143 B2

7

mable computer (not shown), is connected to the Internet via a web site **4** resident on a conventional web server (not shown). In a preferred embodiment of the invention the buyer (s) **6** and the plurality of vendors **8** each access the web site **4** through respective Internet browsers such as, for example, Netscape or Internet Explorer. An example of such an arrangement is shown at FIG. **2A**. It should be noted that the actual physical location of the computer(s) on which the web site **4** resides, and of the computer(s) (not shown) which perform the operations described below on the database **2** contents, and of the buyers' computers and the vendors' computers (not shown) are not prescribed by this invention. For example, the conventional general purpose programmable computer on which the database **2** resides may be co-located with, or can be located remote from the conventional web server (not shown) hosting the web site **4**. Further, the database **2** may be resident on the computer (not shown) of the buyer **6**, in which case the buyer **6** would access the database **2**, through a web browser or equivalent means, or the database **2** would automatically access the buyer's computer and download the database contents.

This specific embodiment shown on FIG. **2A** is particularly suitable for high-speed communications with a plurality of users operating in parallel. The system is illustrated with a functional diagram shown generally at **610**. In this illustration, a plurality of entities having projects to be bid upon **613** are each individually connected to a common communication network such as the Internet **614**. Potential bidders or product/service vendors **615** are similarly connected to the common communication network **614**. This high-volume bid processing system shown at **621** is similarly connected to the common communication network **614**. This high-volume bid processing system thus has access to communication with a large number of system users. This high-volume bid processing system is illustrated in greater detail below with reference to FIG. **2B**.

As shown in FIG. **2B**, an example embodiment of the high-volume bid processing system is shown generally at **710**. In this example embodiment, one or more robust, high-capacity telecommunications lines **712**, which for example may be T**1** lines, provide access to the communication network **614**, which as noted in the preferred embodiment is the Internet. The T**1** lines are directly connected to one or more web server units **714**. These web server units are capable of handling a plurality of transmission and reception operations simultaneously. The web server units also handle publication and transfer of the various web pages used with the system to the various system users that are connected through the Internet. The interconnection between the T**1** lines and web servers is a conventional connection that may be scaled for increased volume. Specifically, additional T**1** lines or web server units may be added as necessary to satisfy increases in user demand.

The web server units are connected to a pair of database servers **716** that are mirrored. The database servers **716** handle transfer and storage of all vendor and bid data used by the system as noted above. The database servers **716** are mirrored as generally known in the art in order to prevent degradation of system performance should one of the database servers cease to function properly. It will be appreciated that this particular embodiment of the system provides all of the users with ready access to information and a very simple and straightforward means for exchanging data. Extra database servers may also be added as needed in order to satisfy user demand.

Referring back to FIG. **1A**, block **10** represents the entry by the vendors **8** of a set of vendor's attributes VATTR, each

8

VATTR representing the name, geographical location and the manufacturing, production, and/or provider capabilities and other attributes of the one of the vendors **8** submitting it, which are quantified and entered into the system database by the vendors by way of the web site **4**.

An example device for storing the system database containing the VATTR information is an Internet server running under Windows NT 4.0, with MS Internet Information Server 4.0, Oracle Database 7.3.4.0, and an information server using standard ".dll" files created in any of the standard programming languages known in the art, e.g., Delphi, MS Visual Basic, or C++, Java, all running on a conventional general purpose computer hardware, such as a PC compatible Eisa/Is a HAL (486 C Stepping) equipment or the like. An example of a specific embodiment, showing the graphical user interface, is described later in this specification in reference to FIGS. **3-14**.

It should be noted that the entering of the vendors' attributes VATTR may also be performed via a manual entry of the information into the system database **2** and may also occur after a vendor has been accepted into a buyer's vendor base and begun bidding on jobs, for example, to reflect changes in the vendor's production capabilities or job preferences.

Referring to FIG. **1A** at block **12**, after receipt of a set of vendor attributes VATTR from a plurality of vendors **8**, a buyer **6** inputs, by way of the web site **4**, an invitation-for-bid data BIFBD, defining a customized good or service in terms of standardized buyer job attributes BATTR. The invitation-for-bid data BIFBD also defines any standard or optional selection criteria SC by which a vendor will be selected from among the plurality of vendors **8** and any additional vendors that the buyer **6** adds to the plurality of vendors **8** as part of the invitation-for-bid data BIFBD, as described below. The invitation-for-bid data BIFBD are quantified and entered by the buyer **6** in accordance with standard graphical user interface (GUI) prompts appearing on the particular display of the web site **4**, an example of which is described in reference to FIGS. **3-14** below. The invitation-for-bid BIFBD defines the customized goods or services according to quantified values of standardized attributes so that each vendor **8** will understand what exact manufactured item or customized service is being placed out for bids by the buyer **6**. This arrangement ensures that the bids are comparable and that mistakes as to the requirements of the buyer are minimized.

FIG. **1A**, block **14** illustrates the step of retrieving all of the vendor attribute sets VATTR from the database **2** and comparing each to the job attributes BATTR derived from the invitation-for-bid data BIFBD based on the standard selection criteria SC (such as product category and quality level) previously entered by the buyer **6** as part of the job attributes BATTR. The comparison determines which of the vendors **8** are qualified to provide the requested customized goods or services. The comparison at block **14** also uses any optional selection criteria SC which the buyer **6** had entered as part of the job attributes BATTR (such as geographical location of the vendor, whether the vendor must be a union shop, small-disadvantaged business, or a minority- or women-owned business), and includes the names of specific vendors entered by the buyer **6** as part of the invitation-for-bid data BIFBD that the buyer wished to be given the opportunity, or not be given the opportunity, to bid on the job. Based on the results of the block **14** comparison a vendor selection pool VPOOL is created, and the formatted vendors' invitation-for-bid VIFB is then transmitted at block **16**, via web site portal access, e-mail, or equivalent means, to each of the vendors represented by the vendor pool VPOOL.

US 7,788,143 B2

9 10

Referring to FIG. 1B, at block 18 all of the vendors 8 in the vendor selection pool VPOOL of FIG. 1A that received the invitation-for-bid VIFB can submit, through the web site 4, a responding bid RBID(i), where "i" is an index or name value identifying the submitting vendor, having the ith vendor's fixed price quote or bid to manufacture, produce, and/or provide a manufactured item or customized service in accordance with the specifications designated by the buyer in its invitation-for-bid VIFB or alternative specifications requested or otherwise recommended by the submitting vendor. Each responding bid RBID(i) is stored in the database 2 in a responding bid file RFILE. Prior to award of the job, which is described below, only the buyer 6 has access to the RFILE, as shown at block 20. The buyer 6 can access RFILE through the web site 4, or through direct read of the database 2, if the database 2 is resident on the computer system (not shown) of the buyer 6. The RFILE list is preferably presented to the buyer 6 in rank order according to the bid price.

Referring again to FIG. 1B, at blocks 22 and 24 after the time of bid closing, the lowest price bid is identified as a system default selection and a WINBID information is transmitted or otherwise provided to the buyer 6 which: (i) identifies the lowest bidding vendor, and (ii) solicits the buyer for approval to accept bid RBID of the lowest bidding vendor. The buyer 6 then approves the lowest bidding vendor or overrides the default selection and approves another responding bidder (for example, based on a higher bid associated with alternative job specifications), in either case by visiting the web site 4 and inputting an APPROVAL data through its web site portal workspace, or by transmitting the data via e-mail or equivalent means to the computer. Upon receipt of the APPROVAL from the buyer 6 an ORDER is issued at block 26 to the winning vendor for the purchase of the customized goods or services specified by the invitation-for-bid VIFB (including any alternative specifications accepted by the buyer), at the price bid by the winning vendor among the vendors 8. If, on the other hand, the APPROVAL is not received, or if a corresponding data (not shown) indicating no approval is received, the process goes to block 28 by which the invitation-for-bid is cancelled or reissued (in which event, the process reverts to block 6). It should be noted that depending on the particular design choice, and on the resolution of possible legal issues (such as the validity of digital signatures), a separate formality, such as a letter of acceptance or a phone discussion between the buyer 6 and the winning vendor 8, may be used or required before actual award of the bid, or before the commencing of work on the job. For purposes of this description, though, receipt of APPROVAL is sufficient. In the event that the separate formality is required, this would be carried out before moving to the block 30 described below.

After the ORDER is issued the system goes to block 30 which disseminates via web site portal access, e-mail, or equivalent means, a BIDINFO data to all of the vendors 8 in the vendor selection pool VPOOL who submitted bids, the BIDINFO data representing the identity of the selected vendor and the identity and rank order value of the bids submitted by all of the vendors 8. After the ORDER is transmitted at block 26, the system makes the BIDINFO data accessible by Internet portal to all vendors 8 in the vendor selection pool VPOOL who did not submit bids in response to the invitation-for-bid VIFB. Also after the ORDER is transmitted at block 26, either concurrent with or before or after the BIDINFO is transmitted, the system goes to block 32 and generates a set of job milestones MSTONES, which are transmitted to the buyer 6, in reverse scheduling format. The milestones MSTONES are calculated based on the buyer's job attributes BATTR associated with the particular item(s) to be manufac-

tured or customized service(s) to be provided. The milestones MSTONES are then entered into a database (not shown) that may be associated with a general purpose programmable computer (not shown) of the buyer 6 which generates screen alerts, at block 34, on the winning vendor's web site portal workspace (not shown) at time points specified by the milestones MSTONES. The winning vendor 8 must then confirm on its web site portal workspace that the work requirements associated with each milestone MSTONE have been completed as they have become due. If the completion of each milestone MSTONE is not confirmed as they become due, then the system presumes that the milestone MSTONE was not completed when due and generates a screen alert, at block 36, on the buyer's 6 web site portal workspace (not shown) that no confirmation of the completion of the milestone MSTONE has been received. The buyer 6 is thereby alerted (i) to check for any messages transmitted through the system from the winning vendor 8 to the buyer 6 explaining why the milestone MSTONE was not completed when due, or (ii) if no such message was transmitted, to contact the winning vendor 8 directly by telephone, e-mail, or equivalent means to determine if the job is on schedule or take such steps as may be necessary if the job is not on schedule. In any event, the winning vendor 8 proceeds to manufacture, produce, and/or provide the buyer-required manufactured item or customized service, and then to ship the manufactured item or provide the customized service as instructed by buyer 6.

Referring to FIG. 1C, block 38, upon confirmation by the vendor 8 that the job has been completed, the system generates an automatic vendor payment invoice that contains any approved contract modifications at the vendor's 8 web site portal workspace. Alternatively, the vendor payment invoice could be transmitted to the vendor 8 by other forms of communication such as e-mail, facsimile, or equivalent means. In the embodiment using a web site portal, the vendor 8 confirms the vendor payment invoice with a digital signature, at block 40, and the buyer 8 is then alerted on its web site portal workspace, at block 42, that the vendor payment invoice is ready for review, approval, and payment, at block 44, in accordance with the terms of the invitation-for-bid VIFB. For this embodiment, no fee for using the system is added to the vendor payment invoice, and the vendor 8 receives payment directly from the buyer 6, outside the system, at block 46 by electronic funds transfer (EFT) or physical means. An alternate embodiment for transmitting payment to the vendor 8 through the system is set out in FIG. 1C at block 48. For this embodiment, payment for all buyer 6 jobs is made by electronic funds transfer (EFT) or physical means to a single escrow account, at block 48, managed by the system to provide the buyer with single source accounting. Payment is then made to the vendor 8 from the escrow account, at block 50, by electronic funds transfer (EFT) or physical means.

A further alternate embodiment for invoice payment is set forth at FIG. 1D. Referring to FIG. 1D, at blocks 52 and 54, a vendor payment invoice is generated upon job completion and approved by the vendor 6, in the same manner described above with respect to FIG. 1C, at blocks 38 and 40. Prior to invoice approval by the buyer 6, at block 56, however, a job transaction fee is added to the invoice as payment for the cost of using the system allocated for each job. Payment of the buyer-approved invoice, at block 58, is then made to the system's single source escrow account, at block 60, in the same manner described above with respect to FIG. 1C, at blocks 44 and 48. Upon receipt of funds into the escrow account, the system allocates and distributes the job transaction fee to a system administration account, at block 62, and payment for the job to the vendor 8, at block 64. Transfer of

A-000071

US 7,788,143 B2

11

these funds to the system administration account and the vendor **8** is made by electronic funds transfer (EFT) or physical means in the same manner as described above with respect to FIG. 1C, at block **50**.

The invention and its operation are described above without limitation to specific application. Example applications include customized printed goods, digitally mastered CDs or DVDs, machine tools, furniture, engraved wares, and insurance, in which jobs are awarded on a competitive or "bid" basis.

Referring to FIGS. **3-14**, an example of the present invention applied to print procurement will be described. It will be readily understood to one of ordinary skill in the art, however, that the print procurement example is only an example application of the system and method of the present invention, and that the present invention can be applied to other types of competitive bidding on customized goods and services. The function of this example embodiment is to match a printing vendor, these being a specific example of the above-described vendors **8**, to a print job based on requirements input by the print buyer, which is a specific example of the above-described buyer **6**.

For this description it is assumed that the vendor attributes VATTR described in reference to FIGS. 1A and 1B, a set from each of a plurality of print vendors **8**, have already been entered into the database **2**, at the direction and with the consent of the print buyer **6** and that no additional vendors are added as part of the invitation-for-bid data BIFBD. The print vendors **8** enter their respective vendor attributes VATTR by visiting the web site **4** and using the vendor's web browser (not shown), e.g., Netscape, in a mode and manner substantially identical to the process described below by which the print buyer **6** enters the buyer attributes BATTR describing the particular print job for which bids will be requested. Alternatively, the print vendors **8** can transmit their respective vendor attributes VATTR to the print buyer **6** by e-mail or equivalent means for entry by the print buyers **6** or any authorized third party.

Referring to FIGS. 1A, 1B, and FIG. 2A, the print buyer **6** begins its interaction with the system by logging onto the system web site **4** using a Netscape or equivalent browser. The web site **4** and the buyer's **6** browser **12** are also referenced herein as the buyer's "quantification means". Referring to FIG. 1A, buyer **6** logs onto the web site **4** with a unique user name and password, thus ensuring that the data entered is unique to that user. Once logged in, print buyer **6** moves to his or her individual web site portal workspace **72**, and the first page of the workspace is shown at FIG. **3**. The buyer **6** then clicks on the FIG. **3** hyperlink point labeled as "Create New", using a suitable pointing device (e.g., a mouse, roller ball, track pad, or equivalent) to create a new print job. Upon clicking this hyperlink, print buyer **6** is presented with a clear, easy-to-read form such as that shown at FIG. **4**. Print buyer **6** has available to it a "back" button to go back to the hyperlink point from which any page is accessed. An example system supporting the particular example of the web site **4** represented by FIGS. **3-14**, is Windows NT 4.0, using MS Internet Information Server 4.0, Oracle Database 7.3.4.0, and an information server using standard ".dll" files created in any of the standard programming languages known in the art, e.g., Delphi, MS Visual Basic, C++, or Java, all running on a conventional general purpose computer hardware, such as, a PC compatible Eisa/Isa HAL (486 C Stepping) equipment or the like.

Referring to FIG. **4**, it is seen that the field at the top of the screen is the master ID and description area **90**. Within this field, print buyer **6** may give a print job an identifier or name

12

**92**. A purchasing instructions field **100** is shown arranged beneath the ID/description area **90**. Print buyer **6** utilizes the purchasing instructions field **100** to inform prospective print vendors **8** of any special instructions related to print job.

Referring to FIG. **5**, the buyer **6** next inserts the item for which a bid is to be requested, or adds another item to an existing list, by clicking on a drop-down menu **110** whereupon a list of possible options **115** is presented. The information entered through the screens of FIGS. **5-14** is a specific example of the buyer attributes BATTR described in reference to FIGS. 1A and 1B above. Referring to FIG. **5**, print buyer **6** selects from the list of options **115** on the basis of the particular set of needs and requirements associated with the print job to be quantified. When print buyer **6** selects an option **115** that best matches its printing needs, the "add item" button **120** is clicked, via the pointing device.

Clicking the add item button **120**, moves the buyer to a new screen, shown at FIG. **6**, requesting additional information more specific to the added item of the print job. If print buyer **6** inadvertently clicks the "add item" button **120** and selects an option that does not match its needs, the print buyer **6** may scroll to the bottom of the page and activate a "delete" button (not shown). Print buyer **6** will then be presented with the previous FIG. **5**, screen to introduce a correct job item.

Assuming that the "add item" button at FIG. **5**, was clicked to correctly select "flat sheets", the buyer **6** is presented with the example screen of FIG. **6** requesting entry into a "Master Job ID/Description" field **90**, including a "job number" **92** and "job description" (not numbered). The print buyer **6** can also select the required job quality (not numbered) from the "quality" scroll down, which provides "none designated" as an option, as depicted at FIG. **6**. The FIG. **6** screen provides a "quantity" area **130** so that print buyer **6** may enter the total number of units to be manufactured. For this example, print buyer **6** also supplies the "overrun permitted" and/or "underrun permitted" as a percentage in fields **135**. The FIG. **6** screen provides entry, at field **138**, of additional "complete set(s) of film" and "film or plate ready disc(s)".

After the data entry screen of FIG. **6** is completed, the buyer's browser, in this example of adding an order for "flat sheet", moves to the web page or screen depicted at FIG. **7**. The FIG. **7** example screen includes a proof area **140** which allows print buyer **6** to enter information about types of proofs **142** required and inspection requirements **144**.

After completion of the example screen of FIG. **7**, the buyer **6** is presented with the example screen of FIG. **8**. Near the top of the FIG. **8** screen example is a "production contact" area **145** with a drop-down menu that allows print buyer **6** to choose from a list of production contacts, an example being shown as item **150**. For this example, the print buyer **6** then moves down to the trim field **155** to define the width and type of trimming operation required for the example flat sheet order. This portion of the FIG. **8** example screen is shown in greater detail at FIG. **9**. The detailed example screen of FIG. **9** includes a "stock" field **160** for the print buyer **6** to enter the type of paper stock required for the job, as well as a "color" **165**, "manufacturer" **170**, "grade" **175** selections, "basis weight" **180** and "basis size" **185**. In the particular example screen detailed at FIG. **9**, the print buyer **6** is provided with a field **188** allowing him or her to specify whether substitutes, such as recycled paper, are allowed.

For this print procurement example, the buyer **6**, after completing the FIG. **9** screen, is presented with the fields for entering the ink specification data, by a screen such as that shown at FIG. **10**. The FIG. **10** example provides the print buyer **6** with a field **189** for the selection of ink for front and back of the flat sheet, with a set of "radio buttons" for entering

A-000072

US 7,788,143 B2

13

"Coverage" as "Light", "Medium" or "Heavy", and with a set of "yes" or "no" buttons specifying additional requirements for the materials and the process of manufacture.

Next, at FIG. 11, the print buyer 6 is guided through a series of options related to the finishing of the flat sheet printed item. Each finish option 190 is associated with a small "pop-up" screen 195 that acts as an assistant to guide the print buyer 6 through the process of identifying and specifying the specific finishing requirements. Each pop-up assistant 195 provides print buyer 6 with choices of several options specific to particular types of finishes. Referring to FIG. 12, a detailed view of an example "pop-up" screen 195 is presented to the buyer 6, having a pull down menu of available stitching options. If the buyer 6 clicks on the example highlighted at FIG. 12, which is "Saddle Stitch", he or she is presented with another "pop-up" screen such as that shown at FIG. 13. FIG. 14 shows another finishing set of finishing options 195, defining the packaging requirements for the print job. Other attributes associated with a particular print job include binding, folding, perforations, scoring, punching, numbering, bar coding, and collation.

Referring to FIGS. 1A and 1B, after the buyer 6 enters the data into the example screens of FIGS. 3-14 describing the job, the buyer 6 clicks on a "submit invitation-for-bid" button on the screen (not shown) and, in response, the system generates the buyer's invitation-for-bid data BIFBD, and the system commences the processing indicated at block 12. More specifically, the system receives the invitation-for-bid data BIFBD, and extracts the buyer's attributes BATTR from the information entered by the screens of FIGS. 3-14, and then compares those attributes to each of the plurality of sets of print vendor's attributes VATTR, using as the selection criteria SC for generating the vendor pool VPOOL the standard selection criteria SC entered by the buyer 6 along with the buyer's job attributes BATTR (such as product category and quality level) and any additional optional selection criteria SC (such as geographical limits or whether the vendor must be a union shop, small-disadvantaged business, or a minority- or women-owned business), specified by the buyer 6.

After the print vendor selection pool VPOOL is created by the system, the vendors' invitation-for-bid VIFB is submitted to each print vendor therein. The vendors' invitation-for-bid VIFB provides a specification for the printed item (e.g., paper forms, snap sets, envelopes, labels, rolled labels, magazines/booklets, etc.) presented in a form that is derived from the quantified set of print buyer's job attributes BATTR so that each print vendor 8 will understand the exact item or service is being placed out for bids by the print buyer 6. This arrangement ensures that the bids are comparable and that mistakes as to the requirements of print buyer 6 are minimized.

As described above with reference to FIG. 1B and the general embodiment of this invention, all of the print vendors 8 in the vendor selection pool VPOOL of FIG. 1A that received the invitation-for-bid VIFB can submit, through the web site 4, a responding bid RBID(i) having the i$^{th}$ vendor's price quote or bid on the print job specified by VIFB. In this example embodiment for procuring print jobs, the responding bids RBID do not contain any alternative specifications requested or otherwise recommending by the submitting vendors and are stored in the database 2 in a responding bid file RFILE which is accessible by, or provided to the print buyer 6, preferably presented to the print buyer 6 in rank order according to the bid price. After the time of bid closing the lowest price bid is identified as a system default selection and a WINBID information is transmitted or otherwise provided to the print buyer 6 which: (i) identifies the lowest

14

bidding vendor, and (ii) solicits the print buyer for approval to accept the bid RBID of the lowest bidding vendor. The print buyer 6 then approves the lowest bidding vendor or overrides the default selection and approves another responding bidder, in either case by visiting the web site 4 and inputting an APPROVAL data through its web site portal workspace. Upon receipt of the APPROVAL from the print buyer 6 an ORDER is issued at block 26 to the selected print vendor by web site portal access, e-mail, or equivalent means to provide the printed goods or services specified by the invitation-for-bid, at the price bid by the winning vendor.

After the ORDER is issued the system goes to block 30 which transmits, via web site portal access, e-mail, or equivalent means, a BIDINFO data to all of the print vendors 8 in the vendor selection pool VPOOL who submitted bids, the BID-INFO data representing the identity of the selected print vendor and the identity and rank order value of their bids. After the ORDER is transmitted, the system makes the BIDINFO data accessible by web site portal access to all vendors 8 in the vendor selection pool VPOOL who did not submit bids. Then, at block 32 a set of job milestones MSTONES are generated and transmitted to the print buyer 6, in reverse scheduling format, based on the job attributes BATTR associated with the particular print item(s) to be provided. As each milestone MSTONE becomes due (e.g. pick-up of buyer-furnished material, delivery of proofs, required press sheet inspections, partial and complete shipments of final product), an alert is generated, at block 34, on the print vendor's web site portal workspace (not shown). The print vendor 8 must then confirm on its web site portal workspace that each task associated with the alerted milestone MSTONE has been completed. If the completion of the alerted milestone MSTONE is not confirmed by the print vendor 8, then the system generates a screen alert, at block 36, on the buyer's 6 web site portal workspace (not shown) that no confirmation of the completion of the milestone MSTONE has been received. The buyer 6 is thereby alerted (i) to check the system for any messages from the print vendor 8 explaining why the milestone MSTONE was not completed when due, or (ii) if no such message was transmitted, to contact the print vendor 8 directly by telephone, e-mail, or equivalent means to determine if the job is on schedule or take such steps as may be necessary if the job has been delayed. In this manner, the system automatically tracks the job's progress until the print vendor 8 completes the job by producing and/or providing the specified print item(s) and ships them as specified by the invitation-for-bid VIFB.

Upon completion the winning print vendor 8 confirms that the job has been delivered, and the system generates an automatic invoice that contains any approved contract modifications at the vendor's web site portal workspace. The winning vendor 8 confirms the invoice with a digital signature, and the buyer is then alerted on its web site portal workspace that the invoice is ready for review, approval, and payment in accordance with the terms of the invitation-for-bid VIFB. For this example embodiment, it is assumed that the buyer has chosen to pay a job transaction fee for use of the system with single source accounting for all of its solicited printed jobs. Referring to FIG. 1D, the job transaction fee is added to the vendor payment invoice shown on the buyer's 6 web site portal workspace prior to the buyer's 6 approval, at block 56. Payment of the buyer-approved invoice, at block 58, is then made to the system's single source escrow account, at block 60, by electronic funds transfer (EFT) or physical means. Upon receipt of funds into the escrow account, the system allocates and distributes, again by electronic funds transfer (EFT) or

US 7,788,143 B2

15

physical means, the job transaction fee to a system administration account, at block 62, and payment for the job to the vendor 8, at block 64.

Those skilled in the art will appreciate that the specific embodiments set forth above are for purposes of example only and the invention may be practiced with a wide range of alternate structures. For example, referring to FIG. 15, the present invention contemplates alternative memory and processor structures and connections between these structures, using a generic external data link instead of the vendor web browser 10, buyer web browser 12, web site 4 and database 2 depicted at FIG. 1B.

As shown in FIG. 15, the database 2 of FIG. 1B may reside on a processor 502 with access to a memory 504. The processor may be one associated with a personal computer or workstation, for example. The memory 504 may be dedicated to the personal computer or workstation. However, the memory 504 may actually be comprised of one or more distinct memory units which may be, for example, random access memory (RAM), EEPROM, floppy disc drives or hard drives. In such an embodiment, these separate memory units are simply linked to the processor via a data bus or other known transmission link.

The memory 504 preferably receives data from an external data link 506. The data may be routed to the memory via the processor 502 or through some other data bus or other known transmission link. The external data link 506 may be a connection via the Internet, through e-mail or some other alternate sources for data transfer. For example, the data transfer represented could be accomplished by automated facsimile reception and downloading of data through optical character recognition, or through voice recognition-to-text. The data that is stored in the memory will typically include the request for bid data used in the claimed process BIFB, the received bids RBID, as well as the vendor job attributes VATTR.

Thus, in this alternate embodiment of the present invention, the bid data may be received in a variety of different formats for the convenience of all system users. System users are thus not limited to access through a web interface. This facilitates a much simpler use of the system because users may phone in the required information, send it via e-mail, or even by facsimile. Once a solicitation for bid information has been transmitted by the overall system operator, bid data may be received through the various forms of communications noted above.

The bid data is then transferred and stored in the memory 504. As with the previous embodiments, the processor then identifies the appropriate bid satisfying all the necessary requirements and which also has the lowest bid value. The ultimate selection information may be then transmitted to each of the bidders or may be maintained in secrecy.

In yet a further advanced form of the system, a plurality of jobs may be processed simultaneously. In this regard, separate computer processors with separate dedicated memory units may be associated with each of several distinct jobs. Alternately, a single computer may receive bid data from a plurality of sources that are then categorized or tagged in the memory for the respective jobs to be bid on. The processor will then be able to identify the lowest bid for a particular project once the closing date and time has passed. This is accomplished by examining stored bid data associated with a particular project based on the categorization or further information tag.

It will be recognized by those skilled in the art that the embodiment described above is compatible with the alternate communications devices previously described. Specifically, other computer systems that are programmed to send and

16

receive data in other formats may also be linked with the database servers to provide more flexibility for the overall system. In that regard, computers that are dedicated to received vendor bid information or other data to be used by the system via facsimile, voice, or electronic mail may be linked directly with the database servers in order to transfer this information to the database servers automatically. Any number of computers could be connected in this manner to enable the system to automatically and simultaneously receive voice, facsimile, or electronic mail data and transfer this information to the appropriate file locations on the database servers. For example, in such a version of the system, the vendor bid data could be received over the Internet or via any of the over communication media described above. It is also contemplated that yet additional forms of communication may be used by the system in order to create yet greater flexibility for the system.

Advantages of the Invention

As can be readily determined by one of ordinary skill in the art of procuring customized goods and services, numerous advantages are obtained by employing the present invention. First, the invention enables the buyer to manage a large vendor base without costly administrative burdens so that the buyer's purchasing personnel can focus on budget planning, job preparation, internal customer service needs, production quality, and contract compliance.

The invention accomplishes this goal, initially, by quantifying both the buyer's procurement needs and the vendors' attributes in a database system that matches objective product specifications with pre-determined vendor quality levels and manufacturing, production, or provider capabilities for each approved vendor.

The buyer sets the parameters for both vendor pool selection and the bidding and award process so that vendor quality and responsibility can be determined at the time each buyer's vendor base is established. In this manner the system eliminates time-consuming assessments of the quality or capability of each bidder each time a individual job is solicited. At the same time, the invention obviates the need to make judgments about the responsiveness of the bids after they have been submitted. Significantly, the invention is not a posting system. Rather it is a procurement system in which the buyer can create and manage a single pool of vendors who are given specific production category and quality level ratings that, together with other selection criteria, automatically designate which solicitations each vendor in the pool can receive and bid.

Moreover, the specification writing and bidding and award processes are standardized so as to make the preparation and dissemination of solicitations, the receipt of quotes or bids, and the award of the job to the lowest responsive and responsible bidder virtually automatic and without the need for additional procurement staff or the expenditure of related out-of pocket administrative costs typically associated with comparing or evaluating a multitude of vendor bids.

In addition, the process of monitoring production is enhanced and simplified by the embodiment of the invention that automatically creates a detailed set of production milestones in reverse schedule format. These production milestones then become the focal point for an ongoing dialogue prompted by automatic system alerts about the job's progress among the buyer's procurement personnel, the buyer's end-users or other constituent elements, and each participating vendor, using the system's network of web site portal communication links.

A-000074

US 7,788,143 B2

17

Yet another embodiment of the invention provides a single source accounting method for buyers dealing with a plurality of vendors, while allocating fees associated with using the system to each individual job, which further simplifies and lowers the cost of the administrative process. This embodiment receives an invoice data from the winning print vendor upon completion of the job and generates, for the buyer's approval, a corresponding invoice at the buyer's web site portal workspace that adds a job transaction fee to the payment amount requested by the vendor. Upon approval, the system can prepare the invoice data for direct transmission to the buyer's accounting system for proper allocation of costs within the buyer entity and the electronic transfer of funds from the buyer based on the buyer-approved invoice into a single escrow account that serves as the accounts payable destination for all of the buyer's vendor payments. The system can then allocate and distribute the deposited amount by transmitting the job transaction fee to a system administration account, and transmitting the remainder from the escrow account to the winning vendor.

Second, the invention has many built-in features that help ensure quality control and contract compliance. The emphasis on quality control begins at the pre-qualification stage when vendor pools are established, rather than at the time of job award. This emphasis is underscored by the vendor's knowledge that poor quality or untimely delivery may result in the vendor being removed from that buyer's vendor base and the inability to bid on that buyer's future jobs.

Quality control is further enhanced by the buyer's use of the invention's specification-writing features to create precise detailed production specifications that objectively define the buyer's manufacturing and quality expectations. The comprehensive, easy-to-use computerized specification writing tools associated with the invention, in effect, free the buyer from dependency on the vendor's specialized product knowledge. As a result, the buyer is now able to procure based on objective specifications that reflect the buyer's requirements rather than one particular vendor's existing backlog, manufacturing, production, or provider preferences.

Similarly, the automatic post-award production milestones, reverse scheduling, and job management communication aspects of the invention enable the buyer's procurement personnel to monitor the production process efficiently at any time and from any computer station with Internet access. This feature ensures that potential manufacturing or delivery problems can be addressed early, thereby enhancing quality control and contract compliance.

Third, the invention creates a unique type of enhanced competitive bidding that virtually guarantees the submission of numerous bids containing contribution-level pricing for each and every job. By furnishing the buyer with easy, efficient Internet-based tools to create specifications, disseminate solicitations, and receive and evaluate bids from some or all of a potentially large number of pre-qualified and buyer-approved vendors, the invention makes it more cost effective to solicit competitive bidding on all jobs, including the type of short-term, small-dollar jobs best-suited to fill production holes and generate contribution pricing.

Moreover, once approved for a buyer's base of pre-qualified vendors, the invention enables the vendor to obtain individual jobs without having to expend additional costs on sales or marketing. These savings in sales commissions and marketing costs can then be passed onto the buyer, while the vendor is assured access to future bidding opportunities that match the vendor's quantified quality level and/or manufacturing, production, or provider capabilities. This assured access not only furnishes the vendor with bidding opportuni-

18

ties on the type of short-term work most likely to generate "contribution" pricing, but also allows the vendor to bid high, low, or not at all without fear of undermining the buyer's goodwill or compromising the vendor's opportunities to bid future jobs.

Knowing beforehand that the award will routinely go to the lowest responsive and responsible bidder, each participating vendor will also have an incentive to submit their lowest bid upfront, rather than hold back their lowest bid in the expectation that the buyer will "shop" the bid around or otherwise engage in post-bid opening price negotiations. Similarly, having the ability to review a complete set of detailed objective specifications before bidding, the vendor no longer will need to build pricing cushions into its bids in order offset unforeseen production expenses. Instead, vendors can calculate their bids more precisely, and hence more competitively, at the time of submission.

Lastly, the invention offers an additional feature whereby, at the sole discretion of the buyer, all received bids can be released after award to all vendors who were invited to respond. In this manner, the invention allows the buyer to take advantage of an inherent "ratcheting down" effect as each vendor learns how low the price range is likely to be on similar jobs in the future. These factors taken together virtually assure the buyer of receiving "contribution pricing" from numerous responding vendors on each and every job.

In sum, by harnessing Internet technology to handle all five major steps or operations of an electronic commerce system for procuring customized goods and services-viz., (1) vendor base selection and management; (2) job estimating, specification writing, review, and approval; (3) solicitation distribution, bidding, and award; (4) job production management, quality control, and contract compliance; and (5) invoicing, payment, and cost allocation—the buyer can create and manage large multiple vendor pools to obtain the benefits of competitive bidding based on contribution pricing, while enhancing administrative productivity, production quality, and contract compliance. In this way, the invention enables the buyer to overcome the limitations of prior art systems and methods in escaping the "iron triangle" of quality, timeliness, and cost.

It is to be understood that the present invention is described above in reference to specific embodiments which are for purposes of example only, and that the invention is not limited to the specific arrangement, order of processing, or hardware for carrying out the steps as described above or shown in the drawings, but also comprises the various modifications readily apparent to one skilled in the art upon reading this specification, as defined by the broadest scope of the appended claims.

Having described my invention, what I claim as new and to secure by letters patent is as follows:

1. A method for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services via a computer operated system, comprising the steps of:

prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, receiving and processing electronic communications from a plurality of vendors, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

US 7,788,143 B2

19

20

receiving an electronic communication from or on behalf of any buyer using the system which provides information identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receiving an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor; and

outputting to said buyer an electronic communication providing at least one of said bid response data.

2. A computer operated system for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services, the system comprising:

an electronic memory comprising a plurality of vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service; and

a computer processor associated with said electronic memory, the computer processor configured to:

receive and process electronic communications from a plurality of vendors, prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing the plurality of vendor records which are stored in the electronic memory;

receive an electronic communication from or on behalf of any buyer using the system which provides information identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receive an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically compare via the computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identify via the computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmit the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receive bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor; and

output to said buyer an electronic communication providing at least one of said bid response data.

* * * * *

US007451106B1

## (12) United States Patent
### Gindlesperger

(10) Patent No.: **US 7,451,106 B1**

(45) Date of Patent: **Nov. 11, 2008**

(54) **SYSTEM AND METHOD FOR COMPETITIVE PRICING AND PROCUREMENT OF CUSTOMIZED GOODS AND SERVICES**

(75) Inventor: **William A. Gindlesperger**, Chambersburg, PA (US)

(73) Assignee: **e-LYNXX Corporation**, Chambersburg, PA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/450,023**

(22) Filed: **Nov. 29, 1999**

### Related U.S. Application Data

(60) Provisional application No. 60/110,248, filed on Nov. 30, 1998.

(51) **Int. Cl.**
$\quad$ **G06Q 40/00** $\quad$ (2006.01)

(52) **U.S. Cl.** ............................. **705/37**; 705/35; 705/26; 705/28

(58) **Field of Classification Search** ............. 705/35–37, 705/26, 27, 28
$\quad$ See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,992,940 | A | 2/1991 | Dworkin |
| 5,117,353 | A | 5/1992 | Stipanovich et al. |
| 5,237,499 | A | 8/1993 | Garback |
| 5,287,194 | A | 2/1994 | Lobiondo |
| 5,592,375 | A | 1/1997 | Salmon et al. |
| 5,627,973 | A | 5/1997 | Armstrong et al. |
| 5,634,055 | A | 5/1997 | Barnewall et al. |
| 5,640,569 | A | 6/1997 | Miller et al. |
| 5,659,731 | A | * 8/1997 | Gustafson ................... 395/604 |
| 5,664,115 | A | 9/1997 | Fraser |
| 5,758,327 | A | 5/1998 | Gardner et al. |
| 5,758,328 | A | 5/1998 | Giovannoli |
| 5,765,138 | A | * 6/1998 | Aycock et al. ................. 705/7 |
| 5,790,642 | A | 8/1998 | Taylor et al. |

(Continued)

#### OTHER PUBLICATIONS

Sources Sought and Long Range Opportunities, Set-Aside Alert, Feb. 10, 1997, ISSN: 1068-5715, V5,n3.

(Continued)

*Primary Examiner*—Stefanos Karmis

(74) *Attorney, Agent, or Firm*—Robert J. Depke; Rockey, Depke & Lyons, LLC.

(57) **ABSTRACT**

An apparatus and method or selecting a lowest bidding vendor from a plurality of vendors of a customized good or service, including receiving a set of vendor's attributes from each of the plurality of vendors representing their respective capabilities, and receiving an invitation-for-bid data from the buyer defining a custom job for which the buyer desires price quotes or bids. The vendor attributes or the invitation-for-bid, or both, are received through a web browser. The invitation-for-bid is compared to each of the vendor's attributes according to certain standard or optional selection criteria to generate a vendor selection pool of vendors qualified to bid on the job. Each vendor in the vendor selection pool receives a vendor's invitation-for-bid. A bid is received from at least one vendor in the vendor selection pool, the lowest price bid is identified, the buyer is informed of the identity of the selected vendor, and solicited for approval of the selected vendor. Upon receipt of approval from the buyer, an order is issued to the selected vendor. The non-selected vendors in the selection pool are informed of the bid prices and of the selection results.

**24 Claims, 18 Drawing Sheets**



# US 7,451,106 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,794,207 A | 8/1998 | Walker et al. | |
| 5,815,665 A | 9/1998 | Teper et al. | |
| 5,826,244 A | 10/1998 | Huberman | |
| 5,842,178 A * | 11/1998 | Giovannoli | 705/26 |
| 5,862,223 A * | 1/1999 | Walker et al. | 705/50 |
| 5,963,911 A | 10/1999 | Walker et al. | |
| 5,970,475 A | 10/1999 | Barnes et al. | |
| 5,995,947 A | 11/1999 | Fraser et al. | |
| 6,014,644 A * | 1/2000 | Erickson | 705/37 |
| 6,243,691 B1 * | 6/2001 | Fischer et al. | 705/37 |
| 6,324,522 B2 * | 11/2001 | Peterson et al. | 705/28 |

## OTHER PUBLICATIONS

ImproveNet: Improve.Netcom Now Matches Homeowners to Pre-screened Architects and Designers: America's Home Improvement Network Answers Consumer Demand for More Help with Home Remodeling, Business Wire, Dec. 4, 1997, entire article.

ImproveNet2: ImproveNet Launches Contractor Watch: A Free, Nationwide Contractor Quality Tracking Network for Homeowners, Business Wire, Sep. 2, 1998, entire article.

"ImproveNet: A Match Made on the Internet: ImproveNet. com Helps Contractor Build Their Businesses", Business Wire, Oct. 15, 1997 entire article.

ABC/BidsPlus Service Agreement; Jan. 1, 1997.

ABC/BidsPlus Printing and Information Product Service Agreement; Mar. 24, 1997.

ABC/BidsPlus Printing and Information Product Service Agreement; Sep. 8, 1997.

ABC/BidsPlus 1st Marketing Package: Cover Letter; Mar. 24, 1997.

ABC/BidsPlus 1st Marketing Package:(Feb. 1, 1997 Supplemental Printing Specifications (ABC SPS1); Mar. 21, 1997.

ABC/BidsPlus 1st Marketing Package: Invitation for Bid; Mar. 26, 1997.

ABC/BidsPlus 1st Marketing Package: Bid Submission Form; Mar. 21, 1997.

ABC/BidsPlus 2nd Marketing Package: Black Folder Cover Stock and Introductory Letter; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Print and Information Product Procurement Management Services Agreement; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Print and Information Product Procurement Management Services Agreement; Operational Guidelines; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Supplemental Printing Specifications (SPS); Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Invitation for Bid; Sep. 1, 1997.

ABC/BidsPlus 2nd Marketing Package: Bid Submission Form; Sep. 1, 1997.

* cited by examiner

Case: 14-1043 Case: 16-953 Document: 00118 Document: 00147100329 Page: 99 Page: Filed: 99 06/09/2014 Filed: 06/09/2014



FIG. 1A



FIG. 1B

Case: 14-13... Case: ... Document... Page... Filed 06/09/2014

**FIG. 1C**



**FIG. 1D**



Case: 14-1329 Case: CASE PARTICIPANTS ONLY Document: 188 Page: 102 Filed: 06/09/2014

System Overview



FIG. 2A

Case: 14-13Case: CASE: PARTICIPANTS Document 88 Page: Filed 09/27 Page 103 Filed: 06/09/2014

## 710



**FIG. 2B**



Fig. 3



Fig. 4

A-000085



Fig. 5



Fig. 6



Fig. 7

A-000088

Case: 14-1348 Case: 14-1348 CASE: 14-1348 Document: 189 Document: 189 Page: 109 Page: 109 Filed: 06/09/2014 Filed: 06/09/2014

**U.S. Patent**     Nov. 11, 2008     **Sheet 11 of 18**     **US 7,451,106 B1**



Fig. 8



Fig. 9



Fig. 10



Fig. 11



Fig. 12



Fig. 13



Fig. 14



**FIG. 15**

US 7,451,106 B1

1

# SYSTEM AND METHOD FOR COMPETITIVE PRICING AND PROCUREMENT OF CUSTOMIZED GOODS AND SERVICES

The present application claims priority to provisional Application No. 60/110,248, filed Nov. 30, 1998.

## FIELD OF THE INVENTION

The present invention generally relates to an apparatus and method for creating a database representing pools of vendors of customized goods and services for one or more subscribing buyers, and for selecting the lowest bidder from the database's represented vendor pool on a per-job basis and, more particularly, for (i) creating and maintaining a database representing a vendor base or pool for each subscribing buyer of customized goods and services, the database further representing capabilities of said vendors, (ii) receiving solicitation data containing production specifications and related contracting terms and vendor qualification criteria from buyers, (iii) extracting vendor qualification criteria data from solicitation data, (iv) transmitting invitations to bid on said solicitations to qualified ones of said vendors, based on said vendor qualification criteria data, and (v) selecting from among the responding vendors based on the response price and other factors.

## BACKGROUND OF THE INVENTION

Customized goods and services, such as print and other types of digitally mastered information product goods (e.g. CDs and DVDd) and services, differ from non-custom manufactured goods or services in that such goods and services are generally not pre-stocked as "off-the-shelf" items but, instead, must be specifically manufactured or provided to meet the buyer's particular requirements. Consequently, customized goods and services cannot simply be purchased "off-the-shelf" at fixed prices appearing on standard price lists. Instead, their prices are established when the exact goods or services are actually specified, either by single or multiple order(s), invitation-for-bid ("IFB"), request-for-quote ("RFQ"), or request-for-proposal ("RFP"); only then can the manufacturer or service provider assess the precise quality and manufacturing or service specifications required to perform the job.

The general procedure used in the prior art of procurement of customized goods and services is that the buyer provides the actual solicitation to one or more vendors with whom, in general, the buyer has had sufficient previous experience or recommendation to know what type of product or level of service can be provided. For purposes of this description the term "vendor", unless further qualified or clearly having a different meaning readily apparent from the context, means an entity in the market for providing customized goods and services and, unless specified, does not require that the entity being qualified meets any criteria or preference. Similarly, for purposes of this description, the terms "solicitation" or "solicitations" shall mean, individually or collectively, an order, IFB, RFQ, or RFP, while the terms "quote" or "bid" shall be used interchangeably and mean any type of pricing or other response from a vendor to an order, IFB, RFQ, or RFP.

After receiving the solicitation, the vendor reviews the buyer's product manufacturing and delivery specifications and requirements that are stated therein, including but not limited to physical specifications, characteristics of style, quantities, mode of shipment, delivery schedule, and quality level required to perform individual jobs or estimated job

2

requirements over a given period of time. Then based on its previous experience in producing or providing the requested goods or services, the vendor provides an estimated price quote or bid to the buyer. Generally, the buyer will provide the solicitation to a single or very limited number of vendors, and either (1) award the contract to the single or lowest bidder; (2) award the contract to a vendor whose quality or working relationship is preferred if that preferred vendor's quote or bid is sufficiently low; or (3) "shop" the lowest quote or bid to other vendors to determine if they are willing to match or underbid the initial low quote or bid.

In following this general procedure in the prior art, however buyers of customized goods or services confront the so-called "iron triangle" of quality, timeliness, and cost. Buyers want a product or service that is good, fast, and cheap, but what they discover is that traditional procurements methods will, at best, only achieve two of these three goals on any given job. Thus, a buyer might demand and receive top quality on a "rush" order, but only at a high cost. Conversely, negotiating a lower price may achieve cost savings, but also compromise quality and timeliness.

This problem is heightened by great elasticity in the so-called "market" price of many customized goods or services, which can vary widely from vendor to vendor and from week to week. This elasticity results from the fact that pricing of such customized goods or services greatly depends on (1) the level of service and quality desired; (2) the labor and equipment required to produce the job or provide the service; (3) the amount time involved in producing the job or providing the service; (4) whether the job or service can be engineered, designed or furnished in a cost-effective way; and (5) whether the customer order can be included in the vendor's production schedule, while still complying with the required delivery date.

This last factor is particularly crucial when the vendors are "hard-iron" manufacturers or service providers with high overhead and labor costs, such as suppliers of print and information products. In the case of such vendors, idle equipment and labor can be devastating to their profit margins. At the same time, such vendors must be ready to service their regular customers on short notice, which means planning for downtime in the production schedule to ensure that their machinery is available for "rush" orders. Because of the limitations of traditional procurement methods, vendors are often left not only with unscheduled holes in their production schedules, but also unable to fill downtime purposefully set aside for last minute "rush" orders from regular customers. Managing customer job orders in a way that minimizes these "holes" in the production schedule is frequently what distinguishes the profitable vendor from the insolvent one.

As a result of this tension between the cost of idle equipment and labor and the need to preserve downtime for regular customers, vendors are constantly seeking short-turnaround jobs to fill their production "holes" when their regular orders do not materialize. To obtain these short-turnaround jobs, many vendors will resort to extremely low pricing, provided that they can do so without losing the goodwill of their regular customers. This pricing strategy is called "contribution pricing" because it involves bidding for work at below normal profit margins knowing that any income above out-of-pocket costs will still "contribute" 100% to the vendor's bottom line in comparison to the cost of letting its labor and machinery retain idle. In current printing markets, for example, "contribution" pricing on a regular basis is found in federal and state government procurements of customized print goods.

Contribution pricing occurs in the pubic sector because federal and state agencies are often required by law to make

US 7,451,106 B1

3

bid opportunities available to large numbers of vendors in order to obtain "full and open competition." Where Government agencies are further required to award contracts to the lowest responsive and responsible bidder, procurements of customized goods typically result in poor quality control and relatively high administrative costs that must be subsidized by the taxpayer. In contrast, traditional procurement methods and prior art devices in the private sector have emphasized quality control by limiting the vendor pool for customized goods and services to a small number of reliable vendors with whom the buyer has previously done business.

There is a significant cost problem, however, associated with limiting the vendor pool to a small number of suppliers. Lacking the discipline of a more competitive market, vendors who know that they are bidding against limited competition will offer and charge higher prices. Prior art methods attempt to address this problem of non-competitive pricing in one of two ways: (1) longer term contracts with preferred vendors in established commercial relationships that lump procurements together over an extended contract period in the hope of enhancing the buyer's purchasing power and thereby obtaining controlled term pricing; and (2) "best buy" or "best value" procurement practices that award jobs based on factors other than price and which are largely creative user or quality control driven. Such alternative prior art methods are now being adopted increasingly in the public sector due precisely to quality issues arising from "full and open competition."

In both public and private sector customized product and service markets, however, traditional procurement methods and prior art devices have failed to solve the "iron triangle" because of their inability to take advantage of "contribution" pricing without incurring prohibitive administrative costs or sacrificing quality or timeliness. There are several key reasons for this failure.

First, in order to find the manufacturer or service provider who is willing to offer the lowest "contribution" pricing on any given job, the buyer must often request price quotations from a larger vendor pool than they are prepared or equipped to manage efficiently. A larger vendor pool would, in theory, be desirable because it usually means that a lower price quote or bid can be received. This is well-known in the general business world. In the actual business environment, however, identifying such a large vendor pool is generally not practical. The main reason is that gathering and maintaining information about a large number of current and potential vendors is time consuming and expensive. Few companies have the time, money, or inclination to maintain a large, up-to-date database on such potential vendors, particularly when soliciting dozens of quotes or bids can itself require staff and administrative time that costs more than the savings generated from receiving a greater number of competitive bids. This disparity is heightened by the fact that many customized goods or services involve relatively low dollar purchases or procurements, which is often the case, for example, with printing jobs.

Second, even if a buyer were willing to absorb the administrative costs associated with establishing, maintaining, and managing a large database of vendors to improve the competitiveness of their bidding, the buyer is often reluctant to do so because quality control becomes more difficult as the vendor pool increases. A crucial aspect of quality control is obtaining information about the performance record of vendors from whom the buyer would like to solicit quotes or bids, particularly with respect to the quality and dependability of goods and services output by each vendor in the vendor pool. This is difficult not due only to the volume and nature of the information required, but also to the fact that the buyer must

4

generally obtain such information from its own dealings with the vendor. In such circumstances, the reliability, price history, and quality of a vendor's work for other buyers may not be obtainable. As a result, buyers are reluctant to seek goods or services from new vendors because negative information on their reliability or quality may then have to be learned first hand.

This problem is made more acute by the fact that the procurement of customized goods and services frequently requires specialized knowledge and expertise in finding the right vendor for each job. Most businesses hire purchasing officials with general procurement knowledge who are then given responsibility for a wide range of purchases. As a result, the purchasing official is ill-equipped to manage large numbers of customized procurements efficiently and without loss of control over the production of individual jobs. Instead, the purchasing official is forced to rely on the vendor's expertise in designing or engineering a job, which often results in a more expensive (and more profitable for the vendor) design, engineering, or production process.

Third, even if the buyer is willing to make the financial investment necessary to hire procurement personnel with the administrative experience, staffing resources, and specialized product knowledge to manage a large pool of vendor and monitor each job closely for quality control and contract compliance, the buyer has no guarantee that vendors will offer contribution pricing. The reason is that even vendors who would gain, in an immediate sense, from contribution pricing to fill a production hole are frequently unwilling to offer that pricing to their regular customers. Such vendors are primarily concerned about losing their customers' goodwill when the vendor is unable or otherwise fails to offer contribution pricing on a repeat basis. After once receiving a quote or bid reflecting contribution pricing (e.g., due to idle machine time at the vendor's production plant when the contract must be performed), the regular customer would expect to pay the same low prices for all future jobs from that same vendor, even when the vendor lacks idle production capacity. The vendor is then faced with a Hobson's choice of either risking the loss of the customer account by refusing the less profitable job (thereby forfeiting the sales and marketing costs previously incurred to obtain the customer account) or suffering financial loss by displacing more profitable work to accept the regular customer's lower paying work.

As a consequence of the foregoing obstacles to overcoming the "iron triangle" of quality, timeliness, and cost, there has been a long felt need for a system and method of competitive pricing for custom goods and services that: (1) identifies and manages a vendor pool large enough to obtain the benefits of enhanced pricing competition, without imposing high administrative costs; (2) enables the buyer to procure from a greater number of vendors without causing a loss of quality control or contract compliance; and (3) encourages vendors to offer contribution-level pricing on a consistent basis, while identifying vendors willing to offer contribution pricing on any given job.

SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a system and method meeting the above-identified long-felt needs. The present invention meets these and other objectives by providing a system and method for matching and selecting a vendor meeting both general and job-specific requirements specified by a buyer, from a plurality of vendors, comprising, in one example embodiment, an apparatus and method for quantifying a set of buyer's attributes associated with at least

A-000098

US 7,451,106 B1

5

one kind of customized good or service and quantifying a set of vendor's attributes associated with the manufacturing, production, or provider capabilities corresponding to each of a plurality of vendors. The example embodiment further comprises means and method steps for comparing the set of quantified buyer's attributes to each quantified set of vendor's attributes corresponding to each of the plurality of vendors, the comparison being in accordance with a buyer defined selection criteria and generating, as a result of the comparison, a data set representing a vendor selection pool for the particular buyer. In addition, the example embodiment comprises means and method steps for receiving a data representing a buyer's invitation for bid to manufacture, produce, and/or provide at least one manufactured item or customized service and for submitting a corresponding data to each of the vendors represented by the data in the vendor selection pool. The described example embodiment further comprises means and method steps for receiving a bid data, having a field representing a bid price (which may be based on alternative specifications suggested by the responding vendor), from each vendor in the vendor selection pool that submits a bid data, for identifying the received bid data having the lowest bid price, and for transmitting a data to the buyer representing the identity of the identified vendor and notifying the buyer to transmit a data representing a approval or disapproval of the identified vendor. In addition, the described example embodiment includes means and method steps for receiving an approval data from the buyer and, in response to receipt, for generating and transmitting an order to the selected vendor for the purchase of at least one manufactured item or customized service at the bid price, and for transmitting or otherwise releasing a data to all vendors in the selection pool, informing each of the identity of the selected vendor and the rank order value of the bids submitted by all other selection pool vendors.

A further described embodiment of the invention implements the reception of buyer attribute data and vendor attribute data by a web site accessible through the Internet. According to this embodiment, a web site includes a graphical user interface through which potential vendors are asked to input information characterizing their products and services, their manufacturing capability, and other attribute data. Similarly, the web site has a graphical user interface accessible to buyers, for entering solicitation data and other information, including preferred vendors and standard or optional vendor selection criteria.

A further embodiment of the invention includes means and method steps for maintaining multiple vendor pools for each of a plurality of buyers, the multiple vendor pools for a particular buyer corresponding to multiple product or service types that the buyer procures.

A still further embodiment of the invention transmits and/or releases data representing the bid price of all received bids, to all vendors who submitted bids or received solicitations.

A still further embodiment of the invention automatically generates a set of project milestone data, in reverse scheduling format, for use in monitoring the winning vendor's progress on the buyer's requested manufactured item or customized service.

A still further embodiment of the invention has means and method steps for receiving an invoice data from the winning vendor upon completion of the job, and generating a corresponding invoice for the buyer's approval. In this embodiment, upon invoice approval, the system can prepare the invoice data for direct transmission to the buyer's accounting system for (i) the proper allocation of costs associated with the job within the buyer entity and (ii) the transfer of funds for

6

payment of the buyer-approved invoice from the buyer into a single escrow account for subsequent transfer of the payment funds to the vendor. This embodiment provides a single source accounting feature for buyers dealing with a plurality of vendors regardless of the type of fee charged for using the invention.

A still further embodiment of the invention has means and method steps for allocating a service, user, access, licensing, or similar fee for using the invention to each job transaction. For purposes of this description, such fee shall be referred to as a "job transaction fee." In this embodiment, the system receives an invoice data from the winning vendor upon completion of the job, and generates for the buyer's approval a corresponding invoice that, in addition to the invoice payment data from the winning vendor, includes the job transaction fee associated with the individual job. Upon invoice approval and the transfer of funds indicated on the buyer-approved invoice into an escrow account, the system can then allocate and distribute such funds by transmitting the job transaction fee included on the buyer-approved invoice to a system administration account and transmitting the remainder of such funds to the winning vendor.

BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of the present invention will be more fully described by the following detailed description of the preferred embodiment of the invention, which is to be considered together with the accompanying drawings wherein like numbers refer to like parts and further wherein:

FIGS. **1**A and **1**B show a typical communications system and arrangement of an example embodiment of the invention, and a flow chart of the system operation;

FIGS. **1**C and **1**D show flow charts of example embodiments of the invoicing and payments procedures associated with the system operation;

FIG. **2**A shows an Internet-based arrangement of the system of FIGS. **1**A and **1**B;

FIG. **2**B shows a more detailed example embodiment of an arrangement of the system's web servers and database servers shown generally on FIG. **2**A at Block **621**.

FIGS. **3**-**14** show screen displays used in connection with a specific embodiment of a print procurement application of the present invention; and

FIG. **15** shows a general embodiment of the communications system of FIG. **1**A.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The method and apparatus of the present invention will be better understood by the description below of its operation in reference to the attached figures. It is to be understood, though, that the present invention is not limited to the example embodiments and arrangements described herein, but that it also comprises any modifications or equivalents within the scope of the claims.

FIGS. **1**A and **1**B set forth a first example embodiment of the present invention. Referring to FIG. **1**A, a system database **2**, which is resident on the data storage (not shown) associated with a conventional general purpose programmable computer (not shown), is connected to the Internet via a web site **4** resident on a conventional web server (not shown). In a preferred embodiment of the invention the buyer(s) **6** and the plurality of vendors **8** each access the web site **4** through respective Internet browsers such as, for example, Netscape or Internet Explorer. An example of such

A-000099

US 7,451,106 B1

7

an arrangement is shown at FIG. 2A. It should be noted that the actual physical location of the computer(s) on which the web site 4 resides, and of the computer(s) (not shown) which perform the operations described below on the database 2 contents, and of the buyers' computers and the vendors' computers (not shown) are not prescribed by this invention. For example, the conventional general purpose programmable computer on which the database 2 resides may be co-located with, or can be located remote from the conventional web server (not shown) hosting the web site 4. Further, the database 2 may be resident on the computer (not shown) of the buyer 6, in which case the buyer 6 would access the database 2, through a web browser or equivalent means, or the database 2 would automatically access the buyer's computer and download the database contents.

This specific embodiment shown on FIG. 2A is particularly suitable for high-speed communications with a plurality of users operating in parallel. The system is illustrated with a functional diagram shown generally at 610. In this illustration, a plurality of entities having projects to be bid upon 613 are each individually connected to a common communication network such as the Internet 614. Potential bidders or product/service vendors 615 are similarly connected to the common communication network 614. This high-volume bid processing system shown at 621 is similarly connected to the common communication network 614. This high-volume bid processing system thus has access to communication with a large number of system users. This high-volume bid processing system is illustrated in greater detail below with reference to FIG. 2B.

As shown in FIG. 2B, an example embodiment of the high-volume bid processing system is shown generally at 710. In this example embodiment, one or more robust, high-capacity telecommunications lines 712, which for example may be T1 lines, provide access to the communication network 614, which as noted in the preferred embodiment is the Internet. The T1 lines are directly connected to one or more web server units 714. These web server units are capable of handling a plurality of transmission and reception operations simultaneously. The web server units also handle publication and transfer of the various web pages used with the system to the various system users that are connected through the Internet. The interconnection between the T1 lines and web servers is a conventional connection that may be scaled for increased volume. Specifically, additional T1 lines or web server units may be added as necessary to satisfy increases in user demand.

The web server units are connected to a pair of database servers 716 that are mirrored. The database servers 716 handle transfer and storage of all vendor and bid data used by the system as noted above. The database servers 716 are mirrored as generally known in the art in order to prevent degradation of system performance should one of the database servers cease to function properly. It will be appreciated that this particular embodiment of the system provides all of the users with ready access to information and a very simple and straightforward means for exchanging data. Extra database servers may also be added as needed in order to satisfy user demand.

Referring back to FIG. 1A, block 10 represents the entry by the vendors 8 of a set of vendor's attributes VATTR, each VATTR representing the name, geographical location and the manufacturing, production, and/or provider capabilities and other attributes of the one of the vendors 8 submitting it, which are quantified and entered into the system database by the vendors by way of the web site 4.

8

An example device for storing the system database containing the VATTR information is an Internet server running under Windows NT 4.0, with MS Internet Information Server 4.0, Oracle Database 7.3.4.0, and an information server using standard ".dll" files created in any of the standard programming languages known in the art, e.g., Delphi, Miss. Visual Basic, or C++, Java, all running on a conventional general purpose computer hardware, such as a PC compatible Eisa/Isa HAL (486 C Stepping) equipment or the like. An example of a specific embodiment, showing the graphical user interface, is described later in this specification in reference to FIGS. 3-14.

It should be noted that the entering of the vendors' attributes VATTR may also be performed via a manual entry of the information into the system database 2 and may also occur after a vendor has been accepted into a buyer's vendor base and begun bidding on jobs, for example, to reflect changes in the vendor's production capabilities or job preferences.

Referring to FIG. 1A at block 12, after receipt of a set of vendor attributes VATTR from a plurality of vendors 8, a buyer 6 inputs, by way of the web site 4, an invitation-for-bid data BIFBD, defining a customized good or service in terms of standardized buyer job attributes BATTR. The invitation-for-bid data BIFBD also defines any standard or optional selection criteria SC by which a vendor will be selected from among the plurality of vendors 8 and any additional vendors that the buyer 6 adds to the plurality of vendors 8 as part of the invitation-for-bid data BIFBD, as described below. The invitation-for-bid data BIFBD are quantified and entered by the buyer 6 in accordance with standard graphical user interface (GUI) prompts appearing on the particular display of the web site 4, an example of which is described in reference to FIGS. 3-14 below. The invitation-for-bid BIFBD defines the customized goods or services according to quantified values of standardized attributes so that each vendor 8 will understand what exact manufactured item or customized service is being placed out for bids by the buyer 6. This arrangement ensures that the bids are comparable and that mistakes as to the requirements of the buyer are minimized.

FIG. 1A, block 14 illustrates the step of retrieving all of the vendor attribute sets VATTR from the database 2 and comparing each to the job attributes BATTR derived from the invitation-for-bid data BIFBD based on the standard selection criteria SC (such as product category and quality level) previously entered by the buyer 6 as part of the job attributes BATTR. The comparison determines which of the vendors 8 are qualified to provide the requested customized goods or services. The comparison at block 14 also uses any optional selection criteria SC which the buyer 6 had entered as part of the job attributes BATTR (such as geographical location of the vendor, whether the vendor must be a union shop, small-disadvantaged business, or a minority- or women-owned business), and includes the names of specific vendors entered by the buyer 6 as part of the invitation-for-bid data BIFBD that the buyer wished to be given the opportunity, or not be given the opportunity, to bid on the job. Based on the results of the block 14 comparison a vendor selection pool VPOOL is created, and the formatted vendors' invitation-for-bid VIFB is then transmitted at block 16, via web site portal access, e-mail, or equivalent means, to each of the vendors represented by the vendor pool VPOOL.

Referring to FIG. 1B, at block 18 all of the vendors 8 in the vendor selection pool VPOOL of FIG. 1A that received the invitation-for-bid VIFB can submit, through the web site 4, a responding bid RBID(i), where "i" is an index or name value identifying the submitting vendor, having the ith vendor's

fixed price quote or bid to manufacture, produce, and/or provide a manufactured item or customized service in accordance with the specifications designated by the buyer in its invitation-for-bid VIFB or alternative specifications requested or otherwise recommended by the submitting vendor. Each responding bid RBID(i) is stored in the database 2 in a responding bid file RFILE. Prior to award of the job, which is described below, only the buyer 6 has access to the RFILE, as shown at block 20. The buyer 6 can access RFILE through the web site 4, or through direct read of the database 2, if the database 2 is resident on the computer system (not shown) of the buyer 6. The RFILE list is preferably presented to the buyer 6 in rank order according to the bid price.

Referring again to FIG. 1B, at blocks 22 and 24 after the time of bid closing, the lowest price bid is identified as a system default selection and a WINBID information is transmitted or otherwise provided to the buyer 6 which: (i) identifies the lowest bidding vendor, and (ii) solicits the buyer for approval to accept bid RBID of the lowest bidding vendor. The buyer 6 then approves the lowest bidding vendor or overrides the default selection and approves another responding bidder (for example, based on a higher bid associated with alternative job specifications), in either case by visiting the web site 4 and inputting an APPROVAL data through its web site portal workspace, or by transmitting the data via e-mail or equivalent means to the computer. Upon receipt of the APPROVAL from the buyer 6 an ORDER is issued at block 26 to the winning vendor for the purchase of the customized goods or services specified by the invitation-for-bid VIFB (including any alternative specifications accepted by the buyer), at the price bid by the winning vendor among the vendors 8. If, on the other hand, the APPROVAL is not received, or if a corresponding data (not shown) indicating no approval is received, the process goes to block 28 by which the invitation-for-bid is cancelled or reissued (in which event, the process reverts to block 6). It should be noted that depending on the particular design choice, and on the resolution of possible legal issues (such as the validity of digital signatures), a separate formality, such as a letter of acceptance or a phone discussion between the buyer 6 and the winning vendor 8, may be used or required before actual award of the bid, or before the commencing of work on the job. For purposes of this description, though, receipt of APPROVAL is sufficient. In the event that the separate formality is required, this would be carried out before moving to the block 30 described below.

After the ORDER is issued the system goes to block 30 which disseminates via web site portal access, e-mail, or equivalent means, a BIDINFO data to all of the vendors 8 in the vendor selection pool VPOOL who submitted bids, the BIDINFO data representing the identity of the selected vendor and the identity and rank order value of the bids submitted by all of the vendors 8. After the ORDER is transmitted at block 26, the system makes the BIDINFO data accessible by Internet portal to all vendors 8 in the vendor selection pool VPOOL who did not submit bids in response to the invitation-for-bid VIFB. Also after the ORDER is transmitted at block 26, either concurrent with or before or after the BIDINFO is transmitted, the system goes to block 32 and generates a set of job milestones MSTONES, which are transmitted to the buyer 6, in reverse scheduling format. The milestones MSTONES are calculated based on the buyer's job attributes BATTR associated with the particular item(s) to be manufactured or customized service(s) to be provided. The milestones MSTONES are then entered into a database (not shown) that may be associated with a general purpose programmable computer (not shown) of the buyer 6 which generates screen alerts, at block 34, on the winning vendor's web site portal workspace (not shown) at time points specified by the milestones MSTONES. The winning vendor 8 must then confirm on its web site portal workspace that the work requirements associated with each milestone MSTONE have been completed as they have become due. If the completion of each milestone MSTONE is not confirmed as they become due, then the system presumes that the milestone MSTONE was not completed when due and generates a screen alert, at block 36, on the buyer's 6 web site portal workspace (not shown) that no confirmation of the completion of the milestone MSTONE has been received. The buyer 6 is thereby alerted (i) to check for any messages transmitted through the system from the winning vendor 8 to the buyer 6 explaining why the milestone MSTONE was not completed when due, or (ii) if no such message was transmitted, to contact the winning vendor 8 directly by telephone, e-mail, or equivalent means to determine if the job is on schedule or take such steps as may be necessary if the job is not on schedule. In any event, the winning vendor 8 proceeds to manufacture, produce, and/or provide the buyer-required manufactured item or customized service, and then to ship the manufactured item or provide the customized service as instructed by buyer 6.

Referring to FIG. 1C, block 38, upon confirmation by the vendor 8 that the job has been completed, the system generates an automatic vendor payment invoice that contains any approved contract modifications at the vendor's 8 web site portal workspace. Alternatively, the vendor payment invoice could be transmitted to the vendor 8 by other forms of communication such as e-mail, facsimile, or equivalent means. In the embodiment using a web site portal, the vendor 8 confirms the vendor payment invoice with a digital signature, at block 40, and the buyer 8 is then alerted on its web site portal workspace, at block 42, that the vendor payment invoice is ready for review, approval, and payment, at block 44, in accordance with the terms of the invitation-for-bid VIFB. For this embodiment, no fee for using the system is added to the vendor payment invoice, and the vendor 8 receives payment directly from the buyer 6, outside the system, at block 46 by electronic funds transfer (EFT) or physical means. An alternate embodiment for transmitting payment to the vendor 8 through the system is set out in FIG. 1C at block 48. For this embodiment, payment for all buyer 6 jobs is made by electronic funds transfer (EFT) or physical means to a single escrow account, at block 48, managed by the system to provide the buyer with single source accounting. Payment is then made to the vendor 8 from the escrow account, at block 50, by electronic funds transfer (EFT) or physical means.

A further alternate embodiment for invoice payment is set forth at FIG. 1D. Referring to FIG. 1D, at blocks 52 and 54, a vendor payment invoice is generated upon job completion and approved by the vendor 6, in the same manner described above with respect to FIG. 1C, at blocks 38 and 40. Prior to invoice approval by the buyer 6, at block 56, however, a job transaction fee is added to the invoice as payment for the cost of using the system allocated for each job. Payment of the buyer-approved invoice, at block 58, is then made to the system's single source escrow account, at block 60, in the same manner described above with respect to FIG. 1C, at blocks 44 and 48. Upon receipt of funds into the escrow account, the system allocates and distributes the job transaction fee to a system administration account, at block 62, and payment for the job to the vendor 8, at block 64. Transfer of these funds to the system administration account and the vendor 8 is made by electronic funds transfer (EFT) or physical means in the same manner as described above with respect to FIG. 1C, at block 50.

US 7,451,106 B1

11

The invention and its operation are described above without limitation to specific application. Example applications include customized printed goods, digitally mastered CDs or DVDs, machine tools, furniture, engraved wares, and insurance, in which jobs are awarded on a competitive or "bid" basis.

Referring to FIGS. 3-14, an example of the present invention applied to print procurement will be described. It will be readily understood to one of ordinary skill in the art, however, that the print procurement example is only an example application of the system and method of the present invention, and that the present invention can be applied to other types of competitive bidding on customized goods and services. The function of this example embodiment is to match a printing vendor, these being a specific example of the above-described vendors 8, to a print job based on requirements input by the print buyer, which is a specific example of the above-described buyer 6.

For this description it is assumed that the vendor attributes VATTR described in reference to FIGS. 1A and 1B, a set from each of a plurality of print vendors 8, have already been entered into the database 2, at the direction and with the consent of the print buyer 6 and that no additional vendors are added as part of the invitation-for-bid data BIFBD. The print vendors 8 enter their respective vendor attributes VATTR by visiting the web site 4 and using the vendor's web browser (not shown), e.g., Netscape, in a mode and manner substantially identical to the process described below by which the print buyer 6 enters the buyer attributes BATTR describing the particular print job for which bids will be requested. Alternatively, the print vendors 8 can transmit their respective vendor attributes VATTR to the print buyer 6 by e-mail or equivalent means for entry by the print buyers 6 or any authorized third party.

Referring to FIGS. 1A, 1B, and FIG. 2A, the print buyer 6 begins its interaction with the system by logging onto the system web site 4 using a Netscape or equivalent browser. The web site 4 and the buyer's 6 browser 12 are also referenced herein as the buyer's "quantification means". Referring to FIG. 1A, buyer 6 logs onto the web site 4 with a unique user name and password, thus ensuring that the data entered is unique to that user. Once logged in, print buyer 6 moves to his or her individual web site portal workspace 72, and the first page of the workspace is shown at FIG. 3. The buyer 6 then clicks on the FIG. 3 hyperlink point labeled as "Create New", using a suitable pointing device (e.g., a mouse, roller ball, track pad, or equivalent) to create a new print job. Upon clicking this hyperlink, print buyer 6 is presented with a clear, easy-to-read form such as that shown at FIG. 4. Print buyer 6 has available to it a "back" button to go back to the hyperlink point from which any page is accessed. An example system supporting the particular example of the web site 4 represented by FIGS. 3-14, is Windows NT 4.0, using MS Internet Information Server 4.0, Oracle Database 7.3.4.0, and an information server using standard ".dll" files created in any of the standard programming languages known in the art, e.g., Delphi, MS Visual Basic, C++, or Java, all running on a conventional general purpose computer hardware, such as, a PC compatible Eisa/Isa HAL (486 C Stepping) equipment or the like.

Referring to FIG. 4, it is seen that the field at the top of the screen is the master ID and description area 90. Within this field, print buyer 6 may give a print job an identifier or name 92. A purchasing instructions field 100 is shown arranged beneath the ID/description area 90. Print buyer 6 utilizes the purchasing instructions field 100 to inform prospective print vendors 8 of any special instructions related to print job.

12

Referring to FIG. 5, the buyer 6 next inserts the item for which a bid is to be requested, or adds another item to an existing list, by clicking on a drop-down menu 110 whereupon a list of possible options 115 is presented. The information entered through the screens of FIGS. 5-14 is a specific example of the buyer attributes BATTR described in reference to FIGS. 1A and 1B above. Referring to FIG. 5, print buyer 6 selects from the list of options 115 on the basis of the particular set of needs and requirements associated with the print job to be quantified. When print buyer 6 selects an option 115 that best matches its printing needs, the "add item" button 120 is clicked, via the pointing device.

Clicking the add item button 120, moves the buyer to a new screen, shown at FIG. 6, requesting additional information more specific to the added item of the print job. If print buyer 6 inadvertently clicks the "add item" button 120 and selects an option that does not match its needs, the print buyer 6 may scroll to the bottom of the page and activate a "delete" button (not shown). Print buyer 6 will then be presented with the previous FIG. 5, screen to introduce a correct job item.

Assuming that the "add item" button at FIG. 5, was clicked to correctly select "flat sheets", the buyer 6 is presented with the example screen of FIG. 6 requesting entry into a "Master Job ID/Description" field 90, including a "job number" 92 and "job description" (not numbered). The print buyer 6 can also select the required job quality (not numbered) from the "quality" scroll down, which provides "none designated" as an option, as depicted at FIG. 6. The FIG. 6 screen provides a "quantity" area 130 so that print buyer 6 may enter the total number of units to be manufactured. For this example, print buyer 6 also supplies the "overrun permitted" and/or "underrun permitted" as a percentage in fields 135. The FIG. 6 screen provides entry, at field 138, of additional "complete set(s) of film" and "film or plate ready disc(s)".

After the data entry screen of FIG. 6 is completed, the buyer's browser, in this example of adding an order for "flat sheet", moves to the web page or screen depicted at FIG. 7. The FIG. 7 example screen includes a proof area 140 which allows print buyer 6 to enter information about types of proofs 142 required and inspection requirements 144.

After completion of the example screen of FIG. 7, the buyer 6 is presented with the example screen of FIG. 8. Near the top of the FIG. 8 screen example is a "production contact" area 145 with a drop-down menu that allows print buyer 6 to choose from a list of production contacts, an example being shown as item 150. For this example, the print buyer 6 then moves down to the trim field 155 to define the width and type of trimming operation required for the example flat sheet order. This portion of the FIG. 8 example screen is shown in greater detail at FIG. 9. The detailed example screen of FIG. 9 includes a "stock" field 160 for the print buyer 6 to enter the type of paper stock required for the job, as well as a "color" 165, "manufacturer" 170, "grade" 175 selections, "basis weight" 180 and "basis size" 185. In the particular example screen detailed at FIG. 9, the print buyer 6 is provided with a field 188 allowing him or her to specify whether substitutes, such as recycled paper, are allowed.

For this print procurement example, the buyer 6, after completing the FIG. 9 screen, is presented with the fields for entering the ink specification data, by a screen such as that shown at FIG. 10. The FIG. 10 example provides the print buyer 6 with a field 189 for the selection of ink for front and back of the flat sheet, with a set of "radio buttons" for entering "Coverage" as "Light", "Medium" or "Heavy", and with a set of "yes" or "no" buttons specifying additional requirements for the materials and the process of manufacture.

A-000102

13

Next, at FIG. 11, the print buyer 6 is guided through a series of options related to the finishing of the flat sheet printed item. Each finish option 190 is associated with a small "pop-up" screen 195 that acts as an assistant to guide the print buyer 6 through the process of identifying and specifying the specific finishing requirements. Each pop-up assistant 195 provides print buyer 6 with choices of several options specific to particular types of finishes. Referring to FIG. 12, a detailed view of an example "pop-up" screen 195 is presented to the buyer 6, having a pull down menu of available stitching options. If the buyer 6 clicks on the example highlighted at FIG. 12, which is "Saddle Stitch", he or she is presented with another "pop-up" screen such as that shown at FIG. 13. FIG. 14 shows another finishing set of finishing options 195, defining the packaging requirements for the print job. Other attributes associated with a particular print job include binding, folding, perforations, scoring, punching, numbering, bar coding, and collation.

Referring to FIGS. 1A and 1B, after the buyer 6 enters the data into the example screens of FIGS. 3-14 describing the job, the buyer 6 clicks on a "submit invitation-for-bid" button on the screen (not shown) and, in response, the system generates the buyer's invitation-for-bid data BIFBD, and the system commences the processing indicated at block 12. More specifically, the system receives the invitation-for-bid data BIFBD, and extracts the buyer's attributes BATTR from the information entered by the screens of FIGS. 3-14, and then compares those attributes to each of the plurality of sets of print vendor's attributes VATTR, using as the selection criteria SC for generating the vendor pool VPOOL the standard selection criteria SC entered by the buyer 6 along with the buyer's job attributes BATTR (such as product category and quality level) and any additional optional selection criteria SC (such as geographical limits or whether the vendor must be a union shop, small-disadvantaged business, or a minority- or women-owned business), specified by the buyer 6.

After the print vendor selection pool VPOOL is created by the system, the vendors' invitation-for-bid VIFB is submitted to each print vendor therein. The vendors' invitation-for-bid VIFB provides a specification for the printed item (e.g., paper forms, snap sets, envelopes, labels, rolled labels, magazines/booklets, etc.) presented in a form that is derived from the quantified set of print buyer's job attributes BATTR so that each print vendor 8 will understand the exact item or service is being placed out for bids by the print buyer 6. This arrangement ensures that the bids are comparable and that mistakes as to the requirements of print buyer 6 are minimized.

As described above with reference to FIG. 1B and the general embodiment of this invention, all of the print vendors 8 in the vendor selection pool VPOOL of FIG. 1A that received the invitation-for-bid VIFB can submit, through the web site 4, a responding bid RBID(i) having the $i^{th}$ vendor's price quote or bid on the print job specified by VIFB. In this example embodiment for procuring print jobs, the responding bids RBID do not contain any alternative specifications requested or otherwise recommending by the submitting vendors and are stored in the database 2 in a responding bid file RFILE which is accessible by, or provided to the print buyer 6, preferably presented to the print buyer 6 in rank order according to the bid price. After the time of bid closing the lowest price bid is identified as a system default selection and a WINBID information is transmitted or otherwise provided to the print buyer 6 which: (i) identifies the lowest bidding vendor, an (ii) solicits the print buyer for approval to accept the bid RBID of the lowest bidding vendor. The print buyer 6 then approves the lowest bidding vendor or overrides the

14

default selection and approves another responding bidder, in either case by visiting the web site 4 and inputting an APPROVAL data through its web site portal workspace. Upon receipt of the APPROVAL from the print buyer 6 an ORDER is issued at block 26 to the selected print vendor by web site portal access, e-mail, or equivalent means to provide the printed goods or services specified by the invitation-for-bid, at the price bid by the winning vendor.

After the ORDER is issued the system goes to block 30 which transmits, via web site portal access, e-mail, or equivalent means, a BIDINFO data to all of the print vendors 8 in the vendor selection pool VPOOL who submitted bids, the BID-INFO data representing the identity of the selected print vendor and the identity and rank order value of their bids. After the ORDER is transmitted, the system makes the BIDINFO data accessible by web site portal access to all vendors 8 in the vendor selection pool VPOOL who did not submit bids. Then, at block 32 a set of job milestones MSTONES are generated and transmitted to the print buyer 6, in reverse scheduling format, based on the job attributes BATTR associated with the particular print item(s) to be provided. As each milestone MSTONE becomes due (e.g. pick-up of buyer-furnished material, delivery of proofs, required press sheet inspections, partial and complete shipments of final product), an alert is generated, at block 34, on the print vendor's web site portal workspace (not shown). The print vendor 8 must then confirm on its web site portal workspace that each task associated with the alerted milestone MSTONE has been completed. If the completion of the alerted milestone MSTONE is not confirmed by the print vendor 8, then the system generates a screen alert, at block 36, on the buyer's 6 web site portal workspace (not shown) that no confirmation of the completion of the milestone MSTONE has been received. The buyer 6 is thereby alerted (i) to check the system for any messages from the print vendor 8 explaining why the milestone MSTONE was not completed when due, or (ii) if no such message was transmitted, to contact the print vendor 8 directly by telephone, e-mail, or equivalent means to determine if the job is on schedule or take such steps as may be necessary if the job has been delayed. In this manner, the system automatically tracks the job's progress until the print vendor 8 completes the job by producing and/or providing the specified print item(s) and ships them as specified by the invitation-for-bid VIFB.

Upon completion the winning print vendor 8 confirms that the job has been delivered, and the system generates an automatic invoice that contains any approved contract modifications at the vendor's web site portal workspace. The winning vendor 8 confirms the invoice with a digital signature, and the buyer is then alerted on its web site portal workspace that the invoice is ready for review, approval, and payment in accordance with the terms of the invitation-for-bid VIFS. For this example embodiment, it is assumed that the buyer has chosen to pay a job transaction fee for use of the system with single source accounting for all of its solicited printed jobs. Referring to FIG. 1D, the job transaction fee is added to the vendor payment invoice shown on the buyer's 6 web site portal workspace prior to the buyer's 6 approval, at block 56. Payment of the buyer-approved invoice, at block 58, is then made to the system's single source escrow account, at block 60, by electronic funds transfer (EFT) or physical means. Upon receipt of funds into the escrow account, the system allocates and distributes, again by electronic funds transfer (EFT) or physical means, the job transaction fee to a system administration account, at block 62, and payment for the job to the vendor 8, at block 64.

15

Those skilled in the art will appreciate that the specific embodiments set forth above are for purposes of example only and the invention may be practiced with a wide range of alternate structures. For example, referring to FIG. **15**, the present invention contemplates alternative memory and processor structures and connections between these structures, using a generic external data link instead of the vendor web browser **10**, buyer web browser **12**, web site **4** and database **2** depicted at FIG. **1B**.

As shown in FIG. **15**, the database **2** of FIG. **1B** may reside on a processor **502** with access to a memory **504**. The processor may be one associated with a personal computer or workstation, for example. The memory **504** may be dedicated to the personal computer or workstation. However, the memory **504** may actually be comprised of one or more distinct memory units which may be, for example, random access memory (RAM), EEPROM, floppy disc drives or hard drives. In such an embodiment, these separate memory units are simply linked to the processor via a data bus or other known transmission link.

The memory **504** preferably receives data from an external data link **506**. The data may be routed to the memory via the processor **502** or through some other data bus or other known transmission link. The external data link **506** may be a connection via the Internet, through e-mail or some other alternate sources for data transfer. For example, the data transfer represented could be accomplished by automated facsimile reception and downloading of data through optical character recognition, or through voice recognition-to-text. The data that is stored in the memory will typically include the request for bid data used in the claimed process BIFB, the received bids RBID, as well as the vendor job attributes VATTR.

Thus, in this alternate embodiment of the present invention, the bid data may be received in a variety of different formats for the convenience of all system users. System users are thus not limited to access through a web interface. This facilitates a much simpler use of the system because users may phone in the required information, send it via e-mail, or even by facsimile. Once a solicitation for bid information has been transmitted by the overall system operator, bid data may be received through the various forms of communications noted above.

The bid data is then transferred and stored in the memory **504**. As with the previous embodiments, the processor then identifies the appropriate bid satisfying all the necessary requirements and which also has the lowest bid value. The ultimate selection information may be then transmitted to each of the bidders or may be maintained in secrecy.

In yet a further advanced form of the system, a plurality of jobs may be processed simultaneously. In this regard, separate computer processors with separate dedicated memory units may be associated with each of several distinct jobs. Alternately, a single computer may receive bid data from a plurality of sources that are then categorized or tagged in the memory for the respective jobs to be bid on. The processor will then be able to identify the lowest bid for a particular project once the closing date and time has passed. This is accomplished by examining stored bid data associated with a particular project based on the categorization or further information tag.

It will be recognized by those skilled in the art that the embodiment described above is compatible with the alternate communications devices previously described. Specifically, other computer systems that are programmed to send and receive data in other formats may also be linked with the database servers to provide more flexibility for the overall system. In that regard, computers that are dedicated to

16

received vendor bid information or other data to be used by the system via facsimile, voice, or electronic mail may be linked directly with the database servers in order to transfer this information to the database servers automatically. Any number of computers could be connected in this manner to enable the system to automatically and simultaneously receive voice, facsimile, or electronic mail data and transfer this information to the appropriate file locations on the database servers. For example, in such a version of the system, the vendor bid data could be received over the Internet or via any of the over communication media described above. It is also contemplated that yet additional forms of communication may be used by the system in order to create yet greater flexibility for the system.

### ADVANTAGES OF THE INVENTION

As can be readily determined by one of ordinary skill in the art of procuring customized goods and services, numerous advantages are obtained by employing the present invention. First, the invention enables the buyer to manage a large vendor base without costly administrative burdens so that the buyer's purchasing personnel can focus on budget planning, job preparation, internal customer service needs, production quality, and contract compliance.

The invention accomplishes this goal, initially, by quantifying both the buyer's procurement needs and the vendors' attributes in a database system that matches objective product specifications with pre-determined vendor quality levels and manufacturing, production, or provider capabilities for each approved vendor.

The buyer sets the parameters for both vendor pool selection and the bidding and award process so that vendor quality and responsibility can be determined at the time each buyer's vendor base is established. In this manner the system eliminates time-consuming assessments of the quality or capability of each bidder each time a individual job is solicited. At the same time, the invention obviates the need to make judgments about the responsiveness of the bids after they have been submitted. Significantly, the invention is not a posting system. Rather it is a procurement system in which the buyer can create and manage a single pool of vendors who are given specific production category and quality level ratings that, together with other selection criteria, automatically designate which solicitations each vendor in the pool can receive and bid.

Moreover, the specification writing and bidding and award processes are standardized so as to make the preparation and dissemination of solicitations, the receipt of quotes or bids, and the award of the job to the lowest responsive and responsible bidder virtually automatic and without the need for additional procurement staff or the expenditure of related out-of pocket administrative costs typically associated with comparing or evaluating a multitude of vendor bids.

In addition, the process of monitoring production is enhanced and simplified by the embodiment of the invention that automatically creates a detailed set of production milestones in reverse schedule format. These production milestones then become the focal point for an ongoing dialogue prompted by automatic system alerts about the job's progress among the buyer's procurement personnel, the buyer's end-users or other constituent elements, and each participating vendor, using the system's network of web site portal communication links.

Yet another embodiment of the invention provides a single source accounting method for buyers dealing with a plurality of vendors, while allocating fees associated with using the

17

system to each individual job, which further simplifies and lowers the cost of the administrative process. This embodiment receives an invoice data from the winning print vendor upon completion of the job and generates, for the buyer's approval, a corresponding invoice at the buyer's web site portal workspace that adds a job transaction fee to the payment amount requested by the vendor. Upon approval, the system can prepare the invoice data for direct transmission to the buyer's accounting system for proper allocation of costs within the buyer entity and the electronic transfer of funds from the buyer based on the buyer-approved invoice into a single escrow account that serves as the accounts payable destination for all of the buyer's vendor payments. The system can then allocate and distribute the deposited amount by transmitting the job transaction fee to a system administration account, and transmitting the remainder from the escrow account to the winning vendor.

Second, the invention has many built-in features that help ensure quality control and contract compliance. The emphasis on quality control begins at the pre-qualification stage when vendor pools are established, rather than at the time of job award. This emphasis is underscored by the vendor's knowledge that poor quality or untimely delivery may result in the vendor being removed from the buyer's vendor base and the inability to bid on that buyer's future jobs.

Quality control is further enhanced by the buyer's use of the invention's specification-writing features to create precise detailed production specifications that objectively define the buyer's manufacturing and quality expectations. The comprehensive, easy-to-use computerized specification writing tools associated with the invention, in effect, free the buyer from dependency on the vendor's specialized product knowledge. As a result, the buyer is now able to procure based on objective specifications that reflect the buyer's requirements rather than one particular vendor's existing backlog, manufacturing, production, or provider preferences.

Similarly, the automatic post-award production milestones, reverse scheduling, and job management communication aspects of the invention enable the buyer's procurement personnel to monitor the production process efficiently at any time and from any computer station with Internet access. This feature ensures that potential manufacturing or delivery problems can be addressed early, thereby enhancing quality control and contract compliance.

Third, the invention creates a unique type of enhanced competitive bidding that virtually guarantees the submission of numerous bids containing contribution-level pricing for each and every job. By furnishing the buyer with easy, efficient Internet-based tools to create specifications, disseminate solicitations, and receive and evaluate bids from some or all of a potentially large number of pre-qualified and buyer-approved vendors, the invention makes it more cost effective to solicit competitive bidding on all jobs, including the type of short-term, small-dollar jobs best-suited to fill production holes and generate contribution pricing.

Moreover, once approved for a buyer's base of pre-qualified vendors, the invention enables the vendor to obtain individual jobs without having to expend additional costs on sales or marketing. These savings in sales commissions and marketing costs can then be passed onto the buyer, while the vendor is assured access to future bidding opportunities that match the vendor's quantified quality level and/or manufacturing, production, or provider capabilities. This assured access not only furnishes the vendor with bidding opportunities on the type of short-term work most likely to generate "contribution" pricing, but also allows the vendor to bid high,

18

low, or not at all without fear of undermining the buyer's goodwill or compromising the vendor's opportunities to bid future jobs.

Knowing beforehand that the award will routinely go to the lowest responsive and responsible bidder, each participating vendor will also have an incentive to submit their lowest bid upfront, rather than hold back their lowest bid in the expectation that the buyer will "shop" the bid around or otherwise engage in post-bid opening price negotiations. Similarly, having the ability to review a complete set of detailed objective specifications before bidding, the vendor no longer will need to build pricing cushions into its bids in order offset unforeseen production expenses. Instead, vendors can calculate their bids more precisely, and hence more competitively, at the time of submission.

Lastly, the invention offers an additional feature whereby, at the sole discretion of the buyer, all received bids can be released after award to all vendors who were invited to respond. In this manner, the invention allows the buyer to take advantage of an inherent "ratcheting down" effect as each vendor learns how low the price range is likely to be on similar jobs in the future. These factors taken together virtually assure the buyer of receiving "contribution pricing" from numerous responding vendors on each and every job.

In sum, by harnessing Internet technology to handle all five major steps or operations of an electronic commerce system for procuring customized goods and services—viz., (1) vendor base selection and management; (2) job estimating, specification writing, review, and approval; (3) solicitation distribution, bidding, and award; (4) job production management, quality control, and contract compliance; and (5) invoicing, payment, and cost allocation—the buyer can create and manage large multiple vendor pools to obtain the benefits of competitive bidding based on contribution pricing, while enhancing administrative productivity, production quality, and contract compliance. In this way, the invention enables the buyer to overcome the limitations of prior art systems and methods in escaping the "iron triangle" of quality, timeliness, and cost.

It is to be understood that the present invention is described above in reference to specific embodiments which are for purposes of example only, and that the invention is not limited to the specific arrangement, order of processing, or hardware for carrying out the steps as described above or shown in the drawings, but also comprises the various modifications readily apparent to one skilled in the art upon reading this specification, as defined by the broadest scope of the appended claims.

I claim:

1. A method for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors of customized goods or services via a computer operated system, comprising steps of:

prior to receiving job data from a buyer pertaining to a job for which the buyer seeks a vendor, receiving electronic communications from a plurality of vendors, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

each buyer using the system generating an electronic communication providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job

A-000105

US 7,451,106 B1

**19**

solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid;

automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer;

automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price; and

outputting to said buyer an electronic communication providing at least one of said bid response data.

**2.** A method according to claim **1**, wherein said job data further includes a selection criteria data, said selection criteria specifying at least one of a vendor name, its relevant geographic location, a vendor capability as to product categories, a descriptor of an ownership characteristic for said vendor, a descriptor of a union status of said vendor, and

wherein said comparison is performed in accordance with said selection criteria data.

**3.** A method according to claim **1** further comprising steps of:

ranking said bid response data according to said represented bid price.

**4.** A method according to claim **1** further comprising steps of:

ranking said bid response data according to price; and publishing ranked bid response data.

**5.** A method according to claim **1** further comprising steps of:

ranking said bid response data according to price; and publishing information to other vendors identifying a selected vendor and a rank order value of said bid response data.

**6.** A method according to claim **1**, wherein said vendor capability data represents a vendor's capability to manufacture each of a plurality of different types of customized goods.

**7.** A method according to claim **1**, further comprising steps of:

transmitting to said buyer an invoice for payment of said bid subsequent to receiving a job completion data.

**8.** A method according to claim **7**, further comprising steps of:

transferring a payment from said buyer into an escrow account serving as a single-source accounts payable destination for the buyers vendor payments;

**20**

transferring a payment from said escrow account to an account of said vendor corresponding to the invoice payment data.

**9.** A method according to claim **7**, further comprising steps of:

adding a system use fee to the invoice.

**10.** A method according to claim **1**, wherein a vendor status in the buyer associated vendor pool is not altered as a result of its bid values or failure to bid.

**11.** A method according to claim **1**, wherein an award is made only to a lowest bidder.

**12.** A method for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors of customized goods or services via a computer operated system, comprising steps of:

prior to receiving job data from a buyer pertaining to a job for which the buyer seeks a vendor, receiving electronic communications from a plurality of vendors, the electronic communications being used in automatically establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

each buyer using the system generating an electronic communication providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid;

automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer;

automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter automatically transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price; and

thereafter automatically outputting to said buyer an electronic communication providing at least one of said bid response data.

**13.** A system for facilitating a buyer's selection of a vendor via automated comparison of records and based upon bidding by vendors of customized goods or services via a computer operated system, comprising:

US 7,451,106 B1

21                                                          22

a means for receiving electronic communications from a plurality of vendors prior to receiving job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

a means for receiving an electronic communication from any buyer using the system providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

a means for receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid;

a means for automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer;

a means for automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

a means for transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

a means for receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price; and

a means for outputting to said buyer an electronic communication providing at least one of said bid response data.

**14.** A system according to claim **13**, wherein said job data further includes a selection criteria data, said selection criteria specifying at least one of a vendor name, its relevant geographic location, a vendor capability as to product categories, a descriptor of an ownership characteristic for said vendor, a descriptor of a union status of said vendor, and

  wherein said comparison is performed in accordance with said selection criteria data.

**15.** A system according to claim **13** further comprising a means for

  ranking said bid response data according to said represented bid price.

**16.** A system according to claim **13** further comprising a means for

  ranking said bid response data according to price and

  publishing ranked bid response data.

**17.** A system according to claim **13** further comprising a means for

  ranking said bid response data according to price and

  publishing information to other vendors identifying a selected vendor and a rank order value of said bid response data.

**18.** A system according to claim **13**, wherein said vendor capability data represents a vendor's capability to manufacture each of a plurality of different types of customized goods.

**19.** A system according to claim **13**, further comprising a means for

  transmitting to said buyer an invoice for payment of said bid subsequent to receiving a job completion data.

**20.** A system according to claim **19**, further comprising

  a means for transferring a payment from said buyer into an escrow account serving as a single-source accounts payable destination for the buyer's vendor payments; and

  a means for transferring a payment from said escrow account to an account of said vendor corresponding to the invoice payment data.

**21.** A system according to claim **19**, further comprising a means for

  adding a system use fee to the invoice.

**22.** A system according to claim **13**, wherein a vendor status in the buyer associated vendor pool is not altered as a result of its bid values or failure to bid.

**23.** A system according to claim **13**, wherein an award is made only to a lowest bidder.

**24.** A system for facilitating a buyer's selection of a vendor via automated comparison of records and based upon bidding by vendors of customized goods or services via a computer operated system, comprising:

a means for receiving electronic communications from a plurality of vendors prior to receiving job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in automatically establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

a means for receiving an electronic communication from any buyer using the system providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

a means for receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid;

US 7,451,106 B1

23

a means for automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer,

a means for automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

24

a means for automatically transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors; and

a means for receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price.

\*  \*  \*  \*  \*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

e-LYNXX CORPORATION,       :      **CIVIL ACTION NO. 1:10-CV-2535**

                 :

      **Plaintiff,**      :

                 :      **(Judge Conner)**

     **v.**              :

                 :

**INNERWORKINGS, INC.,**    :

**RENT-A-CENTER, INC.,**    :

**DR. PEPPER SNAPPLE GROUP,**  :

**INC., R.R. DONNELLEY & SONS**  :

**CO., NEWLINENOOSH, INC.,**   :

**THE STANDARD REGISTER CO.,** :

**AND CIRQIT.COM, INC.,**     :

                 :

      **Defendants**    :

## MEMORANDUM

Presently before the court in this patent infringement action is the motion for summary judgment (Doc. 109) of defendants Innerworkings, Inc., Taylor Corporation, Rent-a-Center, Inc., Dr. Pepper Snapple Group, Inc., Staples, Inc., R.R. Donnelley & Sons Company, NewlineNoosh, Inc., The Standard Register Company, and Cirqit.com, Inc. (collectively, "defendants"). Also before the court are the parties' contentions regarding the proper interpretation of claim terms. (Docs. 112, 113, 125, 126). The court will first construe the disputed terms and limitations pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996). Having construed the terms, the court will then consider defendants' motion for summary judgment.

## I.    Factual Background and Procedural History

### A.    Factual Background

At issue in the instant matter are U.S. Patent No. 7,451,106 (the "'106 patent") and U.S. Patent No. 7,788,143 (the "'143 patent"). These patents cover procurement systems used for competitive bidding on customized goods and services. See '106 patent, abstract; '143 patent, abstract. The '143 patent is a continuation of the '106 patent and shares its specification with the '106 patent. William A. Gindlesperger invented the system covered by both patents, which was assigned to plaintiff e-LYNXX Corporation ("e-LYNXX").

Abstracts of the '106 patent and the '143 patent describe the invention as "[a]n apparatus and method for selecting a lowest bidding vendor from a plurality of vendors of a customized good or service." '106 patent, abstract; '143 patent, abstract. As the name suggests, custom-produced goods and services, unlike pre-stocked or "off-the-shelf" goods, are manufactured to the specific requirements of the buyer. '106 patent, col. 1, ll. 30-45. Pricing, availability, and buyer specifications are likely to vary from project to project, leading to the so-called "iron triangle" of cost, timeliness, and quality. Id. col. 2, ll. 12-21. The "iron triangle" problem derives from the conundrum that buyers desire: (1) high quality goods; (2) quickly; and (3) at an inexpensive price, but can generally achieve only two of these desires – for example, high quality goods on short notice, but at great cost, or inexpensive goods quickly, but lacking in quality. It is this problem that the invention at issue seeks to solve.

2

A-000110

The method claimed by e-LYNXX is designed to streamline the procurement process for custom goods.  As described in the specification, the prior art in this area entailed high search costs for buyers.  Buyers were generally limited to soliciting bids from a small number of vendors, and then simply awarding the contract to the lowest bidder, or awarding it to a vendor who did not submit the lowest bid but with whom the buyer had a previous relationship and could trust to produce high quality work.  Buyers could also solicit bids and then "shop" the lowest bid to other vendors seeking a better deal.  See id. col. 2, ll. 4-11.

Problems persisted on the supply side of the transaction as well. Manufacturers in industries with substantial overhead and labor costs – for example, printing and information product suppliers, see id. col. 2, ll. 35-50 – must balance their need to maintain a steady production schedule with the need to be available on short-notice to handle rush orders from regular customers. Manufacturers do not want to allow machinery and labor to sit idle for too long, thereby cutting into their profit margins.  Id.  Hence, manufacturers build into their production schedules a certain amount of slack time in the event that a customer places an unexpected rush order.  Id.  But if an expected order is withdrawn or cancelled, a manufacturer may be left with both an unscheduled lapse in its regular production schedule, and planned downtime that it has yet to fill with a rush order. Id. col. 2, ll. 43-50. Vendors seek to fill these unexpected holes in their production schedule with short-turnaround orders, securing these by low prices to undercut

3

A-000111

any competitive bids.  Id. col. 2, ll. 50-56.  This process is referred to as "contribution pricing."[1]

On the demand side, the substantial administrative cost of a search for suitable vendors leads inexorably to a small number of primary vendors who receive bid solicitations, which in turn leads to higher prices due to reduced competition.  Id. col. 3, ll. 7-27.  Maintaining a large database of qualified vendors in order to take advantage of competitive pricing is oftentimes impractical for buyers.  Id. col. 3, ll. 42-46 ("In the actual business environment . . . identifying such a large vendor pool is generally not practical . . . . [G]athering and maintaining information about a large number of current and potential vendors is time consuming and expensive.").  The claimed invention combines the benefits of vendors' contribution pricing with a method for aggregating vendor qualifications and attributes to allow buyers to solicit bids from a greater number of vendors, thereby capturing the benefit of increased competition.

The claimed system involves an eight-step process: (1) the vendors enter records regarding their plurality of capabilities; (2) the buyers identify a potential pool of vendors for the job solicitation; (3) the buyer enters job data with a plurality of characteristics; (4) the system automatically compares the vendor's

---

[1] This low cost pricing strategy is referred to as contribution pricing because the price is typically below the vendor's normal profit margin level, but it exceeds production expenses incurred in filling the order.  In this fashion, it "contributes" to the vendor's bottom line more so than idle machinery and idle labor.  Id. col. 2, ll. 51-65.

A-000112

plurality of capabilities to the plurality of characteristics of the job; (5) the system identifies the subset of the vendor pool which are qualified for the job; (6) the system solicits bids to the subset of the vendor pool who are qualified for the job; (7) the system receives bid response data from the subset of the vendor pool who are qualified for the job; (8) the bid response data is transmitted to the buyer. '143 patent, col. 18, l. 50 – col. 19, l. 32 (Claim 1); '106 patent, col. 20 l. 64 – col. 21, l. 49 (Claim 13).

### B.    **Procedural History**

On December 14, 2010, e-LYNXX filed this patent infringement action against defendants.[2]  (See Doc. 1).  e-LYNXX alleges infringement of claims 13, 14, 15, 16, and 18 of the '106 patent and claims 1 and 2 of the '143 patent against each defendant.  (Doc. 110 ¶ 1, Doc. 129 ¶ 1).  Claims 14, 15, 16, 17, and 18 of the '106 patent are dependent claims referring back to independent claim 13; claims 1 and 2 of the '143 patent are independent.[3]  The parties filed claim construction briefs (Docs. 111, 112) on August 12, 2011.  e-LYNXX and defendants dispute twelve claim

---

[2] In addition to the remaining defendants, e-LYNXX also originally sued Emptoris, Inc. and Quadrem U.S., Inc.  Subsequently, e-LYNXX stipulated to dismiss the action against Emptoris and Quadrem.  (See Docs. 161, 162).

[3] "An independent claim is completely self-contained. A dependent claim refers back to an earlier claim and is considered to include all of its own limitations as well as those of the referenced claim."  HERBERT F. SCHWARTZ AND ROBERT J. GOLDMAN, PATENT LAW AND PRACTICE § 2.III.B.1 (7th ed. 2011).  If an independent claim is deemed invalid, all claims that depend on it must fall as well.  See Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).

A-000113

terms and eight means plus-function limitations.[4]  (See Doc. 102-1).  On August 12, 2011, defendants jointly moved for summary judgment against e-LYNXX, asserting that all asserted claims are invalid for failure to meet the patentability requirements of 35 U.S.C. § 112, ¶ 1 (written description requirement) and ¶ 2 (indefiniteness).  (See Doc. 109).  On October 11, 2011, the court conducted a Markman hearing and heard oral argument on the pending motion for summary judgment.  (Doc. 160).  The parties have fully briefed the issues, and the matter is now ripe for disposition.

## II.    Standard of Review

### A.    Motion for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec.

---

[4]  The parties no longer dispute "a selection criteria data" and "selection criteria."

6

A-000114

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

### B. Claim Construction

An inventor may assert ownership only over those designs encompassed within the claims section of the patent. See 35 U.S.C. § 112; Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63 (1998); Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied, 546 U.S. 1170 (2006). The proper construction of claims is a question of law, Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996), of which the central purpose is to aid the jury. O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360-63 (Fed. Cir. 2008).

Claim construction requires the court to determine the "ordinary and customary meaning" of the claim terms as they would be understood by "a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13; see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 290 F. Supp. 2d 508, 519 (M.D. Pa. 2003). Intrinsic evidence – i.e., the language of the patent and its prosecution history – are the "primary resources" reviewing courts use to construe claims. Kara Tech. v. Stamps.com, Inc., 582 F.3d 1341, 1348 (Fed. Cir. 2009). The court may use extrinsic evidence, such as dictionaries, treatises, and expert testimony, to aid in claim construction, but such evidence is "less significant than the intrinsic record" and is "unlikely to result in a reliable interpretation of

7

patent claim scope unless considered in the context of the intrinsic evidence."

Phillips, 415 F.3d at 1317-19, 1324; see also Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1355-56 (2004).

In using the language of the patent itself, "claims 'must be read in view of the specification,' . . . [which] is the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315 (citing Markman, 52 F.3d at 979; and Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Likewise, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. at 1314 (citing Vitronics, 90 F.3d at 1582). To this end, the context in which a claim term is used, the language of other claims in the patent, and the differences among claims can assist the court in construing disputed claim terms. See id. at 1314-15.

## III. **Discussion**

The court will first construe the disputed claim terms. Then, having done so, the court will consider defendants' motion for summary judgment. Because construction of the disputed means-plus-function limitations is inextricably intertwined with the validity analysis of those limitations, the court will construe them in the context of the parties' summary judgment arguments.

### A. **Claim Construction**

#### 1. **Disputed Claim Terms**

The parties dispute the meaning of twelve claim terms. The court will address them *seriatim*.

8

i.  *"buyer"*

The parties dispute the meaning of the claim term "buyer," which appears at various locations in claim 13 of the '106 patent and claims 1 and 2 of the '143 patent. e-LYNXX contends that "buyer" requires no construction, but to the extent that the court decides to construe it, the term should mean "one who makes a purchase." (Doc. 113 at 7). Defendants counter that the term "buyer" refers specifically to the "ultimate purchaser of customized goods or services," excluding from the definition any intermediary who procures or buys goods *on behalf* of the ultimate purchaser. (Doc. 112 at 6).

A claim term must be read in the context of the particular claim of which it is a part, and in the context of the patent as a whole. See Phillips, 415 F.3d at 1313. The manner in which a term is referenced in the claim itself may provide "substantial guidance" as to the term's definition. Id. (citing Vitronics, 90 F.3d at 1582). Indeed, "the context of the surrounding words of the claim must be considered in determining the ordinary and customary meaning of those terms." ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003).

With these principles in mind, the court adopts defendants' proposed claim construction. The term "buyer" as used in the claims is often preceded by language distinguishing an intermediary from the ultimate purchaser. See, e.g., '106 patent, col. 21, ll. 21-22 ("job for which bids are sought *by or on behalf of the buyer*") (emphasis added); id. at col. 21, ll. 23-24 ("a means for receiving an electronic communication defining a job data *from or on behalf of* at least one buyer")

9

(emphasis added); '143 patent, col. 19, ll. 1-2 ("receiving an electronic communication *from or on behalf of any buyer*") (emphasis added); <u>id.</u> at col. 19, ll. 11-12 ("analysis of job data pertaining to a job for which bids are sought *by or on behalf of the buyer*") (emphasis added); <u>id.</u> col. 20, ll. 9-10 ("receive an electronic communication *from or on behalf of any buyer*") (emphasis added). This distinguishing language strongly implies that the definition of "buyer" is narrower than simply "one who makes a purchase," otherwise there would be no need to differentiate between a buyer and an intermediary. <u>Cf.</u> <u>Phillips</u>, 415 F.3d at 1314 ("steel baffles" implies that baffles are not "inherently" steel). Moreover, to adopt e-LYNXX's proposed construction would swallow any distinction between a "buyer" and one who purchases "from or on behalf of" a buyer, because both entities would be "one who makes a purchase." This would violate the Federal Circuit's instruction that differences in claim language are presumed to reflect a difference in scope. <u>See</u> <u>Forest Labs., Inc. v. Abbott Labs.</u>, 239 F.3d 1305, 1310 (Fed. Cir. 2001); <u>see also</u> <u>Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc.</u>, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (claim construction that rendered a portion of the claim language superfluous reversed).

This construction is buttressed by the manner in which "buyer" is used in the specification. While it is improper for a court to read a limitation into a claim from the specification, claims "must be read in view of the specification, of which they are a part." <u>Phillips</u>, 415 F.3d at 1315; <u>see also</u> <u>id.</u> ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive. .

A-000118

. .) (internal citation and quotations omitted); Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification . . . .")  The use of "buyer" in the specification therefore sheds light on its meaning as used in the claims.  The specification generally describes job data input into the system in the context of the buyer's preferences.  See '106 patent, col. 1, ll. 35-36 (goods are manufactured "to meet the buyer's particular requirements"); id. at col. 16, ll. 26-27 (the invention "quantif[ies] . . . the buyer's procurement needs"); id. at col. 5, ll. 57-59 (describing the "buyer's requested manufactured item or customized service"); id. at col. 10, ll. 19-22 (a winning vendor produces "the buyer-required manufactured item or customized service").  The "particular requirements" of job solicitations originate not from third-parties who enter them on behalf of buyers, but from the buyers themselves.  Put another way, it is not the intermediary who determines the specifications of a job solicitation, but the buyer on whose behalf the intermediary acts.  Defendants' proposed construction of "buyer" therefore finds support in both the specification and the claims.

        ii.     *" electronic communications"*

    e-LYNXX contends that "electronic communications" – like "buyer" – requires no construction, or alternatively that the term means "information transmitted or conveyed electronically."  (Doc. 113 at 8).  Defendants urge the court to adopt a narrower construction, limiting the definition to "electronic data input/output directly to/from the system."  (Doc. 112 at 9).  They assert that the

11

A-000119

claims identify four specific types of "electronic communications," each of which references a specific actor in the system who must input data directly into, or receive data output directly from, the system. (Id. at 9-10). These four types include "electronic communications from a plurality of vendors," '106 patent, col. 21, ll. 1-2; electronic communications "from any buyer using the system," id. col. 21, ll. 12-13; electronic communications "defining a job data from or on behalf of at least one buyer," id. col. 21, ll. 23-24; and electronic communications "providing at least one . . . bid response" to a buyer, id. col. 21, ll. 48-49. They posit that the "named actor" must directly input or receive output directly from the system, through an internet browser.

Defendants' construction is unsupported by the specification and, moreover, would be inconsistent with their asserted definition of the term "buyer." To reiterate, the court has adopted defendants' proposed construction of "buyer" – that the term refers distinctly to the *ultimate* purchaser, excluding any intermediary. In light of the court's construction, one must consider the context in which "electronic communication" is used: claim 13 of the '106 patent describes, in part, "an electronic communication defining a job data from or on behalf of at least one buyer." Col. 21, ll. 23-24. If "electronic communication" inherently required input by the "named actor" – in this instance, the buyer – then it would construe out of the claims the option of the electronic communication originating from one "on behalf" of the buyer. As the Federal Circuit has instructed, "all claim terms are presumed to have meaning in a claim." Innova/Pure Water, Inc. v. Safari Water

12

Filtration Systems, Inc., 381 F.3d 1111, 1119 (Fed. Cir. 2004). Defendants'
construction would drain any meaning from the phrase "from or on behalf."
Furthermore, claim terms are normally used consistently throughout a patent. See
Phillips, 415 F.3d at 1314-15 ("the usage of a term in one claim can often illuminate
the meaning of the same term in other claims"). Defendants' narrow construction
of "electronic communication" would be inconsistent with its use relative to the
term "buyer," and that finding must influence how the term is used in other
portions of the patent.

　　　e-LYNXX's interpretation of "electronic communication" to mean simply
"information transmitted or conveyed electronically" is entirely consistent with the
specification. Contrary to defendants' contention, the specification expressly
provides for communication of information through computers via means *other*
than web browsers. See '106 patent, col. 15, l. 67 – col. 16, l. 4 (computers may
receive "vendor bid information or other data via facsimile, voice, or electronic
mail" and may be "linked directly with the database servers in order to transfer this
information to the database servers automatically"). And finally, the specification
discloses that print vendors may transmit their vendor attributes to the system "by
e-mail or equivalent means" and that this may be communicated by the vendor
themselves or "any authorized third party," id. at col. 11, ll. 31-34, further
undermining defendants' argument that only the "named actors" themselves may

13

initiate or receive the communication. The court therefore adopts e-LYNXX's

proposed construction of "electronic communications" to refer to "information

transmitted or conveyed electronically."

       *iii.*   *"vendor records"*

e-LYNXX asserts that "vendor records" refers simply to "a set of attributes

associated with a vendor." (Doc. 113 at 9). These attributes include the production

capabilities of the vendor, but also such information as geographic location. (Id.)

Defendants argue that "vendor records" means "data input into the system by the

vendor which identifies the vendor's capabilities," (Doc. 112 at 12), a narrower

construction in that it limits both *who* may enter the records (the vendor), and *what*

data constitutes the records ("vendor capability data," rather than the broader

"attributes").

Defendants correctly assert that "vendor capability data" must be included

within the vendor records, see '106 patent, col. 22, ll. 42-46 ("[T]he vendor records

corresponding to each of a plurality of vendors *and having* vendor capability data . .

. ) (emphasis added), but it does not follow that the vendor records must consist

*exclusively* of vendor capability data. The specification explicitly reflects that the

database stores information about a vendor above and beyond its capabilities. See

'106 patent, col. 7, ll. 60-67 ("entry by the vendors 8 of a set of vendor's attributes

VATTR, each VATTR representing the name, geographical location and the

manufacturing, production, and/or provider capabilities *and other attributes* of the . .

. vendor[] submitting it"). Indeed, the specification describes "other attributes,"

14

A-000122

such as whether the vendor uses union labor, is a small or disadvantaged business, or is minority- or women-owned. Id. col. 8, ll. 50-54.

Similarly, the court concurs with e-LYNXX's assertion that the vendor records need not be input by the vendors themselves, but may be input by an intermediary or third-party. First, the specification itself describes an alternative embodiment that contemplates just such a possibility. '106 patent, col. 11 ll. 31-34 ("Alternatively, the print vendors 8 can transmit their respective vendor attributes VATTR to the print buyer 6 by e-mail or equivalent means for entry by the print buyers 6 *or any authorized third party*.") (emphasis added). Second, defendants' argument that this embodiment was disavowed in prosecution is unpersuasive. The claim amendment that defendants cite for the alleged disavowal references only "receiving electronic communications from a plurality of vendors, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with a computer system." (See Doc. 112 at 12); (Doc. 113-10 at App'x 760). This language does not support defendants' claim that e-LYNXX disavowed any embodiment which contemplates vendor record entry by a party other than the vendor. See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]he claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" (quoting Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)). The claim amendment contains no such express disavowal of an

A-000123

embodiment allowing vendor record entry by a third party, and therefore

defendants' argument is rejected, and e-LYNXX's interpretation of "vendor

records" is adopted.

> iv.    *"vendor capability data" and "plurality of capabilities for said*
> *vendor to provide a customized good or service"*

The parties' constructions for "vendor capability data" and "plurality of

capabilities for said vendor to provide a customized good or service" are quite

similar, with the noted exception that defendants would exclude from the definition

the vendor's name, contact information, payment preferences, type of business, and

goods sold. (See Doc. 112 at 15). e-LYNXX proposes that these terms need no

construction, or alternatively that "vendor capability data" means "a set of

information identifying a plurality of capabilities for a vendor to provide a

customized good or service," and that "plurality of capabilities for said vendor to

provide a customized good or service" means "two or more capabilities of a vendor

to provide a customized good or service." (Doc. 113 at 10). Defendants would

construe the two terms as synonyms, both meaning "two or more capabilities of a

vendor to manufacture or produce a customized good or service and excluding the

vendor's name, contact information, payment preferences, type of business and

goods sold." (Doc. 112 at 15).

The gravamen of defendants' argument is that, in order to differentiate this

application from the prior art, the applicant for the patents-in-suit disclaimed

information such as name, contact information, payment preferences, type of

16

A-000124

business, and the goods sold from the definition of a "plurality of capabilities." (Id. at 16). The court agrees. In his application, the inventor expressly disclaimed that this information qualified as "vendor capability data:"

> In regard to the [prior art] seller database, the specification notes that the database maintains data on sellers with fields such as name, contact information, payment preferences, type of business, and the goods sold. . . . None of the referenced fields indicate that data regarding a plurality of capabilities for each vendor should be maintained for subsequent comparison. . . . *Nothing in the referenced portion of the cited document or any other portion could reasonably be considered to be data identifying a plurality of capabilities of each vendor.*

See Amendment F, Sep. 19, 2006, U.S. Patent Application No. 09/450,023 at 7 (filed Nov. 29, 1999). According to e-LYNXX, the applicant was arguing that, at most, only the "type of goods sold" identified in prior art databases would fall within the ambit of a capability, and so the prior art disclosed only a *single* vendor capability, not a *plurality* of vendor capabilities, thus distinguishing the instant application. (See Doc. 126 at 10). This argument is unpersuasive.

In context, it is clear that the applicant disclaimed vendor name, contact information, payment preferences, type of business, and the goods sold as encompassed within "vendor capability data." In attempting to distinguish the instant invention from the prior art, the applicant stated unequivocally that the aforementioned attributes did *not* constitute capabilities. When an applicant disclaims specific claim term meanings in the course of prosecution, they may not be recaptured through claim construction in litigation. See Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323-24 (Fed. Cir. 2003). It is true that the Federal

17

Circuit has been reluctant to find disclaimer when the prosecution history is ambiguous. See, e.g., Northern Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (declining to find disclaimer where statements were ambiguous and amenable to multiple reasonable interpretations). Here, the court finds that the applicant unambiguously disclaimed the vendor's name, contact information, payment preferences, type of business, and goods sold from within the meaning of "vendor capability data" when he stated that this information "could [not] reasonably be considered to be data identifying a plurality of capabilities of each vendor." See Amendment F, *supra*, at 7. Defendants' construction is therefore adopted.

> v. *"information identifying a plurality of vendors" and "a pool of vendors associated with said buyer"*

Defendants assert that these claim terms are indefinite and that the specification lacks a written description to support the terms, and so they are therefore invalid and cannot be construed. (Doc. 112 at 17). This argument is the basis for defendants' motion for summary judgment. Consequently, the court will address defendants' summary judgment arguments before attempting to construe these claim terms.

> vi. *"job data" and "job descriptor data"*

The claim terms "job data" and "job descriptor data" are closely related, and so the court will consider them in tandem. The parties disagree over the scope of information encompassed within "job data," with e-LYNXX asserting that the term

A-000126

means "a set of information specified in a request for a job for which the buyer seeks a vendor," (Doc. 113 at 14), and defendants asserting that it refers to "*all of the* information specified by the buyer in preparing its request for a job," (Doc. 112 at 17) (emphasis added).  e-LYNXX argues that some information may be input by the buyer – such as updating its profile – that is not within the meaning of job data. However, they cite nothing within the specification that supports this assertion.

The court adopts defendants' proposed construction of "job data."  The asserted claims require that "job data pertaining to a job for which the buyer seeks a vendor" be input into the system.  '143 patent, col. 20, ll. 4-6.  Nothing in the patent limits the scope of "job data" to something less than all of the information for the particular job requested.  This information includes the detailed specification for the job at hand, but may also include "standard or optional selection criteria" beyond those details.  '106 patent, col. 8, ll. 25-27.  Both of these categories of information fall within the definition of "job data."

The parties' views on the meaning of "job descriptor data," however, are not materially different from one another.  e-LYNXX asserts that the term means "a set of information defining a plurality of characteristics of a customized good or service for which the buyer wishes a bid," (Doc. 113 at 15), while defendants would define it as "data which specifies two or more characteristics for each customized good or service for which the buyer wishes a bid, and that is based upon the actual job specification and no other information," (Doc. 19 at 112).

19

A-000127

The term is explicitly defined in the claims themselves. Claim 13 of the '106 patent describes "a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid," which is the definition put forth by e-LYNXX. Col. 21, ll. 27-29. Other types of information associated with the job but not strictly related to the characteristics of the job itself – such as the vendor's geographic location or union status – fall under the larger umbrella of job data, but are not job *descriptor* data. Defendants attempt to define "job descriptor data" narrowly, limiting its construction to information that relates to an actual job. For that limitation they cite a disclaimer made by the applicant in the prosecution history. (See Doc. 112 at 20). The court finds that the difference between the two constructions is not material, as no party has asserted that the term *should* encompass anything beyond the characteristics of a particular job. The term is defined in the claims and the court finds it unnecessary to engage in any further construction. For purposes of record clarity, and preservation of issues for appeal, the court will adopt e-LYNXX's proposed meaning.

> vii.    *"automatically comparing via a computer processor"*

The parties dispute two aspects of the meaning of the term "automatically comparing via a computer processor," contained in claim 13 of the '106 patent. See col. 21, ll. 36-37. e-LYNXX submits that this term requires no construction, and alternatively means "examining two sets of data to discover one or more similarities, which once initiated, is performed by a computer processor, without the need for manually performing the function." (See Doc. 113 at 17). Defendants

20

argue that the term requires "comparing *each* of the capabilities identified in the vendor record to *each* of the characteristics identified in the job data *without human intervention or input*." (See Doc. 112 at 20) (emphasis added). Hence, the threshold dispute is the meaning of the term "automatically," and the second is the nature of the comparison. Because the term "automatically" may be construed with relative ease, the court addresses that term first.

e-LYNXX argues that "automatic" does not exclude the system from being initiated or interrupted by human intervention. The court agrees. The preferred embodiment in the specification states that, after the buyer enters job data into a form, the buyer "clicks on a 'submit invitation-for-bid' button . . . , and, in response, the system commences the processing for the comparison." '106 patent, col. 13, ll. 19-37. The process, while "automatic" in the sense that a computer performs the actual comparison, must still be initiated by human action. This interpretation is wholly consistent with Federal Circuit precedent, which has recognized that a process may be construed as "automatic" even thought it may be initiated or halted by human intervention. See CollegeNet, Inc. v. ApplyYourself, Inc., 418 F.3d 1225, 1235 (Fed. Cir. 2005).

The disagreement over the meaning of "comparison" is more intricate, and illustrates the parties' fundamental conflict over the meaning of e-LYNXX's patents. According to defendants, the patented system requires a comparison of *each capability* disclosed by a vendor in their vendor record with *each characteristic* defined by the buyer in the job data. (Doc. 112 at 20-21). For support, they direct

21

A-000129

the court's attention to Figure 1A of the specification, which discloses that a buyer's invitation for bid is "compared to all VATTR [vendor attributes], according to SC criteria." '106 patent, fig. 1A (block 14). e-LYNXX disputes this perception, maintaining that the specification provides for a comparison based upon a "single specified search variable." (Doc. 113 at 19). As an example, e-LYNXX suggests that a buyer could run a comparison based on one of the variable search criteria, such as product category. Then, the system would return one or more vendor records whose product category matches the query. (Id.) For example, a buyer could run a search for the product category of "envelopes," and return only those vendors who have self-identified in their vendor records as having the capability of providing envelopes.

The court agrees with e-LYNXX. The claims and specification are devoid of any requirement that each attribute of the job data be compared to the vendor records of each vendor in the database. Claim 14, which is dependent upon and refers back to claim 13, discloses that "said comparison is performed *in accordance with selection criteria data.*" This disclosure is consistent with the larger "two pool" system, discussed in detail *infra*, by which buyers may establish one or more pre-qualified "vendor pools," to be stored in the database and accessed later for solicitation of bids. Search criteria are a means of narrowing the field of potential vendors to those most relevant to the instant job – envelope vendors for an envelope job. But the buyer need not limit strictly by product category, instead searching by geographic area or perhaps the characteristics of the vendor itself. It is the ability

22

to winnow down the aggregate database of vendors to only those most relevant to a particular buyer's needs for a particular job that supports the "two pool" system described by the claims, and that system is supported by the specification. The court therefore adopts e-LYNXX's proposed construction.

> viii. *"automatically identifying via a computer processor"*

The parties' dispute on this term is limited to the meaning of "automatically." As noted *supra*, the court has adopted e-LYNXX's proposed meaning of the term "automatically" in the context of "automatically comparing via a computer processor." The court similarly adopts that definition here, and holds that this term means "establishing the identity of one or more qualified vendors, which once initiated, is performed by a computer processor, without the need for manually performing the function."

> ix. *"selected members from the identified subset of the buyer's associated pool of vendors"*

e-LYNXX proposes that "selected members from the identified subset of the buyer's associate pool of vendors" requires no construction, or alternatively means "the vendors identified from the buyer's vendor pool through the comparison." Defendants assert that this term is invalid for indefiniteness and failure to provide a written description, and therefore cannot be construed, (Doc. 112 at 25). Defendants have moved for summary judgment partially on this basis. In the alternative, defendants argue that the term means "all of the vendors automatically identified as qualified for receiving the solicitation." (Doc. 112 at 25).

A-000131

As in the case of the vendor pool terms, this claim term must be construed in the context of defendants' summary judgment arguments.

## B. **Summary Judgment**

Defendants assert that summary judgment in their favor is warranted because each of e-LYNXX's asserted claims is invalid. They argue that the claims are invalid under 35 U.S.C. § 112, ¶ 2 for indefiniteness, under § 112, ¶ 6 for failing to disclose a corresponding structure to each means-plus-function element, and under § 112, ¶ 1 for failure to adequately describe the invention. (See generally Doc. 111). These arguments are addressed *seriatim*, and for the reasons set forth herein, are rejected.

### 1. **Indefiniteness Under § 112, ¶ 2**

A patent grants its holder a monopoly over the protected invention and the right to exclude all others from the subject matter covered by the patent claims. See Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008). In order for a patent to be valid, the specification must, *inter alia*, "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. A validly issued patent is entitled to a statutory presumption of validity. See 35 U.S.C. § 282. One seeking to invalidate a claim must produce clear and convincing evidence of invalidity. Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347-48 (Fed. Cir. 2005) (citing Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001)).

24

A-000132

A patent's claims strike out the "metes and bounds" of the rights conveyed to the patentee. The undisputed purpose of the claims is to define the invention "in such a way as to distinguish it from prior art," see ROBERT L. HARMON ET AL., PATENTS AND THE FEDERAL CIRCUIT § 5.5 (10th ed. 2011), and to give sufficient notice to the public and potential competitors what is patented, such that they may avoid infringement, Halliburton, 514 F.3d at 1249; see also Datamize, 417 F.3d at 1347 ("Because the claims perform the fundamental function of delineating the scope of the invention . . . the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude.") (internal citations omitted); Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1582 (Fed. Cir. 1996) ("[T]he primary purpose of the requirement 'is to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights.'" (quoting General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369 (1938))).

The validity analysis under § 112, ¶ 2 consists of two requirements: first, the claim must "set forth what 'the applicant regards as his invention,' and second, it must do so with sufficient particularity and distinctness, i.e., the claim must be sufficiently 'definite.'" Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1348-49 (Fed. Cir. 2002) (quoting Solomon v. Kimberly-Clark Corp., 216 F.3d 1372, 1377 (Fed. Cir. 2000) (internal quotation marks omitted)). Determining whether a claim is adequately "definite" is a question of law, Orthokinetics, Inc. v. Safety Travel

25

A-000133

Chairs, Inc., 806 F.2d 1565, 1576 (Fed .Cir. 1986); see also Personalized Media

Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998) ("A

determination of claim indefiniteness is a legal conclusion that is drawn from the

court's performance of its duty as the construer of patent claims."), to be judged by

the standard of whether "one skilled in the art would understand the bounds of the

claim when read in light of the specification." Id. Similarly, the "subject matter

which the applicant regards as his invention" portion of the statutory requirement

is also a question of law, judged by the standard of one skilled in the art. Solomon,

216 F.3d at 1377, 1380.

Under either of the inquiries called for by § 112, ¶ 2, a court should review

only a "limited range of evidence." Solomon, 216 F.3d at 1378-80 (explaining that a

more circumscribed evidentiary review is appropriate because "the language of

issued claims is generally fixed . . . , the claims are no longer construed as broadly

as is reasonably possible, and what the patentee subjectively intended his claims to

mean is largely irrelevant to the claim's objective meaning and scope"). This

"limited range" may include the language of the claim, of the specification, and the

history of the patent prosecution. See Power-One, Inc. v. Artesyn Tech., Inc., 599

F.3d 1343, 1350 (Fed. Cir. 2010). Because the patent is a legal writing, a reviewing

court may be aided by the "familiar canons of claim construction." Oakley, Inc. v.

Sunglass Hut Int'l, 316 F.3d 1331, 1340-41 (Fed. Cir. 2003) (quoting All Dental Prodx,

LLC v. Advantage Dental Prods., 309 F.3d 774, 779-80 (Fed. Cir. 2002)).

A-000134

A claim must be particular and distinct, but it need not be drafted with "absolute clarity." Datamize, 417 F.3d at 1347.  For a claim to be invalid due to indefiniteness it must be "insolubly ambiguous" and "not amenable to construction." Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348, 1358 (Fed. Cir. 2003).  Whether such insoluble ambiguity exists turns on "whether [the] terms can be given any reasonable meaning." Datamize, 417 F.3d at 1347; see also Exxon Research and Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (stating that a claim is sufficiently definite "[i]f one skilled in the art would understand the bounds of the claim when read in light of the specification"). "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree . . . [the claim may be] sufficiently clear to avoid invalidity on indefiniteness grounds." Id.

The Federal Circuit has held claims invalid under the "which the applicant regards as his invention" clause of § 112, ¶ 2, when the invention described by the claims is clearly different from that described in the specification, thus establishing that what was claimed was not "what the applicant regarded" as his invention. See Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1348-49 (Fed. Cir. 2002). Allen Engineering, an infringement case involving the gearboxes for riding concrete finishing machines, featured a rank incompatibility between the specification and the claim: the claim limited the steering box to pivoting "its gear box *only* in a plane perpendicular to said biaxial plane," while the specification stated that the "gearbox . . . *cannot* pivot in a plane perpendicular to the biaxial plane." Id. at 1349

27

(emphasis added). In light of this "obvious" inconsistency, the court held the claim to be invalid under § 112, ¶ 2. Id.

In the instant matter, defendants argue that all of e-LYNXX's asserted claims are invalid under § 112, ¶ 2. Defendants contend that the claims are "irreconcilably inconsistent" with the written description, because the term "vendor pool" is defined differently in the specification and in the context of the claims. (Doc. 111 at 12). They maintain that the definition of "vendor pool," as set forth in the specification, "requires that the vendor pool be created by a comparison of the vendor attributes (VATTR) to the job attributes (BATTR)." (Id.) By contrast, they argue, the definition of vendor pool as set forth in the claims requires "that a buyer establish a vendor pool *before* there is any comparison made between the vendor attributes (VATTR) and the attributes (BATTR) derived from the invitation-for-bid data." (Id.)

Defendants argue that this disjuncture between the claims and the specification is primarily one of timing. The specification teaches that a selection of potential vendors is drawn from the database based on a comparison of the buyer's specific needs and the vendor's capabilities. The group of vendors produced by this comparison is the "vendor pool," to whom invitations-to-bid are sent. But the process as described in the claim requires that a vendor pool exist *prior* to a comparison between a buyer's needs and a vendor's capabilities. Once a vendor pool is formed, there is then a comparison between vendor records and job data from which a further subset of qualified vendors is compiled, and who are invited to

28

bid. In essence, they argue that the specification describes only one pool, while the claims describe two, thus creating an inconsistency that invalidates the asserted claims under § 112, ¶ 2.

e-LYNXX counters that defendants' description of the specification fails to account for the organization of vendors *within* the database. e-LYNXX argues that vendors enter their attributes into the database, which stores this information in the form of "vendor records." (Doc. 128 at 3). The attributes that the vendors enter include their name, geographic location, and their manufacturing, production, and/or provider capabilities, among other things. See '106 patent col. 7, l. 67 – col. 8, l. 5. Buyers may then "pre-approve or pre-qualify" vendors, prior to the input of job data, in order to create a group of vendors associated with them – the "vendor pool." (Doc. 128 at 3); (id. at 5) ("[T]he database is created by establishing vendor records containing the attributes of various vendors and organized to associate certain of the vendors with a particular buyer according to the buyer's preferences. In fact, the specification discloses that a buyer may create a single vendor pool or multiple vendor pools."). When a buyer submits the specifications for a job, the system compares those specifications with the attributes contained within the buyer's pre-qualified vendor pools, generating a subset of vendors who will then receive invitations to bid. (Id. at 6). This is the "vendor selection pool."

The court agrees with e-LYNXX's interpretation of the patent. The specification clearly discloses the maintenance of several vendor pools associated with a buyer *prior* to the input of any specific job data:

29

> A further embodiment of the invention includes means and method steps for *maintaining multiple vendor pools* for each of a plurality of buyers, the multiple vendor pools for a particular buyer *corresponding to multiple product or service types that the buyer procures*.

See '106 patent col. 5, ll. 47-51 (emphasis added). This corresponds with e-LYNXX's assertion that the specification allows buyers to pre-qualify vendors *before* the system runs a job data comparison to select those who are qualified, and ultimately to solicit bids from them. Later, the specification describes the process of retrieving from the database the various vendor pools associated with a buyer for any particular job, and comparing the attributes of the vendors with the buyer's job requirements. See id. col. 8, ll. 41-46 (describing "the step of retrieving all of the vendor attribute sets VATTR from the database . . . and comparing each to the job attributes . . . derived from the invitation-for-bid . . . *based on the standard selection criteria SC (such as product category and quality level)*" . . . ) (emphasis added). Search criteria also may include vendor attributes such as whether the vendor uses union labor, is a small or disadvantaged business, or is minority- or women-owned. Id. col. 8, ll. 49-54. These search criteria appear to refer to the various vendor pools that a buyer may pre-qualify and that the database maintains, in order to allow the buyer to easily select which group of vendors to solicit for bids in any given job. For example, a buyer in the mid-Atlantic area may "pre-qualify" vendors within 100 miles of their location, narrowing the field of potential vendors to create a vendor pool that contains only vendors that are within a cost-effective radius. Similarly, a buyer with locations nationwide may

30

maintain multiple vendor pools, each within a set radius of their various locations. See id. col. 5, ll. 47-51 ("[T]he invention includes means and method steps for maintaining *multiple vendor pools* . . . corresponding to *multiple product or service types* . . . .") (emphasis added).

The specification is therefore consistent with the claims. Claim 13 of the '106 patent clearly delineates the "two pools" system for bid solicitation. See id. col. 21, ll. 12-22 ("a means for . . . identifying a plurality of vendors for inclusion in a *pool of vendors associated with said buyer* to potentially receive a job solicitation) (emphasis added); id. col. 21, ll. 23-29 ("a means for . . . defining a job data from or on behalf of at least one buyer, *after said buyer's vendor pool is determined*") (emphasis added); id. col. 21, ll. 30-35 ("a means for . . . comparing . . . characteristics for said customized good or service with corresponding plural capabilities for vendors *from the pool of vendors associated with said buyer*") (emphasis added); id. col. 21, ll. 36-40 ("a means for automatically identifying . . . at least one subset from the *buyer's associated pool of vendors* as qualified for receiving the solicitation") (emphasis added).

31

A-000139

In addition to its independent evaluation of the patent, the court notes that this interpretation is consistent with the findings of the patent examiner of the '106 patent.[5]  In a non-final rejection issued January 10, 2008, the patent examiner rejected the '106 patent application on the same grounds upon which defendants assert invalidity: that there was no support in the specification for the creation of a vendor pool prior to the analysis of job data.  <u>See</u> Office Action, Jan. 10, 2008, U.S. Patent Application No. 09/450,023 (filed Nov. 29, 1999).  In response, the applicant cited a number of locations in the patent that in fact support the two-pool structure.  <u>See</u> Reply to Office Action of Jan. 10, 2008, March 11, 2008, at 18-21, U.S. Patent Application No. 09/450,023 (filed Nov. 29, 1999).  For example, the response cited the "Field of the Invention" portion of the application, stating that the invention "generally relates . . . [to] creating a database representing pools of vendors . . . for one or more subscribing buyers and . . . creating and maintaining a database representing a vendor base or pool for each subscribing buyer."  <u>Id.</u> at 18; <u>see also</u> '106 patent, col. 1, ll. 10-17 (same).

Upon consideration of the applicant's response, the patent examiner deemed the arguments persuasive and withdrew the rejection, <u>see</u> Notice of Allowance and Fee(s) Due, July 7, 2008, U.S. Patent Application No. 09/450,023

---

[5] The patent prosecution history is appropriate intrinsic evidence informing the court's analysis.  <u>See</u> <u>Power-One, Inc. v. Artesyn Tech., Inc.</u>, 599 F.3d 1343, 1350 (Fed. Cir. 2010) (recognizing that the definiteness requirement must be discernible to a skilled artisan based on "the language of the claim, the specification, and the prosecution history").

A-000140

(filed Nov. 29, 1999), and thereafter the PTO approved the '106 patent application. While the court notes that it "is not bound by the PTO's actions and must make its own independent determination of patent validity," <u>Medrad, Inc. v. MRI Devices Corp.</u>, 401 F.3d 1313, 1322 (Fed. Cir. 2005), the fact that the PTO was faced with and rejected the identical arguments put forth by defendants is further support for the court's conclusion that defendants have failed to overcome the statutory presumption of validity by clear and convincing evidence.

As previously discussed, the construction of three claim terms is inextricably tied to the outcome of defendants' summary judgment argument on indefiniteness. Having considered defendants' arguments, the court will adopt e-LYNXX's proposed construction of "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer," e-LYNXX's proposed construction of "information identifying a plurality of vendors" to refer to "obtained knowledge establishing the identity of two or more vendors to potentially receive a job solicitation from that buyer," and e-LYNXX's proposed construction of "selected members for the identified subset of the buyer's associated pool of vendors" to mean "the vendors identified from the buyer's vendor pool through the comparison."

A-000141

## 2.    Means-Plus-Function Limitations

Defendants have identified five elements of claim 13 – which the court will refer to as elements B, C, D, E, and F – that they assert are invalid for indefiniteness.  The court will first engage in a validity analysis of these five disputed terms, and will then construe the remaining means-plus-function terms over which there is a dispute as to construction, but not as to indefiniteness.

### A.    Indefiniteness of Means-Plus-Function Elements of Claim 13

Pursuant to 35 U.S.C. § 112, ¶ 6, inventors may express claim elements as a means for performing a particular function, without the claim describing the structure or material that performs the function. 35 U.S.C. § 112, ¶ 6;[6] see also SCHWARTZ & GOLDMAN, *supra*, at § 5.IV.C.  In patent law parlance, this is drafting in "means-plus-function" form, and the parties do not dispute that claim 13 and each of its constituent elements is drafted in this way.  (See Joint Disputed Claim Terms Chart, Doc. 102-1, at 58-75).  Means-plus-function drafting allows the patent applicant to cast the claim language in broad terms.  However, in order to give the public and competitors sufficient notice as to what invention is actually claimed by the patent, the "applicant must describe in the patent specification some structure which performs the specified function."  Biomedino, LLC v. Waters Techs. Corp.,

---

[6] "An element in a claim for a combination may be expressed as a means for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Id.

490 F.3d 946, 948 (Fed. Cir. 2007).  Put another way, "in return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means."  Id.  Failure to adequately disclose the structure that performs the function is grounds for invalidity under § 112, ¶ 2 because "the applicant has in effect failed to particularly point out and distinctly claim the invention."  In re Donaldson Co., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc).

Construing means-plus-function claims is a two-step process.  First, the court must determine the function of the limitation.  Medtronic, Inc. v. Advanced Cardiovascular Sys. Inc., 248 F.3d 1303, 1311 (Fed. Cir. 2001).  After identifying the function, the next step is to determine what structure, disclosed in the specification, corresponds to the function.  Id.; see also Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("§ 112, ¶ 6 requires both identification of the claimed function and identification of the structure in the written description necessary to perform that function.").  The disclosed structure "corresponds" only if there is a clear link between the functions claimed, and the specification or prosecution history.  B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997).  A means-plus-function clause will be indefinite under § 112, ¶ 2 if "a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim."  AllVoice Computing PLC v. Nuance Commc'ns, Inc., 504 F.3d 1236, 1241 (Fed. Cir. 2007).

A-000143

When faced with a claim consisting of multiple elements – as is the case with claim 13 – it is appropriate for the court to address separately each element in the claim, determine what function it describes, and then determine whether the specification sufficiently discloses a corresponding structure. See Seal-Flex, Inc. v. Athletic Track and Court Const., 172 F.3d 836, 843 (Fed. Cir. 1999) ("Section 112, ¶ 6 . . . obligates this court to interpret *each functional element* in a combination claim by reference to the corresponding structure, material, or acts described in the specification and their equivalents.") (emphasis added); Al-Site Corp. v. VSI Intern'l, Inc., 174 F.3d 1308, 1318-19 (Fed. Cir. 1999) (separately analyzing elements to determine whether they are drafted in means-plus-function form). Therefore, each of the constituent elements of claim 13 that defendant challenges is entitled to a separate analysis regarding its function, corresponding structure, and ultimate validity.

Although clearly still "evolving," the Federal Circuit has invoked a logical analysis of computer-implemented means-plus-function claims. When a claim requires a "special purpose" computer in order to perform the means-plus-function limitation, the Federal Circuit has stated that the structure disclosed in the specification must "be more than simply a general purpose computer or microprocessor." Noah Sys., Inc. v. Intuit, Inc., 675 F.3d 1302, 1312 (Fed. Cir. 2012) (quoting Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008)). Specifically, the required structure is the algorithm by which the computer is to perform the claimed function. Id.; see also Net MoneyIN, Inc. v.

36

VeriSign, Inc., 545 F.3d 1359, 1367 (Fed. Cir. 2008); Aristocrat, 521 F.3d at 1333 ("Thus, in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" (quoting WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999))); Harris Corp. v. Ericsson Inc., 417 F.3d 1241, 1254 (Fed. Cir. 2005).

The meaning of algorithm in the context of computer-implemented means-plus-function limitations is broad, "encompass[ing] 'in essence a series of instructions for the computer to follow.'" Typhoon Touch Tech., Inc. v. Dell, Inc., 659 F.3d 1376, 1384 (Fed. Cir. 2011) (quoting In re Waldbaum, 457 F.2d 997, 998 (Ct. Cust. App. 1972)). What is required is "a fixed step-by-step procedure for accomplishing a given result." Id. at 1384-85 (quoting C. SIPPL & C. SIPPL, COMPUTER DICTIONARY AND HANDBOOK (1972)) (internal quotation marks omitted). The algorithm may be disclosed in the form of a mathematical formula, a flow chart, prose, or in any other sufficiently descriptive manner, but simply disclosing software without detailing the method by which the software functions fails to satisfy the structure requirement. Noah Systems, 675 F.3d at 1312 (quoting Finisar Corp. v. DirecTV Grp., Inc., 523 F.3d 1323, 1340 (Fed. Cir. 2008)).

In Typhoon Touch, the Federal Circuit reversed a district court's ruling of indefiniteness of the computer-implemented means-plus-function claim a "means for cross-referencing." 659 F.3d at 1384-87. Recognizing that satisfying the

37

disclosure requirement of § 112, ¶ 2 does not require that computer code be included in the specification, the court found that a detailed description of the four-step process for cross-referencing was sufficient. Id. at 1385. The cross-referencing process began with data entry and storage of that data in memory. Id. at 1386. The system would then perform a search of a library of responses to determine whether a match existed. Thereafter, the system reported the existence of a match to the user. Id. This step-by-step process was sufficient to satisfy the algorithm requirement.

The Federal Circuit has recognized a narrow exception to the algorithm requirement for computer-implemented means-plus-function limitations when the claimed function can be accomplished by any general purpose computer and does not require special programming. Noah Systems, 675 F.3d at 1332 n.2. In In re Katz Interactive Call Processing Patent Litig., 639 F.3d 1303, 1315 (Fed. Cir. 2011), the court determined that the claimed functions of "processing," "receiving," and "storing" data were functions that could be performed by any general purpose computer. The court rejected the appellee's broad reading of WMS Gaming, Harris and Aristocrat to require the disclosure of an algorithm for any function performed by a general purpose computer. The court distinguished those cases on the grounds that they dealt with specialized programming necessary to convert a general purpose computer into one capable of performing the claimed function. Id. at 1315-17. By contrast, the functions at issue in Katz could be performed by any computer, and therefore it was not required that the patent disclose more

structure than the general purpose processor.  Id. at 1315.  Recently, in Ergo
Licensing, LLC v. Carefusion 303, Inc., the Federal Circuit elaborated that "[i]t is
only in the rare circumstances where any general-purpose computer without
special programming can perform the function that an algorithm need not be
disclosed."  673 F.3d 1361, 1366 (Fed. Cir. 2012).

Defendants argue that elements B, C, D, E, and F of claim 13 describe
functions that have no corresponding structure in the specification, and are
therefore invalid as indefinite.  (Doc. 111, at 16).  Defendants' precise arguments
regarding each element will be discussed infra, but it is a fair summary to say that
their means-plus-function arguments are, in essence, a continuation of their
argument that the definition of "vendor pool" as used in the claims is inconsistent
with the definition as set forth in the specification.  In other words, because the
specification does not even contemplate the two-pool system described in the
claims, then a fortiori the specification fails to adequately disclose a corresponding
structure to achieve that function.

A-000147

i.    *Element B*

Element B of claim 13 states as follows:

a means for receiving an electronic communication from any buyer using the system providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer

'106 patent, col. 21, ll. 11-22.

Defendants argue that element B is indefinite because the specification does not disclose a corresponding structure for the function of storing vendor pool data prior to the analysis of job data. (Doc. 111, at 17). Rather, defendants argue, the specification only discloses a vendor pool after comparison of a vendor base with job data. (Id.) Moreover, defendants argue that the specification does not disclose a corresponding algorithm for the elements of claim 13, and so the claim fails as a matter of law. (Doc. 150, at 8). e-LYNXX submits that this argument is merely a rehashing of the same "straw-man" argument put forth by defendants previously, and that the specification, in multiple places, discloses the organization within the database of multiple vendor pools. (Doc. 128, at 8-9).

Defendants' argument that e-LYNXX cannot rely on a "conventional general purpose computer" to support some elements of claim 13 misstates the law. (See Doc. 150, at 8) (arguing that all "computer-implemented means-plus-function limitations" require disclosure of an algorithm). The Federal Circuit stated in Katz,

40

A-000148

and affirmed recently in <u>Noah Systems</u> and <u>Ergo Licensing</u>, that an algorithm is required only for those means-plus-function limitations that require use of a special purpose computer.  See <u>Katz</u>, 639 F.3d at 1316-17 (holding that the claims "means for processing," "receiving," and "storing" may be performed by a general purpose computer, and therefore do not require disclosure of an algorithm); <u>Noah Systems</u>, 675 F.3d at 1312 n.8 (recognizing the distinction drawn in <u>Katz</u> between those functions requiring special purpose computers and those that can be performed on any general purpose computer); <u>Ergo Licensing</u>, 673 F.3d at 1364-65 ("[<u>Katz</u>] . . . identified a narrow exception to the requirement that an algorithm must be disclosed for a general-purpose computer: when the function 'can be achieved by any general purpose computer without special programming.'" (quoting <u>Katz</u>, 639 F.3d at 1316)).  Defendants' interpretation of the algorithm requirement is therefore too broad, neglecting the narrow but important exception recognized in <u>Katz</u>.  To the extent that any of the means-plus-function elements describe functions that can be performed by a general purpose computer, there is no requirement that the specification disclose an algorithm as the corresponding structure.

The parties have agreed that the function of element B is:

receiving an electronic communication from any buyer using the system providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer.

41

A-000149

(See Joint Disputed Claim Terms Chart, Doc. 102-1, at 58-59). Element B recites "a means for *receiving* an electronic communication." '106 patent, col. 21, l. 11 (emphasis added). As the Federal Circuit held in Katz, "[a]bsent a possible narrower construction of the term[] . . . 'receiving,'" this is a function that can be performed by any general purpose computer without specialized programming. 639 F.3d at 1316. Therefore, there is no need for the '106 patent to disclose a particular algorithm for the function of "receiving" information. The patent specification describes the receipt of information through a website, accessed by a standard web browser. '106 patent, col. 11, ll. 35-44. The buyer accesses the website through the use of a unique username and password, ensuring the proper association between data and the user who enters it. Id.

While the function of receiving electronic communications from buyers requires no specialized programming, the element B functions related to the organization and association of vendors with buyers do require the disclosure of an algorithm, because vendor data could be organized according to myriad criteria. See Katz, 639 F.3d at 1315 (noting that, because telephone calls may be "conditionally coupled" in many ways, the patent must disclose with particularity the algorithm by which the system at issue worked). The '106 patent's specification discloses the necessary structure to support the claims, and is therefore not invalid for indefiniteness. The summary portion of the patent describes "means and method steps for maintaining multiple vendor pools for each of a plurality of

42

buyers, the multiple vendor pools for a particular buyer corresponding to multiple product or service types that the buyer procures." '106 patent, col. 5, ll. 46-51. Later, the specification describes how buyers can create and manage a pool of vendors by the assignment of selection criteria, which as noted *supra* can include such things as geographic location and union status. Id., col. 16, ll. 41-46 ("[T]he buyer can create and manage a single pool of vendors who are given specific production category and quality level ratings that, *together with other selection criteria*, automatically designate which solicitations each vendor in a pool can receive . . . .") (emphasis added); see also id., col. 17, ll. 22-25 ("quality control begins at the pre-qualification stage when vendor pools are established . . . ."). Element B's function therefore corresponds with the structure disclosed in the specification, and is not invalid.

ii. *Element C*

Element C of claim 13 states as follows:

a means for receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid

Id., col. 21, ll. 23-29.

Defendants argue that element C is invalid on functionally identical grounds as element B: that the specification only discloses the creation of a vendor pool after the submission of job data, not before; as a result, there is no disclosed structure and the claim is indefinite. (Doc. 111, at 17).

43

The court finds that the function of element C is to "[receive] an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined," with the job data "including a job descriptor data which specifies a plurality of characteristics." As established *supra*, the patent satisfies the structural disclosure requirements necessary to link the two-pool system in the claims with the specification. Consequently, the question remains whether the specification sufficiently discloses a structure for the receipt of job data as claimed in element C.

As in element B, "receiving" an electronic communication is a function that may be performed by any general purpose computer, and therefore no specific algorithm is required. See Katz, 639 F.3d at 1316. With that in mind, it is clear that the specification sufficiently discloses the process by which the system receives job data from buyers. The specification provides a flow chart detailing this process. The buyer, through an internet web browser connected to the internet via telephone, ISDN, cable modem, or any other connection, transmits job data through the internet to the system's web server/database, which is also connected to the internet. Id. fig. 2A; see also id. col. 6, l. 59 – col. 7, l. 60. Further support may be found in the screen shots of the buyer-side job data entry process, input through a standard internet browser. '106 patent, figs. 3-15. Because the transmittal of data between computers through the internet is a function capable of being performed by a general purpose computer without specialized programming, this disclosure is sufficient. Defendants' argument that element C is indefinite is unavailing.

44

### iii.    Elements D and E

Elements D and E of claim 13 deal with the comparison of vendors in the vendor pool with the buyer's job attributes, and the creation of the vendor selection pool based on that comparison, respectively.  Element D states as follows:

> a means for automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer

'106 patent, col. 21, ll. 30-35.  Element E, which functions in concert with element D, states:

> a means for automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison

Id. col. 21, ll. 36-40.  Once again, defendants' argument on this point is merely a repetition of their previous argument regarding a perceived disparity between the definition of vendor pool as used in the claims and in the specification.  (See Doc. 111 at 18).  This argument is rejected.

Elements D and E both require special-purpose computers to accomplish their respective functions, and so these elements must be supported in the specification by an algorithm.  Element D describes the function of "automatically comparing," through use of a computer processor, the attributes of the vendors in the buyer's vendor pool with the requirements contained in the buyer's submitted job data.  Element E describes the function of "automatically identifying" a further subset of vendors, identified through the comparison in element D, in order to

A-000153

constitute the vendor selection pool that will receive bid solicitations. Both elements correspond with algorithms disclosed in the specification, and so are valid.

The vendor pool comparison is supported by multiple figures and passages in the specification. Fig. 15, box 14 illustrates the comparison: a vendor pool is drawn from the database "according to SC criteria" – the buyer's pre-qualification search criteria, such as geographic location or union status. See '106 patent, fig. 15. Then, the attributes of the vendors in the vendor pool are compared to the specific job criteria identified in the buyer's invitation-for-bid. See '106 patent, abstract ll. 8-12 ("The invitation-for-bid is compared to each of the vendor's attributes according to certain standard or optional selection criteria to generate a vendor selection pool of vendors qualified to bid on the job."); id. col. 5, ll. 4-11 (describing a comparison of "the set of quantified buyer's attributes to each quantified set of vendor's attributes . . . *the comparison being in accordance with a buyer defined selection criteria*") (emphasis added). That comparison generates the vendor selection pool claimed by element D. See id. col. 5, ll. 9-11 ("generating, as a result of the comparison, a data set representing a vendor selection pool for the particular buyer"). The process by which a comparison is made and the vendor selection selected is disclosed in the specification. Hence, elements D and E are valid.

46

A-000154

*iv.* *Element F*

Element F of claim 13 states as follows:

a means for transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors

'106 patent, col. 21, ll. 23-29.

The function of element F is simply to transmit bid solicitations to vendors identified as qualified to receive bid solicitations through the comparison and identification carried out in elements D and E. In light of the fact that the specification properly discloses the structure necessary to support the distinction in the claims between the vendor pool and the vendor selection pool, it is clear that the specification also discloses a sufficient structure for transmitting bid solicitations to members of the vendor selection pool. See id. col. 13, ll. 38-45 ("After the print vendor selection pool VPOOL is created by the system, the vendors' invitation-for-bid VIFB is submitted to each vendor therein."). Defendants' argument that element F is invalid is therefore rejected.

**B.    Construction of Remaining Means-Plus-Function Limitations**

Having determined that elements B, C, D, E, and F of claim 13 are not invalid for indefiniteness, the court will now construe the functions and corresponding structures of elements A, G, and H of claim 13 of the '106 patent.

*i.    Element A*

Element A of claim 13 provides for a "means for receiving electronic communications from a plurality of vendors prior to receiving job data from a

47

buyer." '106 patent, col. 21, ll. 1-3. The parties agree that the function that this limitation describes is to receive electronic communications from a plurality of vendors prior to receiving job data, and to use those electronic communications to establish a plurality of vendor records which are stored in electronic memory. (See Joint Disputed Claim Terms Chart, Doc. 102-1 at 54-55). Although they agree on the function, the parties dispute precisely what structure or structures in the specification correspond to this function.

The parties agree that element A is supported in the specification by "an internet server running under Windows NT 4.0, with MS Internet Information Server 4.0, Oracle Database 7.3.4.0, and an information server using standard '.dll' files created in any of the standard programming languages known in the art, . . . all running on a conventional general purpose computer hardware." '106 patent, col. 8, ll. 2-8. Defendants assert that this is the *only* supporting structure disclosed in the specification, and therefore element A must be limited to this embodiment (see Doc. 112 at 31-32), whereas e-LYNXX asserts that additional portions of the specification correspond with this limitation. In particular, e-LYNXX argues that data can be transferred to the system database through means other than a web portal, such as through e-mail, fax, voice, or other "external data link[s]." (See Doc. 113 at 27).

The court will adopt e-LYNXX's proposed construction. The specification contemplates communication between vendors and the database by means other than website data entry, and by third-parties operating on behalf of the vendors.

48

See '106 patent, col. 11, ll. 31-34 ("Alternatively, the print vendors 8 can transmit their respective vendor attributes VATTR to the print buyer 6 by e-mail or equivalent means for entry by the print buyers 6 or any authorized third party."); id. col. 15, ll. 21-26 ("The external data link 506 may be a connection via the Internet, through e-mail or some other alternate sources for data transfer."). While data entry through a website is certainly *one* structure that supports element A, it is not the *only* structure that does so. Defendants' contentions to the contrary are therefore rejected.

ii. *Element G*

Element G recites "a means for receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price." '106 patent, col. 21, ll. 44-47. The parties agree that the claimed functions of this limitation are: (1) receiving electronic communications from at least one vendor who received a solicitation; and (2) the bid data identifying each of the responding vendors as well as the bid that they submitted. (See Joint Disputed Claim Terms Chart, Doc. 102-1 at 75-78).

The parties also agree that element G is supported in the specification by a structure including a website for receiving bid information from vendors, bids for solicited jobs, and responding bid information, all of which is stored in a file on the database. (See Doc. 112 at 34; Doc. 113 at 33); see also '106 patent, Fig. 1b; id. col. 8, l. 63 – col. 9, l. 7. The parties disagreement on this element, like element A, centers

49

on whether the specification supports structure *beyond* the aforementioned website. e-LYNXX asserts that bid data may be transmitted through a number of means alternative to website entry, and that defendants improperly seek to limit the claims to the preferred embodiment.

The court will construe element G in accordance with e-LYNXX's proposal. The specification supports a number of alternate methods by which bid data may be transmitted to the database. These alternate means include email, fax, optical character recognition, or voice-to-text recognition. Id. col. 15, ll. 24-32. Indeed, the specification explicitly states that "bid data may be received in a variety of different formats for the convenience of all system users. System users are *thus not limited* to access through a web interface." Id. col. 15, ll. 35-36. Based upon this clear language, the court finds that the specification does not limit element G's corresponding structure to website data entry.

     *iii.    Element H*

The parties' final disputed limitation is element H, which claims "a means for outputting to said buyer an electronic communication providing at least one of said bid response data." '106 patent, col. 21, ll. 48-49. The parties agree that the claimed function for this limitation is to output, to the buyer, an electronic communication providing at least one bid response. (See Joint Disputed Claim Terms Chart, Doc. 102-1 at 78-81). As was the case with elements A and G, defendants claim that the structure is limited strictly to a website or direct read of a database that is resident

A-000158

on the computer system.  (See Doc. 112 at 35).  e-LYNXX argues that an additional

structure supports this limitation.

The court agrees with e-LYNXX.  The patent specification expressly

discloses that "a generic external data link [may be used] instead of the vendor web

browser 10, buyer web browser 12, web site 4 and database 2 depicted at FIG. 1B."

'106 patent, col. 14, ll. 4-9.  The court will therefore adopt e-LYNXX's proposed

construction of element H's corresponding structure.

### 3.  Lack of Written Description Under § 112, ¶ 1

Defendants' final argument for summary judgment is that the patent is

invalid for failure to adequately describe the invention.  Pursuant to 35 U.S.C. § 112,

¶ 1, a patent's specification must "contain a written description of the invention."

Id.  The purpose of the written description requirement is to ensure that, as of the

filing date of the application, the inventor possessed the specific subject matter

claimed.  See HARMON ET AL., supra, § 5.4; see also LizardTech, Inc. v. Earth

Resource Mapping, Inc., 424 F.3d 1336, 1344 (Fed. Cir. 2005) (the written description

requirement, "an essential part of the quid pro quo of the patent bargain, 'requires

the patentee . . . to describe [the invention] in such terms that any person skilled in

the art to which it appertains may construct and use it after the expiration of the

patent.'" (quoting Permutit Co. v. Graver Corp., 284 U.S. 52, 60 (1931) (alterations in

original)).

51

A-000159

Defendants' argument is based entirely on their contention that the patent specification fails to disclose the two-step vendor pool process described in the claims. Having engaged in a thorough analysis of this question with regard to defendants' indefiniteness argument, the court finds it unnecessary to do so with regard to the written description requirement. The specification provides ample support for the two-step vendor pool process. See *supra* Part III.B.1. Defendants' argument that the patent is invalid for failure to comply with the written description requirement of § 112, ¶ 1, is without merit.

**IV.** <u>**Conclusion**</u>

For the aforementioned reasons, defendants' motion for summary judgment is denied. An appropriate order containing the court's claim constructions will follow.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:    September 27, 2012

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| Defendants | : | |

## <u>ORDER</u>

AND NOW, this 27th day of September, 2012, upon consideration of the

motion for summary judgment (Doc. 109) of defendants Innerworkings, Inc., Taylor

Corporation, Rent-a-Center, Inc., Dr. Pepper Snapple Group, Inc., Staples, Inc.,

R.R. Donnelley & Sons Company, NewlineNoosh, Inc., The Standard Register

Company, and Cirqit.com, Inc. (collectively, "defendants"), and the parties' briefs

regarding the proper interpretation of claim terms, (Docs. 112, 113, 125, 126), and

for the reasons set forth in the accompanying memorandum, it is hereby

ORDERED that:

    1.    Defendants' motion for summary judgment is DENIED.

    2.    The court will construe the disputed claim terms as follows:

**A-000161**

a. *"buyer"* – the ultimate purchaser of customized goods or services

b. *"electronic communications"* – information transmitted or conveyed electronically

c. *"vendor records"* – a set of attributes associated with a vendor

d. *"vendor capability data"* – two or more capabilities of a vendor to manufacture or produce a customized good or service and excluding the vendor's name, contact information, payment preferences, type of business and goods sold

e. *"plurality of capabilities for said vendor to provide a customized good or service"* – two or more capabilities of a vendor to manufacture or produce a customized good or service and excluding the vendor's name, contact information, payment preferences, type of business and goods sold

f. *"information identifying a plurality of vendors"* – obtained knowledge establishing the identity of two or more vendors to potentially receive a job solicitation from that buyer

g. *"a pool of vendors associated with said buyer"* – two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer

h. *"job data"* – all of the information specified by the buyer in preparing its request for a job

i. *"job descriptor data"* – a set of information defining a plurality of characteristics of a customized good or service for which the buyer wishes a bid

j. *"automatically comparing via a computer processor"* – examining two sets of data to discover one or more similarities, which once initiated, is performed by a computer processor, without the need for manually performing the function

k. *"automatically identifying via a computer processor"* – establishing the identity of one or more qualified vendors, which once initiated, is performed by a computer processor, without the need for manually performing the function

2

A-000162

l.    *"selected members from the identified subset of the buyer's
associated pool of vendors"* – the vendors identified from the
buyer's vendor pool through the comparison


         S/ Christopher C. Conner
         CHRISTOPHER C. CONNER
         United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| Defendants | : | |

## <u>MEMORANDUM</u>

Presently before the court in the above-captioned matter are two motions for summary judgment on the grounds of non-infringement (Docs. 232, 235), filed by defendants Cirqit.com, Inc., and InnerWorkings, Inc., respectively. Also before the court is the motion for leave to file an amended answer (Doc. 252), filed jointly by defendants, and plaintiff e-LYNXX Corporation's motion to strike Cirqit's summary judgment evidence (Doc. 259). The motions have been fully briefed and are ripe for disposition. For the reasons to be discussed, the court will deny e-LYNXX's motion to strike and defendants' motion to amend, and grant InnerWorkings' and Cirqit's motions for summary judgment.

## I.   <u>Procedural History</u>

e-LYNXX originally filed this action in the United States District Court for the Eastern District of Texas, in August 2010. e-LYNXX voluntarily dismissed that

**A-000164**

case, refiling in this district on December 14, 2010. (See Doc. 1). The parties filed their Joint Case Management Plan (Doc. 7) on March 22, 2011, setting the deadline for amending pleadings as May 1, 2012. Trial in this matter is currently scheduled for November 2013.

In August and September, 2011, the parties filed briefs regarding their respective claim constructions, and defendants moved for summary judgment on grounds of patent invalidity. On October 11 and 12, 2011, the court heard oral argument on summary judgment and held a claim construction hearing, pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). The court issued a memorandum and order denying the motion for summary judgment and construing the disputed claim terms on September 27, 2012. While those motions were pending, e-LYNXX moved for leave to file a second amended complaint, in order to assert claims of infringement of a newly issued patent, number 8,209,227 ("the '227 patent"). In their joint brief in opposition to e-LYNXX's motion, defendants argued that prejudice would result from amendment because they had engaged in "significant discovery," including document production, written discovery, and the issuance of subpoenas to third parties regarding prior art. (Doc. 204 at 6). The court denied the motion to amend on October 31, 2012, concluding that amendment would "delay resolution of this matter, whether by trial or dispositive motion, at least several months." (Doc. 214 at 6). On February 1, 2013, the parties submitted a joint motion to extend the deadline for filing dispositive motions to February 18, 2013, which the court granted. Cirqit and InnerWorkings separately moved for

A-000165

summary judgment on February 19, 2013, but did not file their joint motion for leave to amend until March 18, 2013.

## II.    **The Invention and Claims**

e-LYNXX alleges that Cirqit and InnerWorkings infringed U.S. Patent No. 7,451,106 (the "'106 patent") and U.S. Patent No. 7,788,143 (the "'143 patent"). Both patents cover procurement systems for competitive bidding on customized goods and services. They share the same specification, which describes the invention as "[a]n apparatus and method for selecting a lowest bidding vendor from a plurality of vendors of a customized good or service." '106 patent, abstract; '143 patent, abstract. The invention seeks to streamline the process for procuring customized goods or services by reducing the search costs for buyers. As described in the specification, the prior art in this area generally limited buyers to soliciting bids from a small number of vendors, awarding the contract to the lowest bidder or to a bidder with whom the buyer had a previous relationship, and could therefore trust to produce high quality work. See '106 patent, col. 2, ll. 4-11. Buyers could attempt to "shop" the lowest bid to other vendors in an effort to secure a better deal, but to do so was both expensive and time consuming, and prevented buyers from securing the benefits of competition between many bidders.

Nor were suppliers without their inefficiencies. Manufacturers in industries with substantial overhead and labor costs, such as printing and information product suppliers, see id. col. 2, ll. 35-50, must balance their need to maintain a steady production schedule with the need to be available on short-notice to handle

3

A-000166

rush orders from regular customers. Manufacturers do not want to allow their machinery to sit idle for too long, cutting into their profit margins. Accordingly, they build into their production schedules a certain amount of slack time in the event that a customer places an unexpected rush order. Id. But if an expected order is cancelled, a manufacturer may be left with both an unscheduled lapse in its regular production schedule, and planned downtime that it has yet to fill with a rush order. Vendors seek to fill these unexpected holes in their production schedules with short-turnaround orders, which they secure by undercutting competitive bids. Id. col. 2, ll. 50-56. This process is referred to as "contribution pricing," because the price is below the manufacturer's normal profit margin level, but it nevertheless "contributes" to the bottom line more so than would idle machinery and labor.

In the instant matter, e-LYNXX accuses defendants of infringing claims 13-16 and 18 of the '106 patent, and claims 1 and 2 of the '143 patent. Claim 13 of the '106 patent states the following:

> A system for facilitating a buyer's selection of a vendor via automated comparison of records and based upon bidding by vendors of customized goods or services via a computer operated system, comprising:
> a means for receiving electronic communications from a plurality of vendors prior to receiving job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

4

a means for receiving an electronic communication from any buyer using the system providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

a means for receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid;

a means for automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer;

a means for automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

a means for transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

a means for receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price;

and a means for outputting to said buyer an electronic communication providing at least one of said bid response data.

Claim 1 of the '143 patent states:

A method for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services via a computer operated system, comprising the steps of:

prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, receiving and processing electronic communications from a plurality of vendors, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the

5

computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

receiving an electronic communication from or on behalf of any buyer using the system which provides information identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receiving an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor;

and outputting to said buyer an electronic communication providing at least one of said bid response data.

Claim 2 of the '143 patent states:

A computer operated system for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services, the system comprising:

an electronic memory comprising a plurality of vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to

6

provide a customized good or service; and

a computer processor associated with said electronic memory, the computer processor configured to:

receive and process electronic communications from a plurality of vendors, prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing the plurality of vendor records which are stored in the electronic memory;

receive an electronic communication from or on behalf of any buyer using the system which provides information identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receive an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically compare via the computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identify via the computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmit the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receive bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor; and

output to said buyer an electronic communication providing at least one of said bid response data.

Claims 14, 15, 16, and 18 of the '106 patent are dependent claims that refer back to

independent claim 13.

A-000170

III.    **The Accused Products**

A.    **InnerWorkings**

InnerWorkings is in the business of providing global print management and promotional products to corporate clients in a variety of industries. InnerWorkings procures, manages, and delivers print materials for their clients through a system known as Print Procurement Manager 4 ("PPM4"). InnerWorkings claims that the PPM4 system contains approximately 9,000 suppliers of print products.

The PPM4 system's precise operating details will be discussed at length *infra*, but generally speaking, InnerWorkings employs print procurement managers to manage the procurement process for its clients. InnerWorkings' clients do not have direct access to the PPM4 system; rather, clients communicate the specifications of their proposed jobs to managers, who in turn input this information into the system. The managers are neither assigned nor grouped with specific vendors, nor does the buyer determine which vendors against whom a particular set of job data will be compared. Indeed, though nominally disputed by e-LYNXX, the PPM4 system does not have the capability to extract subsets of vendors to compare with job data; rather, the system compares job data against the entire database of vendors in order to identify the best vendor for the particular job at hand.

B.    **Cirqit**

Cirqit is a Delaware corporation in the business of e-Procurement software. Order-It was developed at Cirqit by vice president of product management Dan

8

A-000171

Miller, who then left Cirqit to work for former-defendant R.R. Donnelly.  In October 2009, Cirqit was sold to LogicSource.

Cirqit developed and sold the accused Order-It system, which allows buyers to submit to vendors invitations to bid on contracts for customized paper goods. The Order-It system is intended to provide an efficient and cost-effective means to source customized paper goods, such as letterhead and envelopes.  It is a web-based system that allows a buyer to compare potential vendors with the specifications of the particular job, and then select one to provide the requested goods.  Unlike PPM4, buyers have direct access to the Order-It system, and they are able to describe the vendors they are interested in soliciting.  The parties disagree over the significance of this fact, as well as what information Order-It stores, and what information it uses to evaluate which vendors from whom to solicit bids.  Both will be discussed at length *infra*.

## IV.  <u>Discussion</u>

The arguments presented by Cirqit and InnerWorkings on summary judgment are unique to each defendant, and the court will address them separately. First, however, the court will address defendants' motion for leave to file an amended answer, and e-LYNXX's motion to strike evidence presented by Cirqit in support of its motion for summary judgment.  Both of these motions will be denied.

### A.    Defendants' Motion for Leave to File an Amended Answer

Defendants seek leave to file an amended answer to add an affirmative defense and counterclaim of inequitable conduct.  e-LYNXX stridently opposes this

A-000172

motion, arguing that defendants were tardy in seeking leave to amend and that their purpose is to delay, that prejudice would result from amendment, and that amendment would be futile. The court agrees with e-LYNXX, and will deny the motion.

A motion to amend a pleading in a patent case is governed by regional circuit law. Advanced Software Design Corp. v. Fiserv, Inc., 641 F.3d 1368, 1380 (Fed. Cir. 2011). The Federal Rules of Civil Procedure allow a party to amend a pleading once as a matter of course, within 21 days after serving it, or within 21 days after the filing of a responsive pleading or service of a motion under Rule 12(b), (e), or (f). FED. R. CIV. P. 15(a)(1). In any other circumstance, a party seeking to amend must obtain written consent of the opposing party, or seek leave of court, which should be given freely "when justice so requires." FED. R. CIV. P. 15(a)(2). The decision whether to grant a motion for leave to amend is committed to the sound discretion of the district court. See Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993) (citing Bechtel v. Robinson, 886 F.2d 644, 647 (3d Cir. 1989)). The "touchstone for the denial of an amendment" is prejudice to the non-moving party, Lorenz, 1 F.3d at 1413-14, but leave may be denied for a variety of reasons – for example, if the plaintiff's conduct exhibits "undue delay, bad faith or dilatory motive." Foman v. Davis, 371 U.S. 178, 182 (1962). A significant and undue delay in moving to amend may itself be prejudicial enough to justify denial. CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 629 (3d Cir. 2013).

Defendants' theory of inequitable conduct derives from e-LYNXX's alleged

10

A-000173

failure to disclose a prior art procurement system while prosecuting the patents-in-suit before the PTO. They argue that e-LYNXX operated two procurement systems before applying for the instant patents – called ABC BidsPlus and CAPS – but disclosed only ABC BidsPlus to the PTO. Defendants deposed e-LYNXX's Chief Technology Officer Kevin Long, General Counsel Andy Hawks, and named inventor William Gindelsperger on November 6, 7, and 8, 2012, respectively. They allege that, during Mr. Long's deposition, they "learned more detailed information" regarding e-LYNXX's prior art, specifically that Mr. Long "confirmed" the existence of ABC BidsPlus and CAPS, "confirmed" that the systems were different, and indicated that CAPS performed "most, if not all" of the steps in the instant patents. (Doc. 252 at 3). Defendants further allege that, while deposing Mr. Hawks, they learned that he was involved in prosecuting the patent applications, was aware of both ABC BidsPlus and CAPS, and that he discussed both systems with the prosecuting attorney Mr. Robert J. Depke. Mr. Hawks allegedly chose to "selectively" disclose to the PTO only information about ABC BidsPlus. (Id. at 3-4). This deposition, defendants claim, led them to subpoena Mr. Depke, whom they deposed on January 18, 2013. According to defendants, Mr. Depke was aware of both ABC BidsPlus and CAPS, and chose to withhold information regarding CAPS from the PTO. (Id. at 4). Defendants assert that e-LYNXX's failure to disclose the CAPS system to the PTO renders the patents unenforceable.

e-LYNXX vigorously disputes the merits of defendants' inequitable conduct claim, but argues first that the motion is untimely. e-LYNXX directs the court's

11

attention to a set of documents it produced to defendants on October 14, 2011. (See Nicholson Letter, Br. in Opp. Ex. B, Doc. 274-1 at 15-16). These documents were labeled with bates numbers ELC00001 through ELC044598. (Id.) Included within this production is a document entitled "BidsPlus® CAPS™ Participation Agreement" and subtitled "BidsPlus Contracted Agent Procurement Service," which bears bates numbers ELC042396 through ELC042429. (CAPS Agreement, Br. in Opp. Ex. C, Doc. 274-1 at 19). Defendants rely heavily – according to e-LYNXX, exclusively – on the CAPS agreement to support their claim of inequitable conduct.

Defendants argue that their motion is timely in light of the heightened pleading standard for claims of inequitable conduct imposed by Federal Rule of Civil Procedure 9(a). See Cent. Admixture Pharmacy Serv., Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1356 (Fed. Cir. 2007). Although regional circuit law governs motions to amend pleadings in patent cases, Federal Circuit law applies to the question of whether the pleading meets the standard of Rule 9(a). Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326 (Fed. Cir. 2009). Inequitable conduct must be plead with "particularity," setting forth the "who, what, when, where, and how" of the material misrepresentation or omission before the PTO. Id. at 1327 (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

Defendants' position is that despite the early disclosure of the CAPS agreement, it was not until after the depositions of Messrs. Gindlesperger, Hawks,

12

A-000175

and Depke that they had enough information to plead inequitable conduct.  Hawks

and Gindlesperger were deposed in early November 2012, and Depke on January

18, 2013.  However, as e-LYNXX correctly notes, defendants have been in

possession of the CAPS agreement since October 24, 2011, at which point it would

have been clear that the agreement was not disclosed in the file wrappers for the

'106 and '143 patents.  Defendants excuse their delay in deposing Gindlesperger,

Hawks, and Depke by arguing that the parties waited until after the court's

Markman ruling to conduct the bulk of their discovery, but this assertion is

diametrically opposed to the position that defendants took in their brief in

opposition to e-LYNXX's motion for leave to file an amended complaint.  There,

defendants argued against amendment because "the parties ha[d] conducted

significant discovery related to the '106 and '143 patents," and that allowing e-

LYNXX to add a claim for infringement of a new patent would necessitate "new

discovery."  (Doc. 204 at 4, 9).  Nothing stopped defendants from conducting

discovery on the CAPS agreement shortly after that document was produced.  See

Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd., 599 F.3d 1308, 1320 (Fed.

Cir. 2010) (affirming denial of a motion to amend an answer because "[n]othing

prevented" the defendant from conducting discovery on its inequitable conduct

defense at an earlier time).  Further, even if the parties agreed to postpone

discovery until after the court's Markman order, that agreement does not excuse

defendants' delay in seeking leave to amend until nearly a month after the deadline

for dispositive motions.

13

A-000176

At this late stage in litigation, it is a virtual certainty that granting defendants' motion would result in prejudice to e-LYNXX. To do so would moot the pending motions for summary judgment, and would likely require the court to extend the upcoming trial date. Considering the duration of this litigation and defendants' idleness in seeking leave to amend, the court is unwilling to delay resolution of this matter any further. Accordingly, defendants motion for leave to file an amended answer will be denied.

### B. e-LYNXX's Motion to Strike

e-LYNXX has moved to strike the declaration of Craig Garno, current managing director for OneMarket Operations for LogicSource, Inc., and former General Manager and Vice President for Technology for Cirqit, which Cirqit provided in support of its motion for summary judgment. Mr. Garno is one of the individuals who developed Cirqit's allegedly infringing Order-It software system, and he provides in his declaration information regarding who can access the system, what type of information can be submitted, and by whom. e-LYNXX asserts that Cirqit should not be permitted to rely on this declaration because it failed to disclose Mr. Garno in its Rule 26 disclosure or as a Rule 30(b)(6) witness, and did not produce such a witness for deposition on the functionality of the Order-It system.

e-LYNXX's argument blurs the lines between two distinct federal rules. Rule 26(a) requires a party, without awaiting a discovery request, to disclose the identity and contact information of individuals likely to have discoverable

14

information that the disclosing party may use to support its case, unless the witness would be presented solely for impeachment.  FED. R. CIV. P. 26(a)(1)(A)(i).  Rule 26(e) imposes a continuing obligation on a party to supplement its Rule 26(a) disclosures "in a timely manner" if it learns additional or corrective information through the discovery process, unless that information has been made known to the other parties through discovery or in writing.  FED. R. CIV. P. 26(e)(1).  Rule 30(b)(6), on the other hand, allows a party to name as a deponent an organization, which must then designate one or more "officers, directors, or managing agents, or designate other persons" to testify on the organization's behalf.  FED. R. CIV. P. 30(b)(6).

e-LYNXX can find no recourse in Rule 26.  Although it appears that Cirqit did not disclose Mr. Garno as a potential fact witness in its initial Rule 26(a) disclosures, made in March 2012 (see Doc. 270 at 2), Cirqit did apprise e-LYNXX of Mr. Garno and his familiarity with the functionality of the accused systems on a number of occasions throughout discovery.  On November 24, 2012, in response to e-LYNXX's first set of interrogatories, which were filed on October 22, 2012, Cirqit identified Mr. Garno and Hany Teylouni, both of LogicSource, as fact witnesses familiar with the Order-It system.  (See Cirqit Interrogatory Answers, Doc. 270-4 at 5).  On December 3, 2012, the parties filed a joint motion for extension of the fact discovery deadline, which the court granted that same day, extending the deadline for discovery until January 18, 2013.  e-LYNXX's overwrought complaint that Cirqit did not identify Mr. Garno in its Rule 26 disclosures is true but irrelevant: he was

15

elsewhere identified *at least* in interrogatory responses and, according to Cirqit, during the deposition of its Rule 30(b)(6) designee.  See Fed. R. Civ. P. 26(e)(1), (2). Despite its awareness of Mr. Garno and the extended discovery timetable, e-LYNXX did not seek his deposition.

Similarly, Cirqit complied with Rule 30(b)(6), and e-LYNXX's failure to depose Mr. Garno can be attributed only to its own lack of diligence.  Rule 30(b)(6) requires a subpoenaed organization to designate a corporate officer or other person to testify on its behalf.  e-LYNXX served its notice of deposition on November 16, 2012, in response to which Cirqit made available for deposition Mr. John Wehrle, chairman of the board of directors.  Cirqit informed e-LYNXX that it would be unable to produce a Rule 30(b)(6) witness with technical knowledge of the Order-It system, as it no longer employed such an individual.  At no time during the course of discovery, nor before the filing of dispositive motions, did e-LYNXX seek to compel Cirqit to produce a Rule 30(b)(6) witness with technical knowledge of its systems, nor did e-LYNXX specifically seek Mr. Garno's deposition.  Whether or not such a motion, timely filed, would have been successful is beside the point.  e-LYNXX failed to pursue the matter prior to Cirqit's summary judgment motion, and the court will not punish Cirqit now.  See Gutierrez v. AT&T Broadband, LLC, 382 F.3d 725, 733 (7th Cir. 2004).  Accordingly, e-LYNXX's motion to strike will be denied.

### C.   Summary Judgment

Cirqit and InnerWorkings have separately moved for summary judgment, each arguing that there is no genuine dispute of material fact that their accused products do not infringe e-LYNXX's patents as the court has construed the patent claims.  For the reasons to be discussed, the court agrees.

### i.   Summary Judgment Standard

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see also</u> FED. R. CIV. P. 56(a).  Only if this threshold is met may the cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell or sells any patented invention" during the life of the patent, commits patent infringement.  The larger question of infringement can be distilled to two discrete issues: what is the thing that was patented, and has the accused infringer

17

made that thing?  See ROBERT L. HARMON, ET AL., PATENTS AND THE FEDERAL CIRCUIT 463 (10th ed. 2011).  Determining what the patent covers is a question of law that the court answers through claim construction; infringement – whether literal or through the doctrine of equivalents – is a factual question.  Ultra-Tex Surfaces, Inc. v. Hill Bros. Chemical Co., 204 F.3d 1360, 1363 (Fed. Cir. 2000).

To be liable for direct infringement of a method claim, an alleged infringer "must perform all the steps of the claimed method, either personally or through another acting under his direction or control."  Akamai Tech., Inc. v. Limelight Networks, Inc., 692 F.3d 1301, 1307 (Fed. Cir. 2012).  The plaintiff must prove by a preponderance of the evidence that the accused device "contains each limitation of the asserted claim(s)."  Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247-48 (2000).  There is no literal infringement, as a matter of law, "[i]f any claim limitation is missing from the accused device."  Id.; see also HARMON, ET AL., at 467-68 (noting that the Federal Circuit has adopted the "All Limitations Rule," meaning that to establish infringement, "every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent").

If one or more claims do not read literally on the accused product or process, it may still infringe if its elements are equivalent to the claimed elements of the patented invention.  Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1357 (Fed. Cir. 2012) (quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997)).  Under the doctrine of equivalents ("DOE"), infringement exists if the differences between a claim limitation and the corresponding element in the

18

A-000181

accused product or process are "insubstantial." Voda v. Cordis Corp., 536 F.3d 1311, 1326 (Fed. Cir. 2008). Put another way, an element in the accused product is equivalent to a claim limitation if it "performs substantially the same function in substantially the same way to obtain substantially the same result." Id.

e-LYNXX alleges infringement of independent claim 13 and dependent claims 14, 15, 16, and 18 of the '106 patent, and independent claims 1 and 2 of the '143 patent. "An independent claim is completely self-contained. A dependent claim refers back to an earlier claim and is considered to include all of its own limitations as well as those of the referenced claim." HERBERT F. SCHWARTZ AND ROBERT J. GOLDMAN, PATENT LAW AND PRACTICE § 2.III.B.1 (7th ed. 2011). To infringe a dependent claim, one must necessarily infringe the independent claim to which it refers. Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

ii. InnerWorkings' Motion for Summary Judgment

InnerWorkings bases its motion for summary judgment on the court's construction of the claim term "buyer." At the claim construction stage of this litigation, e-LYNXX argued that "buyer" means simply "one who makes a purchase." (Doc. 205 at 9). The court rejected this construction, instead adopting defendants' proposal and construing "buyer" to mean "the ultimate purchaser of customized goods or services." (Id. at 9-11). The court also construed the term "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that

19

buyer." (Id. at 33).

InnerWorkings is in the business of procuring, managing, and delivering printed materials for corporate clients across a variety of industries. According to InnerWorkings, PPM4 does not practice three elements of e-LYNXX's patents: first, the buyer never has access to PPM4 to procure bid jobs; second, PPM4 does not associate a pool of vendors with the buyer; and third, a supplier's bid response data is not output to the buyer. Because the court finds InnerWorkings first and second arguments to be dispositive, it is unnecessary to address the third.

        a.     *"Buyer"*

It is undisputed that InnerWorkings' clients do not directly access the PPM4 system. (See Doc. 237-2 at 8; Doc. 266 at 6). Instead, InnerWorkings employs print "managers" to interact with the PPM4 system, who determine which suppliers receive bid solicitations. (See Cioffi Dep., Doc. 237-12 at 144:4-9; 152:16-20). InnerWorkings argues that because the buyer, defined by the court as the ultimate purchaser of the goods, does not interact with PPM4, it cannot be liable for infringement.

With respect to the '143 patent, this argument is rejected. InnerWorkings' argument fails to appreciate the language that accompanies buyer in the '143 patent's claims. Claim 1 describes the receipt of "an electronic communication from *or on behalf* of any buyer" defining the buyer's job data. '143 patent, col. 19, ll. 13-14 (emphasis added). Further, it claims "an electronic communication *from or on behalf of* any buyer" providing information identifying vendors. Id. col. 19, ll. 1-2

(emphasis added).  Claim 2 claims a computer system that "receive[s] an electronic communication defining a job data *from or on behalf of* at least one buyer."  Id. col. 20, ll. 21-22 (emphasis added).  Although, as the court recognized in its claim construction order, the definition of buyer is narrower than simply "one who makes a purchase," the '143 claims are not so circumscribed.  See also id. col. 20, ll. 9-10 (claiming a system that "receive[s] an electronic communication *from or on behalf of any buyer using the system*" that identifies vendors for the vendor pool) (emphasis added).  InnerWorkings' print managers input job specifications into the PPM4 system on behalf of their clients, the buyers and ultimate purchasers.  The '143 patent does not require that the buyer directly input data into the system, as claims 1 and 2 make clear.  Therefore, summary judgment on infringement of the '143 patent is inappropriate on these grounds.

The '106 patent is, however, a different matter.  Claim 13 provides that information identifying the vendors in the buyer's vendor pool be communicated through an electronic communication "from any buyer using the system."  '106 patent, col. 21, ll. 11-12.  As e-LYNXX concedes, claim 13 lacks the "on behalf of" language present in the '143 patent claims.  (Doc. 266 at 14).  Acknowledging this distinction, e-LYNXX appeals to the court's construction of the term "electronic communication" to suggest that the claim does not require direct interaction with the system by the ultimate purchaser, but this argument fails.  In its claim construction order, the court rejected defendants' argument that "electronic communication" meant strictly "electronic data input/output directly to/from the

21

A-000184

system" by the named actor, i.e., the buyer. (Doc. 205 at 11-12). The court

concluded that to construe "electronic communication" in such a manner would

read out of the claims the "from or on behalf" language. (Id. at 13). In other words,

the court rejected the argument that the *term itself* required input by the ultimate

purchaser. Instead, the court construed "electronic communication" to mean

simply "information transmitted or conveyed electronically." However, the court

did not hold that the sender of the electronic communication could not be limited

by the surrounding language of a particular claim. That is precisely what claim 13

does, claiming "a means for receiving an electronic communication *from any buyer*

*using the system*." '106 patent, col. 21, ll. 11-12 (emphasis added). Claim 13 therefore

imposes a limitation on who may send the electronic communication that does not

read literally on the PPM4 system.[1]

    As an alternative to literal infringement, e-LYNXX argues that

InnerWorkings' PPM4 system infringes claim 13 of the '106 patent under the

---

[1] The court similarly rejects e-LYNXX's "system" argument. Claim 2 of the '143 patent and claim 13 of the '106 patent are both "system" claims. e-LYNXX asserts that even if the claims require direct access to the system by the buyer, InnerWorkings can still be liable for infringement because it "uses" the system. To be liable for direct use infringement, "a party must put the invention into service, i.e., control the system as a whole and benefit from it." Centillion Data Sys., LLC v. Qwest Communs. Int'l, 631 F.3d 1279, 1284 (Fed. Cir. 2011). According to this theory, InnerWorkings maintains control over the PPM4 system, and therefore can be liable for infringement even if some elements of the claims are performed by another party. This argument fails because every element of the claim must still read on the accused system, regardless of whether physical or direct control over each element resides in a single party. Id. Here, a required element of the claim is that the electronic communication originate *from the buyer*. That is simply not the case in the PPM4 system.

A-000185

doctrine of equivalents.[2]  A product that does not literally infringe one or more of a patent's claims may still infringe if elements of the accused product are equivalent to claimed elements in the patent.  Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1357 (Fed. Cir. 2012).  Infringement under the DOE may be found when the differences between the limitations in the claim and the allegedly infringing element of the accused device are "insubstantial," Voda v. Cordis Corp., 536 F.3d 1311, 1327 (Fed. Cir. 2008), or, in other words, when the accused device "performs substantially the same function in substantially the same way to obtain substantially the same result." Mirror Worlds, 692 F.3d at 1357 (quoting Voda, 536 F.3d at 1326).  This latter formulation is known as the "function-way-result" test.  Under either rubric, "the doctrine of equivalents must be applied to individual limitations of the claim, not to the invention as a whole." Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 29 (1997).  The All-Elements Rule is equally applicable to infringement under the DOE as it is to literal infringement, TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1377 (Fed. Cir. 2008), and there can be no infringement, as a matter of law, "[i]f a theory of equivalence would vitiate a claim limitation." PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1365 (Fed. Cir. 2005) (internal citation and quotation marks omitted).

InnerWorkings argues that e-LYNXX's DOE theory is barred by prosecution

---

[2] e-LYNXX does not assert a doctrine of equivalents theory as to the '143 patent claims.

A-000186

history estoppel, and even if that were not so, e-LYNXX's theory does not comply with the All-Elements Rule.  Prosecution history estoppel requires a court to interpret a patent's claims "in light of the proceedings in the PTO during the application process." <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.</u>, 535 U.S. 722, 733 (2002).  Estoppel prevents a patent holder from reclaiming under the doctrine of equivalents what he surrendered during patent prosecution.  <u>Id.</u> at 733-34 (stating that when a patentee narrows a claim during prosecution "in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issue patent"); <u>see also</u> <u>Duramed Pharm., Inc. v. Paddock Lab., Inc.</u>, 644 F.3d 1376, 1380 (Fed. Cir. 2011).  When a patentee narrows a claim in response to a prior art rejection by the PTO, a presumption of estoppel applies, which may be rebutted upon a showing that the alleged equivalent was "unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered." <u>Id.</u> (internal quotation marks and citation omitted).

The prosecution history indicates that the patentee surrendered its claim to a system that is not accessed directly by a buyer.  On October 3, 2006, in response to an office action of May 18, 2006, the patentee for the '106 patent filed an amendment to independent claim 1, which would become claim 13 of the issued patent.  The patentee amended the claim so that the step for receiving an electronic communication identifying the vendors for the vendor pool originated from "each buyer using the system."  (<u>See</u> Ex. A, Doc. 283-1 at 27).  In the same amendment,

A-000187

the patentee altered the job-data-receiving-step to originate "from or on behalf of at least one buyer." (Id.) These amendments were made in order to overcome prior art rejections by the patent examiner. (See id. at 29).

The doctrine of equivalents is meant to account for the imprecision of language to describe the "essence" of an invention, but when it is clear that the inventor "knew the words for both the broader and narrower claim, and affirmatively chose the latter," the patentee is estopped from claiming the former in litigation. Festo, 535 U.S. at 734-355. Such is the case here. The October 3 amendment makes manifest that the patentee understood the difference between a system accessed directly by the buyer, and one accessed by or on behalf of the buyer. Attempting to overcome a prior art rejection, the patentee abandoned the broader claim that e-LYNXX now asserts, instead requiring that "the buyer using the system" identify vendors for the vendor pool. InnerWorkings' PPM4 system is not accessible by buyers, as the court has construed that term, and e-LYNXX relinquished the broader claim that would encompass the PPM4 system. Summary judgment for InnerWorkings is therefore appropriate as to infringement of the '106 patent.

b.     *"a pool of vendors associated with said buyer"*

InnerWorkings asserts, in addition to its argument related to the term "buyer," that the PPM4 system does not infringe the '143 patent as a matter of law because it does not associate a pool of vendors with a buyer. Claim 1 of the '143 patent describes an electronic communication from or on behalf of a buyer

25

A-000188

"identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation." '143 patent, col. 19, ll. 1-5. In its claim construction order, the court construed the term "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." (Doc. 205 at 54). In adopting this construction, the court agreed with e-LYNXX that the patent specification "allows buyers to pre-qualify vendors *before* the system runs a job data comparison to select those who are qualified, and ultimately to solicit bids from them." (Id. at 30).

InnerWorkings argues that the PPM4 system does not associate buyers with vendors or print managers, that the buyer does not control which vendors against whom particular job data will be compared, and that in any bid solicitation, the job data is compared against every vendor in the PPM4 system, not against a subset of vendors. (See Doc. 237-2 at 14-15). InnerWorkings' senior business analyst Colleen Cioffi stated at her deposition that the PPM4 system does not allow a buyer to identify a subset of the database:

Q: . . . What I'm saying is, can an enterprise customer set it up so that I don't want to get this list out of 7,000, I only want to use 20 to show up as potential recommended suppliers?

A: No, sir, the system doesn't support that at all.

Q: Okay. Likewise – or not likewise, but relatedly, can I, as an enterprise customer, exclude particular suppliers?

A: No, sir.

26

(Cioffi Dep., Doc. 237-12 at 121:25 - 122:1-9).  InnerWorkings' director of technology Mr. Mohammed Basheeruddin testified that "[a] customer is never tied to a supplier" because the "system doesn't have that capability."  (Basheeruddin Dep., Doc. 237-13 at 34:11-13). Mr. Basheeruddin further stated that, once an InnerWorkings print procurement manager enters the specs for a job, the PPM4 system will compare those specs "against all suppliers within the system . . . to see if there's a match for . . . those specifications."  (Id. at 45:6-14; see also id. at 69:11-14 ("Q: Okay. There is never an occasion in which a subset or less than all is examined? A. No. It will be all the vendors.")).

e-LYNXX does not directly dispute that the system does not extract a subset of vendors from the database, but pivots the focus to the fact that the PPM4 system maintains records for vendors that have not been certified by InnerWorkings or are otherwise pending, inactive, or deleted.  (Doc. 266 at 22).  According to e-LYNXX, because only certified vendors are selected from the aggregate database, the certified vendors form a vendor pool "associated" with a buyer for receiving a job solicitation.  e-LYNXX's expert Ivan Zatkovich opines that the court's construction of vendor pool "pertains to any set of vendors that is qualified by the system to be made available to receive a job solicitation from the buyer."  (Zatkovich Decl., Doc. 267-2 at ¶ 51).  He further states that he has "identified no constraint in the claim language or the Court's claim constructions that requires that different buyers have access to unique or different pools of vendors."  (Id.)  However, Zatkovich provides no elaboration – and cites no evidence – to support this supposition.  See, e.g.,

27

Intellectual Sci. & Tech., Inc. v. Soney Elecs., Inc., 589 F.3d 1179, 1184 (Fed. Cir. 2009) ("An expert's unsupported conclusion on the ultimate issue of infringement will not alone create a genuine issue of material fact.").

What e-LYNXX describes is not a vendor pool as the court construed the term. The claims discuss a vendor pool *associated* with a buyer, and the court's construction of this term contemplates the system creating a subset of vendors, associated with the buyer, against whom the client's job specifications may then be compared. Culled to its essence, e-LYNXX's argument is that when a print manager runs a search on the PPM4 system, the entire database of vendors becomes "associated" with the buyer. (See Doc. 266 at 22). This is inconsistent with the court's claim constructions. The '143 patent's claims require that a subset of vendors be drawn from a database before running a job specification comparison. There is no genuine factual dispute that InnerWorkings' system does not compare a buyer's job specifications to anything less than the entire network of vendors in its database. Accordingly, the PPM4 system cannot, as a mater of law, infringe the '143 patent, and the court will grant InnerWorkings' motion for summary judgment as to the '143 patent.

iii.  Cirqit's Motion for Summary Judgment

Cirqit posits that each asserted independent claim of the '143 and '106 patents requires the receipt of electronic communications from a plurality of vendors, used to create "vendor records" that reflect "vendor capability data," and requires an automatic comparison of vendor capabilities with job data submitted by

28

the buyer.  Cirqit's Order-It system cannot infringe, they argue, because only buyers can populate the system with information about vendors, meaning Order-It does not receive electronic communications *from vendors* as required by the claims. Second, the system does not store "vendor capability data" as the court has construed that term, or use that data to evaluate a vendor's fitness for a particular bid.  Rather, the only information used by the system to determine a vendor's participation in the bidding process relates to the vendor's business type and goods sold.

In its claim construction order, the court construed the terms "vendor records" and "vendor capability data."  Vendor records is the broader term of the two, which the court interpreted to mean "a set of attributes associated with a vendor," rejecting defendants' argument that vendor records meant "data input into the system *by the vendor* which identifies the vendor's capabilities."  (Doc. 205 at 14 (emphasis added)).  The court agreed with defendants that "vendor capability data" is a subset of vendor records and refers to "two or more capabilities of a vendor to manufacture or produce a customized good or service and excluding the vendor's name, contact information, payment preferences, type of business and goods sold."  (Id. at 14-15).  However, the court was not persuaded that vendor records had to be input into the system by the vendors themselves, but rather could be input by an intermediary or third party.

Claim 1 of the '143 patent claims a method for facilitating the buying of customized goods or services, requiring a step for "receiving and processing

29

electronic communications from a plurality of vendors." '143 patent, col. 18, ll. 59-61. The electronic communication is used to "establish[] a plurality of vendor records," which includes "vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service." Id. col. 18, ll. 65-68. Claims 2 of the '143 patent and 13 of the '106 patent claim systems that "receive and process electronic communications from a plurality of vendors." '106 patent, col. 21, ll. 1-2; '143 patent, col. 20, ll. 3-4.

As a threshold matter, Cirqit argues that summary judgment is appropriate because there is no genuine factual dispute that buyers, not vendors, submit the electronic communications used to establish vendor records, but this simply refashions an argument Cirqit lost at claim construction. In rejecting defendants' proposed construction of "vendor records," the court recognized that the vendor records "need not be input by the vendors themselves, but may be input by an intermediary or third-party," (Doc. 205 at 15), because the specification describes an alternative embodiment in which vendor attributes are entered by the print buyers. See '106 patent, col. 11, ll. 31-34. Cirqit's argument that the Order-It system cannot, as a matter of law, infringe e-LYNXX's patents merely reargues its construction of "vendor records," and is accordingly rejected.

Cirqit argues in the alternative that the Order-It system cannot infringe because it does not store or evaluate suppliers on the basis of vendor capability data. As noted *supra*, the court construed this term to refer to a vendor's capabilities to manufacture or produce a particular good or service, but not

including the vendor's name, contact information, payment preferences, type of

business or goods sold. Cirqit claims that the Order-It system relies exclusively on

the vendor's type of business and what goods they sell in determining their

suitability for a particular job.

The Order-It system allows a user to enter information about what a vendor

can produce. This information includes whether the vendor sells such products as

one and two color manual documentation, product catalogs, envelopes, bound

commercial printing with one or two text sections, commercial print catalogs, die

cut mailers, letters, cards, pocket folders, posters, stationary and business cards, flat

or folded commercial printing, and flat or folded financial printing, among others.

(See Enhancement Release Notes for Order-It, Br. in Supp. Ex. B, Doc. 233-3 at 22).

Cirqit argues that this information falls under the aegis of the types of goods that

the vendor sells, rather than data identifying the vendor's capabilities, an example

of which could include the vendor's ability to print four colors in one pass. The

court agrees.

e-LYNXX views the distinction in terms of the level of generality – paper

goods generally would be the type of goods sold, within which some vendors would

have the "capability" to sell envelopes – but this argument is unpersuasive. The

Order-It system can readily be distinguished from the vendor capability

information contemplated in e-LYNXX's patents by considering one embodiment

described in the patent specification. Figure 10 shows a specific embodiment of the

invention in which the buyer indicates, by clicking radio buttons in a web browser,

31

whether the vendor must have a press capable of printing four colors in one pass, whether the vendor's ink must be at least 20% vegetable oil, whether the user requires laser proof ink, and whether the vendor must be able to perform ink matching.  <u>See</u> '143 patent, fig. 10.  The buyer is able to specify whether a vendor must have these capabilities in order to receive an invitation to bid on a print job.  <u>See</u> <u>id.</u> at col. 13, ll. 2-3, 22-26.  But the Order-It system does not store this type of information about vendors.  Rather, it compares vendors based on the type of goods that they sell – envelopes, letters, cards, posters, and so forth.  (<u>See</u> Garno Decl., Br. in Supp. Ex. B, Doc. 233-2 at ¶ 2).  Therefore, the patent claims do not read literally on Cirqit's product, and summary judgment is appropriate.[3]

**V.**     <u>**Conclusion**</u>

For the reasons previously discussed, the court will deny e-LYNXX's motion to strike and defendants' motion for leave to file an amended complaint, and will grant the motions for summary judgment of Cirqit and of InnerWorkings.  An appropriate order will issue.

　　　　　　　　　　 S/ Christopher C. Conner
　　　　　　　　　　CHRISTOPHER C. CONNER
　　　　　　　　　　United States District Judge

Dated: July 25, 2013

---

[3] Though it raises a doctrine of equivalents argument in its brief, e-LYNXX advances that argument in response only to Cirqit's point on who enters the vendor records into the system.  e-LYNXX does not make that argument with respect to the vendor capability argument.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Conner)** |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 25th day of July, 2013, upon consideration of the motions for

summary judgment on the grounds of non-infringement (Docs. 232, 235), filed by

defendants Cirqit.com, Inc. ("Cirqit"), and InnerWorkings, Inc. ("InnerWorkings"),

respectively, the motion for leave to file an amended answer (Doc. 252), filed jointly

by defendants, and plaintiff e-LYNXX Corporation's motion to strike Cirqit's

summary judgment evidence (Doc. 259), and for the reasons discussed in the

accompanying memorandum, it is hereby ORDERED that:

    1.    Defendants' motion for leave to file an amended answer (Doc. 252) is DENIED.

    2.    e-LYNXX's motion to strike Cirqit's summary judgment evidence (Doc. 259) is DENIED.

    3.    e-LYNXX's request for oral argument (Doc. 299) is DENIED.

A-000196

4.  InnerWorkings' motion for summary judgment (Doc. 235) is GRANTED.

5.  Cirqit's motion for summary judgment (Doc. 232) is GRANTED.

6.  InnerWorkings motion to exclude the testimony of e-LYNXX's damages expert Clifford L. Fry, Ph.D. (Doc. 295), pursuant to Federal Rule of Evidence 702, is DENIED is moot.

7.  The Clerk of Court is directed to close the case.

                                    __S/ Christopher C. Conner__
                                    CHRISTOPHER C. CONNER
                                    United States District Judge

AO 450 (Rev. 01/09)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
## MIDDLE DISTRICT of PENNSYLVANIA

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    1:10-CV-2535 |
| INNERWORKINGS, INC., | ) | (Judge Conner) |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus postjudgment interest at the rate of _____ %, along with costs.

☐   the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)*
_____ recover costs from the plaintiff *(name)*
_____ .

X   other:   Summary judgment be and is hereby entered in favor of defendant INNERWORKINGS, INC., and against
plaintiff e-LYNXX CORPORATION, in accordance with the court's memorandum and order (Doc. 302), dated
July 25, 2013.

This action was *(check one)*:

☐   tried by a jury with Judge or Magistrate Judge _____ presiding, and the jury has
rendered a verdict.

☐   tried by Judge or Magistrate Judge _____ without a jury and the above decision

X   decided by Judge or Magistrate Judge        Judge Christopher C. Conner        on a motion for

SUMMARY JUDGMENT

Date: _____ Jul 25, 2013 _____            *CLERK OF COURT*    MARY E. D'ANDREA

K. McKinney, Deputy Clerk

_____
*Signature of Clerk or Deputy Clerk*

**A-000198**

# UNITED STATES DISTRICT COURT
for the
## MIDDLE DISTRICT of PENNSYLVANIA

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.  1:10-CV-2535 |
| CIRQIT.COM, INC., | ) | (Judge Conner) |
| _Defendant_ | ) | |

### JUDGMENT IN A CIVIL ACTION

The court has ordered that _(check one)_:

☐  the plaintiff _____ recover from the
defendant _(name)_ _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus postjudgment interest at the rate of _____ %, along with costs.

☐  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant _(name)_
_____ recover costs from the plaintiff _(name)_
_____ .

X  other:  Summary judgment be and is hereby entered in favor of defendant CIRQIT.COM, INC., and against plaintiff e-LYNXX CORPORATION, in accordance with the court's memorandum and order (Doc. 302), dated July 25, 2013.

This action was _(check one)_:
☐  tried by a jury with Judge or Magistrate Judge _____ presiding, and the jury has rendered a verdict.

☐  tried by Judge or Magistrate Judge _____ without a jury and the above decision

X  decided by Judge or Magistrate Judge _____Judge Christopher C. Conner_____ on a motion for

SUMMARY JUDGMENT

Date: _____Jul 25, 2013_____

_CLERK OF COURT_   MARY E. D'ANDREA

K. McKinney, Deputy Clerk

_____
_Signature of Clerk or Deputy Clerk_

**A-000199**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| Plaintiff, | : | |
| | : | (Chief Judge Conner) |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

Presently before the court in the above-captioned matter is plaintiff e-LYNXX Corporation's ("e-LYNXX") motion to alter or amend judgment (Doc. 308), arising from the court's memorandum and order granting summary judgment in favor of defendants InnerWorkings, Inc. ("InnerWorkings") and Cirqit.com, Inc. ("Cirqit"). (Doc. 302). For the reasons set forth below, the court will deny the motion.

## I. Factual Background and Procedural History

In the instant patent infringement action, plaintiff e-LYNXX alleges that defendants InnerWorkings and Cirqit infringed U.S. Patent No. 7,451,106 (the "'106 patent") and U.S. Patent No. 7,788,143 (the "'143 patent"). (See Doc. 117). Both the '106 patent and the '143 patent cover procurement systems for competitive bidding on customized goods and services. The patents share the same specification, which

describes the invention as "[a]n apparatus and method for selecting a lowest bidding vendor from a plurality of vendors of a customized good or service." '106 patent, abstract; '143 patent, abstract. The invention seeks to streamline the process for procuring customized goods or services by reducing the search costs for buyers.

Defendant InnerWorkings provides global print management and promotional products to corporate clients in a variety of industries. InnerWorkings procures, manages, and delivers print materials for its clients through a system known as Print Procurement Manager 4 ("PPM4"), which contains approximately 9,000 vendors of print products. InnerWorkings' clients do not have direct access to the PPM4 system. The clients communicate the specifications of their proposed jobs to print procurement managers at InnerWorkings, who in turn input this information into the PPM4 system. The PPM4 system then compares job data against the entire database of vendors in order to identify the best vendor for a particular job.

Defendant Cirqit developed and sold the Order-It system, which allows buyers to submit to vendors invitations to bid on contracts for customized paper goods, such as letterhead and envelopes. Unlike PPM4, buyers have direct access to the Order-It system and may solicit bids from vendors who have submitted information to the system regarding their type of business and available goods.

On December 14, 2010, e-LYNXX filed the instant action against several defendants, including InnerWorkings and Cirqit, alleging infringement of claims

2

13–16 and 18 of the '106 patent, and claims 1 and 2 of the '143 patent.[1]  (See Doc.

117).  In August and September 2011, the parties filed briefs regarding their

respective claim constructions, and defendants moved for summary judgment on

the ground of patent invalidity.  (Docs. 112, 113, 125, 126).  On October 11, 2011, the

court heard oral argument on summary judgment and held a claim construction

hearing pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

(Doc. 163).  On September 27, 2012, the court issued a memorandum and order

denying the motion for summary judgment and construing the disputed claim

terms.  (Doc. 205).  Cirqit and InnerWorkings subsequently moved for summary

judgment on the claims of patent infringement.  (Docs. 232, 235).  On July 25, 2013,

the court granted summary judgment in favor of Cirqit and InnerWorkings.  (Docs.

302, 303, 304).  On August 22, 2013,[2] e-LYNXX filed the instant motion to alter or

amend judgment pursuant to Federal Rule of Civil Procedure 59(e).  (Doc. 308).  The

motion has been fully briefed and is ripe for disposition.

---

[1] e-LYNXX alleges infringement of independent claim 13 and dependent claims 14, 15, 16, and 18 of the '106 patent, and independent claims 1 and 2 of the '143 patent.  "An independent claim is completely self-contained.  A dependent claim refers back to an earlier claim and is considered to include all of its own limitations as well as those of the referenced claim."  HERBERT F. SCHWARTZ AND ROBERT J. GOLDMAN, PATENT LAW AND PRACTICE § 2.III.B.1 (7th ed. 2011).  To infringe a dependent claim, one must necessarily infringe the independent claim to which it refers.  Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

[2] e-LYNXX timely filed the motion to alter or amend judgment as Docket No. 307.  At the request of the Clerk of Court, e-LYNXX re-filed the instant motion and supporting brief as two separate documents on August 26, 2013.  (Docs. 308, 309).

3

A-000202

## II.    **Legal Standard**

Motions for reconsideration under Federal Rule of Civil Procedure 59(e) serve primarily to correct manifest errors of law or fact in a prior decision of the court.  See United States v. Fiorelli, 337 F.3d 282, 288 (3d Cir. 2003); Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985).  Under Rule 59(e), "a judgment may be altered or amended if the party seeking reconsideration establishes at least one of the following grounds:  (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  Max's Seafood Cafe *ex rel.* Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).

However, "[a] motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant."  Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002) (internal citation and quotations omitted).  Furthermore, a party may not utilize a Rule 59(e) motion to introduce new evidence or arguments that could have been raised prior to judgment, or "'simply change[ ] theories and [try] again,' thus giving [the movant] 'a second bite at the apple.'"  Prusky v. Prudential Ins. Co. of Am., 44 F. App'x. 545, 548 n.1 (3d Cir. 2002) *(*quoting Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1231 (3d Cir.1995) (alterations in original)); McDowell Oil Serv., Inc. v. Interstate Fire & Cas. Co., 817 F. Supp. 538, 541 (M.D. Pa. 1993).  Reconsideration of a judgment is an

A-000203

extraordinary remedy, and the court grants such motions sparingly.  D'Angio v. Borough of Nescopeck, 56 F. Supp. 2d 502, 504 (M.D. Pa. 1999).

It follows from the remedial purpose of a Rule 59(e) motion that the standard of review relates back to the standard applicable in the underlying decision.  See Fiorelli, 337 F.3d at 288.  When a motion to alter or amend judgment challenges the court's decision to grant or deny summary judgment, Federal Rule of Civil Procedure 56 controls the analysis.  Relief may be granted if the materials related to the summary judgment motion—including the pleadings, discovery materials, and affidavits—"show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The court should consider all facts in the light most favorable to the non-moving party to determine whether a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 250-57; Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).

Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention" during the term of the patent, commits patent infringement.  The larger question of infringement can be distilled to two discrete issues: what is the thing that was patented, and has the accused infringer made that thing?  See ROBERT L. HARMON, ET AL., PATENTS AND THE FEDERAL CIRCUIT 463 (10th ed. 2011).  To be liable for direct infringement of a method claim, an alleged infringer "must perform all the steps of the claimed

A-000204

method, either personally or through another acting under his direction or control."
Akamai Tech., Inc. v. Limelight Networks, Inc., 692 F.3d 1301, 1307 (Fed. Cir. 2012).
The plaintiff must prove by a preponderance of the evidence that "the accused
device contains each limitation of the asserted claim(s)." Bayer AG v. Elan Pharm.
Research Corp., 212 F.3d 1241, 1247-48 (2000). There is no literal infringement, as a
matter of law, "[i]f any claim limitation is absent from the accused device." Id.; see
also HARMON, ET AL., at 467-68 (noting that the Federal Circuit has adopted the "All
Limitations Rule," meaning that to establish infringement, "every limitation set
forth in a claim must be found in an accused product or process exactly or by a
substantial equivalent").

## III.  **Discussion**

e-LYNXX raises issues unique to each defendant in its motion to alter or
amend the court's judgments in favor of InnerWorkings and Cirqit. The court will
therefore address the issues for each defendant separately.

### A.  **InnerWorkings' Summary Judgment**

In its motion for summary judgment, InnerWorkings' arguments centered on
the court's construction of the claim term "buyer." During claim construction, the
court rejected e-LYNXX's proposed construction that "buyer" means simply "one
who makes a purchase." (Doc. 205 at 9). The court reasoned that the claims clearly
intended to distinguish between an intermediary acting on behalf of a buyer and a
buyer as the ultimate purchaser. (Id. at 9-10). Accordingly, the court adopted the
defendants' proposed construction and construed "buyer" to mean "the ultimate

A-000205

purchaser of customized goods or services." (Id. at 9-11). Applying this construction in the context of InnerWorkings' Rule 56 motion, the court concluded that the PPM4 system does not include two elements of e-LYNXX's patents: first, the buyer does not have access to PPM4 to procure bid jobs through electronic communications, and second, PPM4 does not associate a pool of vendors with the buyer. (Doc. 302 at 20).

As to the first element, the parties did not dispute that a buyer cannot access the PPM4 system to submit an electronic communication to identify the vendors in the buyer's vendor pool. (See id.) e-LYNXX argued that the court's construction of "electronic communication" indicated that a third party may send electronic communications to the PPM4 system on behalf of a buyer. (See id. at 21-22). However, claim 13 of the '106 patent provides that such information identifying the vendors in a buyer's vendor pool be communicated through an electronic communication "from any buyer using the system." '106 patent, col. 21, ll. 11-12. Contrary to e-LYNXX's assertions, the court concluded that the surrounding language of claim 13 requires such electronic communications to originate from a buyer. (Doc. 302 at 21-22). Moreover, the prosecution history of the '106 patent indicates that the patentee surrendered its claim to a system that is not accessed directly by a buyer. (See id. at 23-25).

The PPM4 system also does not infringe the '143 patent because it does not associate a pool of vendors with a buyer. (See id. at 25-28). Claim 1 of the '143 patent describes an electronic communication from or on behalf of a buyer

7

A-000206

"identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation." '143 patent, col. 19, ll. 1-5. In its claim construction order, the court construed the term "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer." (Doc. 205 at 54). e-LYNXX argued that the court's construction did not mandate that different buyers have access to unique or different pools of vendors. (See Doc. 302 at 27). In the PPM4 system, the entire database of vendors becomes associated with a buyer whenever a comparison is conducted. (See id. at 28). However, the court concluded that vendors are not "associated" with a buyer unless a subset of vendors is drawn from the database before running a job specification comparison. (Id.) For these reasons, the court granted InnerWorkings' motion for summary judgment.

In the instant motion, e-LYNXX seeks to vacate the court's judgment in order to correct clear errors of law or fact. e-LYNXX first asserts that the court incorrectly assumes that InnerWorkings' clients, and not InnerWorkings, are the "buyers." (Doc. 309 at 3). For the first time, e-LYNXX attempts to create a distinction between intermediaries in a resale transaction and intermediaries in a principal-agent relationship with the buyer. (See id. at 5-7; Doc. 317 at 5-8). e-LYNXX argues that the court intended to exclude from the term "buyer" only intermediaries in a principal-agent relationship with a buyer. (Doc. 317 at 7-8). In contrast, intermediaries in a resale transaction, such as InnerWorkings, are the ultimate purchasers because the supplier-intermediary transaction takes place

8

A-000207

within the infringing PPM4 system, whereas the intermediary-client resale transaction is external to the PPM4 system. (Doc. 309 at 5-7). Specifically, InnerWorkings submits the job specifications, enters into the contract with the vendor, and bears sole liability for the contract. (Id. at 7-8; Doc. 317 at 7-8). Any subsequent transaction with the client is unrelated to the vendor or the PPM4 system. (Doc. 309 at 7-8).

Clearly, e-LYNXX has waived this argument. Generally, a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) "may not be used to present a new legal theory for the first time or to raise new arguments that could have been made in support of the original motion." Sullenberger v. Jobe, No. 06-430, 2008 WL 2705216, at *1 (W.D. Pa. July 8, 2008); Hill v. Tammac Corp., No. 1:05-CV-1148, 2006 WL 529044, at *2 (M.D. Pa. Mar. 3, 2006). In its opposition to the motion for summary judgment, e-LYNXX alleges in a conclusory manner that InnerWorkings is the "buyer" because it has "complete, final, and ultimate contractual liability to the vendors." (Doc. 266 at 6). At no point did e-LYNXX challenge the claim construction of the term "buyer," nor did e-LYNXX argue any distinction between intermediaries in the application of the term "buyer" to undisputed facts. Thus, e-LYNXX's instant motion represents precisely the type of procedural maneuvering that is ineffectual under Rule 59(e). See Bhatnagar, 52 F.3d at 1231 (stating that parties may not utilize motions for reconsideration as opportunities to change theories or receive "a second bite at the apple"). The court will neither consider nor reconsider e-LYNXX's delayed distinction between

9

intermediaries in order to challenge the court's construction and application of the term "buyer."[3]

E-LYNXX also seeks to alter or amend the court's judgment regarding claims 1 and 2 of the '143 patent.  e-LYNXX asserts that all of the vendors in the PPM4 database comprise the "a pool of vendors associated with" InnerWorkings

---

[3] In the exercise of caution, the court is compelled to note that e-LYNXX's argument is without merit.  e-LYNXX argues that InnerWorkings is the "ultimate purchaser" within the infringing system and therefore fits into the court's construction of the term "buyer."  (See Doc. 309 at 5-8).  In reality, e-LYNXX seeks to circumvent the court's construction by creating a limiting distinction between intermediaries.  As previously discussed, the court rejected e-LYNXX's proposal that a "buyer" means simply "one who makes a purchase."  (Doc. 205 at 9).  The court observed that the term "buyer" is often preceded by claim language distinguishing an intermediary from the ultimate purchaser.  (Id.)  A broad construction of buyer would swallow any distinction between a "buyer" and one who purchases "from or on behalf of" a buyer.  (Id. at 10).  Moreover, the specification supports the distinction between buyer and intermediary because it indicates that job data for soliciting bids is based on a buyer's preferences, as opposed to any intermediary acting on behalf of a buyer.  (Id. at 10-11).  Therefore, the court construed "buyer" to mean "the ultimate purchaser of customized goods or services."  (Id. at 9).

e-LYNXX provides no evidence whatsoever to support a distinction between an intermediary in a resale transaction and an intermediary in a principal-agent relationship with a buyer.  Neither the claims nor the specification suggest that actions "from or on behalf of" a buyer require that an intermediary possess binding authority over a buyer as an agent.  (See id. at 9-10).  There is also no indication that an intermediary with sole contractual liability to the vendors does not act "from or on behalf of" a buyer.  In either case, the parties do not dispute that the job data originates from the buyer, not the intermediary.  (See Doc. 316 at 6-7; Doc. 317 at 12-13).  Such a distinction between intermediaries merely creates an improper limitation on the claims and seeks to circumvent the claim construction of "buyer." See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed Cir 2004) ("[T]he claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion of restriction.'") (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)).  For all of these reasons, e-LYNXX's delayed attempt to challenge the court's construction of "buyer" is unavailing.

A-000209

because InnerWorkings is the only buyer in the system. (Doc. 309 at 9). The court need not consider this argument for two reasons. First, e-LYNXX's argument is merely reargument. The court has already determined that InnerWorkings is not a "buyer." The court concluded in its claim construction memorandum that a "buyer" is the "ultimate purchaser of goods or services." (Doc. 205 at 9). In its summary judgment memorandum, the court applied this construction to find that InnerWorkings' clients, and not InnerWorkings, are the buyers in the PPM4 system. (See Doc. 302 at 20-22). As the court previously stated, e-LYNXX may not simply raise a new argument pursuant to Rule 59(e) to challenge the court's prior decisions. See Hill, 2006 WL 529044, at *2 (stating that Rule 59(e) motions "may not be used to raise new arguments . . . that could have been raised prior to the entry of judgment").

Second, e-LYNXX fails to present any evidence of a clear error of law or fact. In its opposition to the motion for summary judgment, e-LYNXX stated that the court's construction for "a pool of vendors associated with said buyer" does not "contain a requirement that there must be unique vendor pools exclusively associated with a single buyer." (Doc. 266 at 14-15). Nevertheless, "certified vendors form a pool of vendors containing only certified suppliers which are selected out of the larger set of all suppliers contained in PPM4." (Id. at 16). In this motion, e-LYNXX again states that "all of the suppliers with vendor records stored in the PPM4 system are associated with InnerWorkings." (Doc. 309 at 9). "Even if the Asserted Patents do 'require that a subset of vendors be drawn from a database

11

before running a job specification,' . . . . the PPM4 systems selects vendors from *only* the pool of certified vendors." (Id. at 10) (internal citation omitted).

The court previously concluded that there was no genuine factual dispute that the PPM4 system does not compare job specifications to anything less than the entire database of vendors. (Doc. 302 at 28). For this reason, the PPM4 system does not satisfy the requirement that a subset of vendors be "associated" with a buyer before running a comparison. (Id.) The court finds that e-LYNXX fails to provide any evidence of a "clear error of fact or law" and merely seeks to relitigate the court's prior conclusions. Therefore, the court will deny e-LYNXX's motion to alter or amend judgment on claims 1 and 2 of the '143 patent.

## B. Cirqit's Summary Judgment

The court granted summary judgment in favor of Cirqit because the Order-It system does not store or evaluate a potential vendor using "vendor capability data" as required by both the '143 and '106 patents. (Id. at 30-32). The court construed the term "vendor capability data" to mean "two or more capabilities of a vendor to manufacture or produce a customized good or service and excluding the vendor's name, contact information, payment preferences, type of business and goods sold." (Doc. 205 at 16-18). Applying this construction, the court found that the only information the Order-It system uses to invite bids from vendors relates to a vendor's type of business and goods sold. (See Doc. 302 at 31-32).

e-LYNXX presently moves to alter or amend summary judgment because the court erroneously assumes that the patentee's disclaimer of "goods sold" from

12

"vendor capability data" includes both goods ready to be sold and goods to be produced. (Doc. 309 at 3-4). This argument seeks to relitigate the court's construction and application of the term "vendor capability data," and the court rejects it.

In the prosecution history, the patentee unequivocally disavowed "goods sold" from a vendor's "plurality of capabilities" in order to distinguish the application from U.S. Patent No. 5,794,207 (the "Walker '207 Patent"). (See Doc. 205 at 16-18). As a result, the court adopted defendants' construction for "vendor capability data" with an express disclaimer for "goods sold." (Id.) The court notes that, during the claim construction phase, e-LYNXX did not request that the court construe the term "goods sold," nor did e-LYNXX assert a distinction between "goods sold" from inventory and goods to be produced in accordance with a buyer's specifications.

e-LYNXX first asserted a distinction between "goods sold" and goods to be produced in its opposition to summary judgment. e-LYNXX posited that, under the Walker '207 Patent, "goods sold" is a description of an existing product or service offered by a vendor, such as an airline ticket or rare coins. (Doc. 260 at 15). Accordingly, the vendor information within the Order-It system is not akin to "'goods sold' for which a product already exists, but rather vendor capabilities for producing a particular type of product or product feature based on their equipment." (Id. at 17). In essence, e-LYNXX sought to avoid the "goods sold"

13

exclusion from "vendor capability data" by equating goods to be produced with a vendor's capability to produce such goods.

The court explicitly rejected this argument because it is inconsistent with the specification.  (See Doc. 302 at 31-32).  The patent specification includes examples of "vendor capability data," such as printing four colors in one pass or ink matching, which clearly distinguish "vendor capability data" from "goods sold."  See '143 patent, fig. 10.  The court found that the Order-It system does not maintain any information similar to the examples of "vendor capability data."  It stores only information regarding the types of goods that a vendor sells, such as product catalogs, envelopes, letters, cards, posters, and stationary and business cards.  (See Doc. 302 at 31-32).  Thus, Cirqit's Order-It system does not satisfy an element of the '106 and '143 patents to be liable for patent infringement.

In the motion at bar, e-LYNXX modifies its previous argument and challenges the court's construction of the term "vendor capability data."  e-LYNXX now asserts that goods to be produced are separate and distinct "product categories," not "goods sold."  (Doc. 309 at 12-13).  Because e-LYNXX did not specifically disclaim "product categories" in the prosecution history,  such "product categories" fall within the court's construction of "vendor capability data."  (Id.) The record demonstrates that neither party requested claim construction on "product categories" or "goods sold" despite significant argument on the term "vendor capability data."  As the court discussed *supra*, e-LYNXX may not rely on a motion to alter or amend judgment to change theories and take "a second bite at

14

the apple." <u>Bhatnagar</u>, 52 F.3d at 1231; <u>see also</u> <u>Ogden</u>, 226 F. Supp. 2d at 606. e-LYNXX's modified argument is clearly another attempt to alter the court's construction of the term "vendor capability data" and prevent its application as construed to the instant matter. Accordingly, the court rejects e-LYNXX's motion to alter or amend judgment in favor of Cirqit.[4]

## IV.  **Conclusion**

For the above reasons, the court will deny e-LYNXX's motion to amend or alter the court's judgments in favor of InnerWorkings and Cirqit.

An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:  February 6, 2014

---

[4] In the exercise of caution, the court notes that, contrary to e-LYNXX's assertions, there is no viable distinction between goods ready to be sold and goods to be produced. e-LYNXX relies heavily on the Walker '207 Patent for its contention that "goods sold" clearly refers to goods that are ready to be sold from inventory. (<u>See</u> Doc. 309 at 11-12). However, e-LYNXX provides no support for such a limited construction of "goods sold" from either the prosecution history of the '106 and '143 patents, or the intrinsic evidence related to the Walker '207 Patent. In fact, the language of the Walker '207 Patent closely mirrors the asserted patents. The Walker '207 Patent states that "the buyer selects the subject of the goods he wants to purchase by selecting from a list of possible subjects . . . . [which] might include airline tickets, hotel rooms, rental cars, insurance, mortgages, clothing, etc." Walker '207 Patent, col. 16, ll. 3-7; (Doc. 309 at 12 n.4). For the patents-in-suit, e-LYNXX asserts that the buyer must add an "item" to the job by selecting from among the options in a drop down list before specifying "vendor capabilities data." (Doc. 309 at 14; <u>see</u> '106 Patent, figs. 5, 10). Neither the Walker '207 Patent's description of goods nor the '106 Patent's explanation of adding an "item" suggests that "goods sold" is limited to a good or item ready for sale at the time of order.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Chief Judge Conner)** |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

AND NOW, this 6th day of February, 2014, upon consideration of the motion to alter or amend judgment (Doc. 308) pursuant to Federal Rule of Civil Procedure 59(e), filed by plaintiff e-LYNXX Corporation, and for the reasons discussed in the accompanying memorandum, it is hereby ORDERED that the motion to alter or amend judgment (Doc. 308) is DENIED.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Chief Judge Conner)** |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

AND NOW, this 20th day of March, 2014, upon consideration of the parties'
joint motion to amend judgment (Doc. 324) and the memorandum and order of
court (Doc. 302) dated July 25, 2013, granting the motions for summary judgment
(Doc. 232, 235) by defendants Cirqit.com, Inc. ("Cirqit"), and InnerWorkings, Inc.
("InnerWorkings"), it is hereby ORDERED that the counterclaims by defendants
Cirqit and InnerWorkings (Docs. 136, 138) are DISMISSED as MOOT without
prejudice.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

A-000216